**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CRAIG M. ROSE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORP., TODD M. FRUCHTERMAN, STEPHANIE FIELDING, JONATHAN M. ROTHBERG, JOHN RODIN, LARRY ROBBINS, MARK HOROWITZ, WESTLEY MOORE, DEREK CRIBBS, and RANDY SIMPSON,<br><br>Defendants | ) | Civ. No. 2:22-cv-00854-EP-JBC<br><br>DEMAND FOR JURY TRIAL |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


NATURE OF THE ACTION ..... 1

I. JURISDICTION AND VENUE ..... 6

II. THE PARTIES ..... 7

A. PLAINTIFFS ..... 7

B. DEFENDANTS ..... 8

C. RELEVANT NON-PARTIES ..... 11

III. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ..... 13

A. LONGVIEW FORMS SPAC TO ACQUIRE A COMPANY WITH HIGH GROWTH POTENTIAL ..... 13

B. BUTTERFLY COMPANY BACKGROUND ..... 16

1. Butterfly's Products ..... 19

a. Ultrasound Devices ..... 19

b. Software Subscriptions ..... 23

2. Butterfly's Supplier Contracts Obligated the Company to Purchase Minimum Amounts of Inventory ..... 23

3. Butterfly's Initial Sales Strategy Focuses on Smaller E-Commerce and "Early Adopter" Customers ..... 29

C. BEFORE BUTTERFLY'S ULTRASOUND DEVICES ARE SUFFICIENTLY DEVELOPED AND RELIABLE, AND WITHOUT THE NECESSARY SALES FORCE IN PLACE, BUTTERFLY CHANGES ITS SALES STRATEGY TO FOCUS ON LARGER ENTERPRISE CUSTOMERS TO JUSTIFY INFLATED 2021 IPO FORECASTS TO INVESTORS ..... 32

D. BUTTERFLY REPORTS INFLATED FORECASTS IN THE DEFECTIVE PROXY/REGISTRATION STATEMENT THAT WERE UNACHIEVABLE AND LACKED ANY REASONABLE BASIS... 36

E. BUTTERFLY'S SALES FLOUNDER AS ENTERPRISE CUSTOMERS ARE SLOW OR UNWILLING TO ADOPT BUTTERFLY'S PROBES ..... 48

1. Enterprise Customers are Slow or Unwilling to Adopt Butterfly's Products Because They Were Still in the Early Stages of Development and Lacked Critical Functionality ..... 48

2. Enterprise Customers are Slow to Adopt Butterfly Products Due to Excessive Pricing ..... 49

3. Butterfly's Belated Hiring of a Sales Force with Appropriate Experience Delays Selling to Enterprise Customers ..... 50

4. Butterfly is Forced to Hire PwC to Develop a Strategy for Targeting Enterprise Customers to Increase Sales ........ 53

F. BUTTERFLY INTERNALLY REVISES ITS 2021 IPO FORECASTS DOWNWARD WHILE PUBLICLY REAFFIRMING GUIDANCE ........ 53

G. LACK OF DEMAND FROM ENTERPRISE CUSTOMERS RESULTS IN A BUILD-UP OF UNUSABLE INVENTORY AND EVENTUAL INVENTORY WRITE-OFFS AND DOWNWARD ADJUSTMENT TO THE 2021 IPO FORECASTS ........ 54

IV. ADDITIONAL ALLEGATIONS RELATING TO PLAINTIFFS' CLAIMS UNDER SECTIONS 11 AND 15 OF THE SECURITIES ACT OF 1933 ........ 60

A. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE DEFECTIVE PROXY/REGISTRATION STATEMENT ........ 61

1. Butterfly's Software Was "Objectively Lagging" and Not Valued by Healthcare Institutions or Other Potential Enterprise Customers ........ 61

2. Butterfly's 2021 IPO Forecasts Lacked Any Reasonable Basis ........ 87

3. The Risks of Excess Inventory Had Already Materialized ........ 91

4. The Risk of Write-Downs and Purchase Commitment Losses Had Already Materialized and Were Ongoing ........ 94

5. The Risk of Obsolete Hardware Had Already Materialized ........ 96

B. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE INVESTOR PRESENTATION MATERIALS INCORPORATED INTO THE DEFECTIVE PROXY/REGISTRATION STATEMENT BY REFERENCE ........ 99

1. No "Strong Initial Adoption" and "Momentum" at Healthcare Institutions ........ 99

2. Near Term Growth was Not Supported by a Pipeline of Enterprise Bookings ........ 104

3. Butterfly's 2021 IPO Forecasts Lacked Any Reasonable Basis ........ 108

4. Butterfly's Gross Margin Forecasts for 2021 Ignored the Company's Minimum Purchase Commitments and the Historical Lack of Demand ... 113

C. THE SECTION 11 DEFENDANTS VIOLATED ITEMS 303 AND 105 OF REGULATION S-K ........ 114

V. ADDITIONAL ALLEGATIONS RELATING TO PLAINTIFFS' CLAIMS UNDER SECTION 14(A) AND 20(A) OF THE EXCHANGE ACT AND RULE 14A-9 ........ 117

A. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE DEFECTIVE PROXY/REGISTRATION STATEMENT AND DOCUMENTS INCORPORATED THEREIN BY REFERENCE ........ 117

B. CAUSATION ........ 117

VI. ADDITIONAL ALLEGATIONS RELATING TO PLAINTIFFS' CLAIMS UNDER SECTIONS 10(B) AND 20(A) OF THE EXCHANGE ACT AND RULE 10B-5 ........ 118

A. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE DEFECTIVE PROXY/REGISTRATION STATEMENT AND DOCUMENTS INCORPORATED THEREIN BY REFERENCE ........ 118

B. MATERIALLY FALSE AND MISLEADING STATEMENTS PUBLISHED IN THE 39TH ANNUAL J.P. MORGAN HEALTHCARE CONFERENCE WEBCAST ON JANUARY 12, 2021 .......... 118

1. No "Strong Initial Adoption" and "Momentum" At Healthcare Institutions........ 119

2. Near Term Growth Was Not Supported By a Pipeline of Enterprise Bookings ........ 124

3. Butterfly's 2021 IPO Forecasts Lacked Any Reasonable Basis................ 128

C. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2020, FILED WITH THE SEC ON MARCH 29, 2021 ...... 137

1. Butterfly's Software Was "Objectively Lagging" and Not Valued by Healthcare Institutions or Other Potential Enterprise Customers ............. 137

2. The Risks of Excess Inventory Had Already Materialized....................... 158

3. The Risk of Obsolete Hardware Had Already Materialized...................... 160

D. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE MARCH 29, 2021 EARNINGS CALL ........ 162

E. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE MAY 2021 EARNINGS CALL, PRESENTATION, AND PRESS RELEASE ........ 167

1. Butterfly and its CEO and CFO Reaffirm the Company's Previously-Stated, Materially False and Misleading 2021 IPO Forecasts .............................. 167

F. MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE AUGUST 2021 EARNINGS CALL AND PRESENTATION........ 174

1. There Was No Strong Pipeline or Demand for Butterfly's Products......... 174

2. Butterfly's CFO Reaffirms the Company's Previously-Stated, Materially False and Misleading 2021 IPO Forecasts........ 177

G. THE 10(B) DEFENDANTS ACTED WITH SCIENTER ........ 183

1. Defendants Fielding and Fruchterman Disregarded Internal Reports and Data that Directly Contradicted Their Public Statements........................ 183

2. Insufficient Demand Was Frequently Discussed at Internal Company Meetings........ 185

3. Laurent Faracci's Departure Supports Scienter ........................................ 186

4. Defendants Fielding and Fruchterman Were Aware Enterprise Customers Were Slow or Unwilling to Adopt Butterfly's Probes Because It Was Butterfly's Core Business ........ 188

5. Defendants Fielding and Fruchterman Provided Due Diligence Materials on the Specific Subject Matters of the False Statements ........ 189

6. Chief Operating Officer David Perri Was Motivated to Use Insider Knowledge of Future Losses on Purchase Commitments to Sell Shares and Avoid the Future Losses in Stock Value........ 191

7. High Executive Turnover Supports Scienter ........ 193

H. LOSS CAUSATION ........ 194

I. PRESUMPTION OF RELIANCE........ 203

X. NO SAFE HARBOR ........ 205

XI. CLASS ACTION ALLEGATIONS ........ 206

COUNT I........ 209

COUNT II........ 210

COUNT III ........ 211

COUNT IV ........ 214

COUNT V ........ 215

PRAYER FOR RELIEF........ 216

DEMAND FOR JURY TRIAL........ 217

Court-appointed Lead Plaintiff, KNS Holdings LLC DBPP UA Jan. 1, 2016 and additional plaintiffs Carl Metzger and Dan Liu (together with KNS, "Plaintiffs"), on behalf of themselves and all persons similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of its undersigned Lead Counsel, which included, among other things, review and analysis of (i) Butterfly Network Inc.'s ("Butterfly") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) Butterfly's other public statements, including quarterly press releases, earning call transcripts and presentations; (iii) interviews with individuals who are former employees of Butterfly; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Butterfly and the industry in which it operates; and (v) review of pertinent court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of the following three classes:

   a. Securities Act Class: a class consisting of all persons who purchased or otherwise acquired public shares in Butterfly (including by way of exchange of publicly-listed Longview Acquisition Corp. ("Longview") shares) pursuant to or traceable to the defective proxy/registration statement that Defendants filed with the SEC on Form S-4 on November 27, 2020, and that was thereafter amended on Forms S-4/A on January 6, 2021, January 19, 2021, and January 26, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on January 26,

2021 (the "Defective Proxy/Registration Statement"). The Securities Act Class asserts claims under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§ 77k and 77o) in connection with Butterfly's initial public offering ("IPO"). These claims arise from the Section 11 Defendants' negligence, and do not assert that the Section 11 Defendants, in their capacity as defendants of the Section 11 claim, acted with scienter.

b. 14(a) Class: a class consisting of all persons who were solicited to approve the merger of Butterfly and Longview and who exchanged publicly-listed Longview shares for Butterfly Class A common stock rather than redeeming the same pursuant to the Defective Proxy/Registration Statement. The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)). These claims arise from the 14(a) Defendants' negligence and do not assert that the 14(a) Defendants acted with scienter.

c. 10(b) Class: a class consisting of all persons who purchased or otherwise acquired public Butterfly Class A common stock or other public Butterfly securities between January 12, 2021 and November 15, 2021, both dates inclusive (the "10(b) Class Period"). The 10(b) Class asserts claims under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.[1]

[1] Excluded from all Classes are: (a) Defendants and their immediate families; (b) current and former directors or officers of Butterfly or Longview; (c) any entity that has entered into a stockholder agreement or co-venture agreement with Butterfly, or was a Private Investment in Public Equities ("PIPE") investor in Butterfly; (d) any entity controlled, majority-owned or wholly owned, or affiliated with any of the above.

2. Butterfly went public on February 16, 2021 (the "IPO") via a billion-dollar merger (the "Merger") with special purpose acquisition company ("SPAC") Longview. Longview was a shell corporation with no business operations of its own incorporated for the explicit purpose of listing on a public exchange and subsequently acquiring or merging with a privately held, high growth potential company.

3. Founded in 2011 by Defendant Rothberg, Butterfly develops and sells ultrasound imaging devices. During the relevant time period, the Company offered two devices to the market—the iQ and the updated version, the iQ+. The devices are handheld ultrasound probes, which connect to a smartphone or tablet that displays the ultrasound images created by the device. Butterfly continues to sell the iQ+ but has discontinued the iQ.

4. Butterfly relies upon third-party vendors to manufacture the highly specialized microchips used in its probes, and upon other third-party vendors to assemble the probes. These vendors typically require Butterfly to enter into non-cancelable agreements to purchase minimum amounts of inventory based on forecasts that Butterfly provides in advance.

5. At the time of the Merger, Butterfly had only marketed and sold its ultrasound probes to smaller, direct-to-consumer and early adopter customers who were willing to use Butterfly's new technology before it was fully developed and a proven, widely accepted technology. These smaller customers, however, generated significantly less demand than what was in Butterfly's inventory from purchased inventory commitments. Thus, around the time of the IPO, Butterfly changed its sales strategy to focus on larger, enterprise customers (*e.g.*, large healthcare institutions) to grow sales. Confidential witnesses ("CW") who are former Butterfly employees confirmed that in order for Butterfly to successfully sell to larger, enterprise customers, it needed sufficiently developed software that could adequately integrate Butterfly's probes with the

enterprise customers' existing workflows and a sophisticated sales force that understood the customer's business needs and could facilitate the sale and implementation of Butterfly's products. At all relevant times hereto, Butterfly had neither.

6. According to the CWs, Butterfly was incapable of executing an enterprise sales strategy at the time of the IPO because the Company lacked an enterprise salesforce knowledgeable about how to market and sell to enterprise customers and enterprise customers were unwilling to use Butterfly's probes as they were still in the proof-of-concept stage lacking important functionality and features and not ready for "prime time."

7. Despite having an underdeveloped technology and no enterprise sales force, Defendants (defined below) provided inflated annual forecasts for 2021 through 2024 in the Defective Proxy/Registration Statement that lacked any reasonable basis. Yet Defendants told investors that Butterfly could achieve those forecasts because, among other things, the probe's software **"** is […] ***fully integrated with the clinical workflow***" resulting in purported "[s]trong initial adoption, excitement, and momentum" from enterprise customers, and "***strong demand in enterprise right now*** for Butterfly, not only as a unique ultrasound device, but for our total solution too" with "[n]ear term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets" that would drive scale.

8. CWs confirmed, however, that the forecasts for at least 2021 (the "2021 IPO Forecasts") were grossly overstated by at least 20% or more, and lacked any reasonable basis because they were based on an assumed growth rate that Butterfly had never even come close to achieving before, and were unsupported by any internal Company data.

9. Indeed, according to the CWs, the 2021 IPO forecasts were a "pie in the sky" that nobody at Butterfly, including management, took seriously because they were not based on any

underlying data, such as Butterfly's historical sales growth and current pipeline of viable enterprise customers. Nor did the 2021 IPO Forecasts factor in that the probes lacked key features and functionality required before enterprise customers would purchase them, and that Butterfly lacked a sufficiently staffed and capable enterprise sales force.

10. The Defective Proxy/Registration Statement also falsely stated that Butterfly's probes and software "***can integrate seamlessly into large health care systems***" and "gives enterprise customers a solution to the governance and workflow challenges" that had previously limited handheld ultrasound devices, even though Butterfly's technology was still in the proof-of-concept stage and lacked key features and functionality that prevented it from being able to fully integrate with enterprise workflows. The Defective Proxy/Registration Statement also falsely asserted that Butterfly's product was a "complete solution" for point-of-care medical imaging that "addresses [] the complex clinical workflow throughout a patient's care" when, in fact, Butterfly's underdeveloped software and inability to integrate with complex clinical workflows was a primary impediment to enterprise sales.

11. Further, Defendants failed to disclose that Butterfly had accumulated significant amounts of excess inventory pursuant to non-cancelable purchase commitments that were based on the inflated 2021 IPO Forecasts and, as a result, Butterfly would incur substantial losses from inventory it could not sell due to insufficient demand.

12. Without the benefit of accurate disclosure in the Defective Proxy/Registration Statement, Longview investors overwhelmingly approved the merger with Butterfly, and less than one percent redeemed shares. Likewise, investors acquired Butterfly shares pursuant or traceable to the Defective Proxy/Registration Statement at inflated prices.

13. CWs confirmed that, after the IPO and throughout 2021, Butterfly was unable to penetrate the enterprise market because enterprise customers were unwilling to adopt Butterfly's probes until they were fully developed and widely accepted. Thus, CWs stated that in May or June 2021, defendants Fielding (the Chief Financial Officer) and Fruchterman (Chief Executive Officer) belatedly decided to internally lower the forecasts disclosed in the Defective Registration Statement to reflect shortfalls in sales to enterprise customers and losses associated with excess inventory.

14. Yet, throughout the Class Period, the 10(b) Defendants publicly reaffirmed the false 2021 IPO Forecasts and made additional false and misleading statements, including that Butterfly had "strong demand in enterprise," while failing to disclose losses from inventory purchase commitments (among others), in violation of Section 10(b) of the Exchange Act, and Plaintiffs suffered losses therefrom.

## I. JURISDICTION AND VENUE

15. The claims asserted herein arise pursuant to §§11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), §§ 10(b), 20(a) and 14(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78n(a)), and SEC rules promulgated thereunder, including Rule 10b-5 (17 C.F.R. § 240.10b-5) and Rule 14a-9 (17 C.F.R. § 240.14a-9).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, § 22 of the Securities Act (15 U.S.C. § 77v), and §27 of the Exchange Act (15 U.S.C. § 78aa). In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

17. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), § 22 of the Securities Act (15 U.S.C. § 77v), and §27 of the Exchange Act (15 U.S.C. § 78aa) because many of the acts and practices complained of herein occurred in substantial part in this District, including the preparation and/or dissemination of materially false or misleading information.

## II. THE PARTIES

### A. Plaintiffs

18. Lead Plaintiff KNS Holdings LLC DBPP UA Jan. 1, 2016 purchased or otherwise acquired Butterfly Class A common stock pursuant or traceable to the Defective Proxy/Registration Statement and purchased or otherwise acquired Butterfly Class A common Stock during the 10(b) Class Period, as set forth in the certification filed with its Lead Plaintiff application (ECF 21-3), incorporated by reference herein, and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

19. Plaintiff Carl Metzger purchased or otherwise acquired Butterfly Class A common stock pursuant or traceable to the Defective Proxy/Registration Statement and before the expiration of the 180-day lock-up period, held Butterfly common stock as of the January 15, 2021 record date and was entitled to vote on the Merger at the February 12, 2021 special meeting of shareholders, and/or purchased or otherwise acquired Butterfly Class A common Stock during the 10(b) Class Period, as set forth in the certification filed with the Court (ECF 32-3), incorporated by reference herein, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

20. Plaintiff Dan Liu purchased or otherwise acquired Butterfly Class A common stock pursuant or traceable to the Defective Proxy/Registration Statement and before the expiration of the 180-day lock-up period, held Butterfly common stock as of the January 15, 2021 record date

and was entitled to vote on the Merger at the February 12, 2021 special meeting of shareholders, and/or purchased or otherwise acquired Butterfly Class A common Stock during the 10(b) Class Period, as set forth in the certification filed contemporaneously herewith, incorporated by reference herein, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

**B. Defendants**

21. Defendant Butterfly Network, Inc. ("Butterfly" or "Company") is a Delaware Corporation that throughout the Class Period was headquartered in Guilford, Connecticut. Butterfly's Class A stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BFLY." Butterfly develops for sale portable ultrasound probes and related software. On or about February 12, 2021, Butterfly completed a merger with Longview. The business combination resulted in the combined company being renamed "Butterfly Network, Inc." The Company's Class A common stock and warrants to purchase Class A common stock commenced trading on the NYSE on February 16, 2021 under the symbols "BFLY" and "BFLY WS", respectively.

22. Defendant Todd Fruchterman was, at all relevant times, Butterfly's Chief Executive Officer and President. Defendant Fruchterman replaced Butterfly's former-CEO, Laurent Faracci, who departed from Butterfly on January 23, 2021. Defendant Fruchterman gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

23. Defendant Stephanie Fielding was, at all relevant times, Butterfly's Chief Financial Officer. Defendant Fielding joined Butterfly on April 6, 2020 as Senior Vice President of Finance and was promoted to CFO in November 2020. Defendant Fielding resigned as Butterfly's CFO in February 2022, effective April 30, 2022.

24. Defendant Jonathan M. Rothberg is the founder of Butterfly and was, at all relevant times, Butterfly's Chairman of the Board of Directors. Defendant Rothberg gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

25. Defendant Dawn Carfora gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

26. Defendant John Hammergren gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

27. Defendant Gianluca Pettiti gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

28. Defendant S. Louise Phanstiel gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

29. Defendant Larry Robbins was the founder and Chairman of Longview and a Director of Butterfly after the completion of the Merger. Defendant Robbins authorized Mark Horowitz to sign the Defective Proxy/Registration Statement on his behalf as "Attorney-in-fact." Defendant Robbins gave consent to be listed in the Defective Proxy/Registration Statement as a director of the merged Company.

30. Defendant John Rodin was, at all relevant times, the Chief Executive Officer and a Director of Longview. Defendant Rodin signed the Defective Proxy/Registration Statement.

31. Defendant Mark Horowitz was at all relevant times the Chief Financial Officer and a Director of Longview. Defendant Horowitz signed the Defective Proxy/Registration Statement.

32. Defendant Westley Moore was at all relevant times a Director of Longview. Defendant Moore authorized Mark Horowitz to sign the Defective Proxy/Registration Statement on his behalf as "Attorney-in-fact."

33. Defendant Derek Cribbs was at all relevant times a Director of Longview. Defendant Cribbs authorized Mark Horowitz to sign the Defective Proxy/Registration Statement on his behalf as "Attorney-in-fact."

34. Defendant Randy Simpson was at all relevant times a Director of Longview. Defendant Simpson authorized Mark Horowitz to sign the Defective Proxy/Registration Statement on his behalf as "Attorney-in-fact."

35. The "14(a) Defendants" referred to herein are Defendants Butterfly, Rodin, Horowitz, Moore, Cribbs, Simpson and Robbins. The "10(b) Defendants" referred to herein are Defendants Butterfly, Fruchterman and Fielding. The "Section 11 Defendants" referred to herein are Defendants Rodin, Horowitz, Moore, Cribbs, Simpson, Robbins, Carfora, Hammergren, Pettiti, Phanstiel, Butterfly, Fruchterman and Rothberg. The 14(a) Defendants, 10(b) Defendants and Section 11 Defendants are referred to herein collectively as the "Defendants."

36. Defendants were directly involved in the management and day-to-day operations of the Company at the highest levels and/or were privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the 10(b) Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

37. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Securities Act and the Exchange Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, Defendants each had a

duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects. In addition, Defendants had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the relevant period violated these specific requirements and obligations.

38. Defendants Fruchterman and Fielding, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.

39. Defendants were provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### C. Relevant Non-Parties

40. CW 1 was employed at Butterfly as the Head of Global Supply Chain from July 2019 to August 2020 responsible for all aspects of Butterfly's hardware supply chain, except for wafers. CW 1 reported to John Tang, Head of Operations.

41. CW 2 was employed at Butterfly as a Strategic Account Executive from May 2021 to December 2021 and as an Acute Care Account Executive for the New England region from December 2021 to July 2022. CW 2's responsibilities included selling Butterfly products to any

customers outside of hospitals, such as physician offices, EMSs and EMTs. As an Acute Care Account Executive, CW 2 reported to Melissa Pavri, General Manager for the Northeast, and was responsible for selling Butterfly's products to the largest enterprise customers, including hospital systems. CW 2's entire team reported to Matt Combs who was Director of Sales.

42. CW 3 was employed at Butterfly as a Senior Finance Planning & Analysis Manager from June 2021 to November 2021 responsible for long-term forecast modeling. CW 3 initially reported to Marcelo Villanueva, who had reported to Defendant CFO Stephanie Fielding, and later reported to Jubin Pandey, a former consultant.

43. CW 4 was Director of Sales – South at Butterfly Network from July 2019 to April 2022. CW 4 was responsible for selling to all customer verticals, including enterprise (but not to veterinary practices). During his tenure CW 4 had several direct reports: CW 4 first reported to David Garner, then to Brett Jansen, and finally to Rhys Gay. Jansen and Gay had reported to Jan Grimm.

44. CW 5 was a Strategic Account Director at Butterfly Network from February 2021 to November 2022. CW 5 was responsible for supporting Butterfly's field sales teams and Regional Sales Directors on large deals involving "key accounts." During CW 5's tenure, CW 5 reported to several VPs and an executive. CW 5 first reported the Melissa Pavri, VP of Strategic Accounts who reported to Matt Combs, VP of Health Sales, but after a restructuring in the latter half of 2021, CW 5 reported to a new VP of Sales. When the new VP of Sales was terminated after only a month at Butterfly, CW 5 reported directly to the Chief Commercial Officer, Stacey Pugh, for several months until another VP of Sales was hired. However, this new VP of Sales was also let go shortly after being hired. CW 5 then reported to a new VP of Health Systems.

45. David Garner was Vice President Commercial at Butterfly from 2017 to 2020.

46. Brett Jansen was Vice President, Sales and New Market Development at Butterfly from July 2020 to October 2021.

47. Rhys Gay was Director, Community Hospital Sales from March 2021 to January 2022 and Regional Director, Acute Care at Butterfly since January 2022.

48. Jan Grimm was Chief Revenue Officer from February 2020 to August 2021.

## III. FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Longview Forms SPAC to Acquire a Company with High Growth Potential

49. Longview, a shell corporation with no business operations of its own, was incorporated in Delaware on February 4, 2020. Longview's team of executive officers and directors consisted of Larry Robbins as Chairman, John Rodin as Chief Executive Officer, Mark Horowitz as Chief Financial Officer, and Westley Moore, Derek Cribbs, and Randy Simpson as Directors.

50. Longview was incorporated for the explicit purpose of listing on a public exchange and subsequently acquiring or merging with a privately held, high growth potential company. Companies formed for such a purpose are frequently known as Special Purpose Acquisition Companies or SPACs.

51. John Coates, speaking as Acting Director of the SEC's Division of Corporate Finance, described the SPAC structure as follows:

> The basics of a typical SPAC are complex, but can be simplified as follows. A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a "promote" – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the

> SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.
>
> But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell "holdco" issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called "de-SPAC" transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to "go public" and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

John Coates, "SPACS, IPOs and Liability Risk Under the Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021) (footnotes omitted).

52. The SPAC structure creates manager incentives to pursue a target that may not be in investors' best interest, and to avoid disclosures that may dissuade investors from exchanging shares in the merger. If a merger is completed within the allocated time frame, founders and managers of the SPAC generally reap windfall profits from their ownership of SPAC securities they obtained cheaply prior to the public offering and enjoy considerable control such as the ability to nominate board members to the new company.

53. In Longview's case, the sponsor purchased 8.625 million founders shares for just $25,000, or approximately $0.003 per share, and received a dividend of another 1.725 million shares, bringing the total founder shares to 10.35 million shares. Thus, the acquisition of virtually any company would be a profitable transaction for the founders, so long as the company's stock price remained greater than one-third of a cent. However, if an acquisition is not effectuated within the specified two-year time frame, then the SPAC is dissolved and the money in the trust is returned

to investors with no compensation paid to the founders and managers of the SPAC. Accordingly, the founders and management team of the Longview SPAC were highly incentivized to complete an acquisition within their deadline, even if the transaction may be to the detriment of the public shareholders.

54. The SPAC structure does not require a shareholder to exchange pre-merger SPAC shares into shares of the merged company. Instead, after what is supposed to be full disclosure of material information, such holders are afforded the opportunity to redeem shares prior to exchange. The redemption of shares directly impacts the working capital of the merged company, and indirectly impacts the economic interests of SPAC sponsors. As a result, SPAC sponsors and merger targets are highly incentivized to minimize the number of redemptions by SPAC shareholders.

55. Companies seeking to go public have increasingly turned to SPAC structures in recent years because they are faster than traditional IPOs, the price is determined in advance instead of by the market determining the price, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. However, SPAC mergers also have the potential to be rife with inaccurate disclosures, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. SEC officials have expressed concern over the recent surge in SPACS and, in particular, about the "baseless hype" by which many are sold. *See* John Coates, "SPACS, IPOs and Liability Risk Under the Securities Laws," https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (April 8, 2021). As SEC Chair Gary Gensler testified in front of Congress, the "surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected?" *See* https://www.sec.gov/news/testimony/gensler-2021-05-26.

56. Longview's offering documents, the Form S-1 registration statement filed with the SEC and declared effective on May 20, 2020, represented to investors that the Longview SPAC was sponsored by an affiliate of Glenview Capital Management. In the Form S-1, Longview stated that "Glenview seeks to invest [] in companies that it believes to be undervalued" and that "Glenview's investment team conducts substantial business, financial and legal due diligence on every investment before acquiring a meaningful ownership stake[.]"

57. Longview's offering documents also included a section titled "Acquisition Criteria" which specified the following:

> [] We intend to seek to acquire companies that we believe: [] Have a history of strong operating and financial results and strong fundamentals (we do not currently intend to acquire start-up companies or companies without a path to long-term profitability); [] Have a defensible market position with demonstrated advantages compared to competitors that create barriers to entry against new potential market entrants; [and] Have a diversified customer base better positioned to endure economic downturns, changes in the industry landscape and evolving customer, supplier and competitor preferences [].

58. Longview's Form S-1/A further stated, with regard to the acquisition process:

> In evaluating a prospective target business, we expect to conduct an extensive due diligence review which may encompass, among other things, meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, and a review of financial and other information about the target and its industry.

59. After Longview's Form S-1 became effective, the SPAC sold approximately 36 million "units," which consisted of one share and one-third of a warrant, for $10 per unit, generating approximately $360 million in proceeds.

**B. <u>Butterfly Company Background</u>**

60. Founded in 2011 by Defendant Rothberg, Butterfly develops and sells an ultrasound imaging device that uses microchips rather than the traditional piezoelectric crystals to create the images.

61. Butterfly has wholly owned subsidiaries located in Australia, Germany, the Netherlands, the United Kingdom, and Taiwan.

62. On November 19, 2020, Butterfly entered into a merger agreement with Longview.

63. On November 20, 2020, when Butterfly announced that it would become a publicly traded company by merging with Longview, the stock price of the SPAC exploded. Over a four-day period, Longview's stock price increased from $9.86 per share to $17.37 per share, a more-than 75% increase in price.

64. Additionally, while Longview's average daily trading volume prior to the Merger announcement had been less than 150,000 shares per day, the average daily trading volume during the four days following the announcement increased to more than 17 million shares per day – a nearly 120x increase in trading volume. The average daily trading volume after the announcement, through the completion of the merger, would remain at more than 4 million shares per day.

65. On January 26, 2021, the Defective Proxy/Registration Statement was declared effective, and on February 12, 2021, Longview's shareholders voted to approve the Merger.

66. The Merger was accomplished when then-private Butterfly merged into a Longview subsidiary, Longview amended its articles of incorporation, bylaws, and charter to rename itself Butterfly Network, Inc., and the new Butterfly Network, Inc. adopted a dual class structure of securities. In substance, Longview ceased to exist except as a matter of pure formalism, Longview shareholders became holders of Butterfly securities, and Butterfly securities became publicly traded for the first time.

67. Notably, all economically meaningful facts surrounding the Merger required the transaction to be accounted for as a reverse capitalization in which Longview was the acquired company. As the Defective Proxy/Registration Statement explained:

> [T]he Business Combination will be treated as the equivalent of Butterfly issuing stock for the net assets of Longview, accompanied by a recapitalization. [] Butterfly has been determined to be the accounting acquirer based on evaluation of the following facts and circumstances:
>
> - Butterfly's existing stockholders and holders of Butterfly convertible notes will have the greatest voting interest in the combined entity under the no and maximum redemption scenarios with over 90% of the voting interest in each scenario;
> - The largest individual stockholder of the combined entity is an existing stockholder of Butterfly;
> - Butterfly's senior management will be the senior management of New Butterfly; and
> - Butterfly is the larger entity based on historical revenue and has the larger employee base.
>
> ***The preponderance of evidence as described above is indicative that Butterfly is the accounting acquirer in the Business Combination***.

68. While the pre-Merger Longview had no operations of its own, the post-Merger Company had operations that were virtually identical to the pre-Merger operations of Butterfly, further demonstrating the practical and economic reality that Longview ceased to exist after the Merger. Not even the name "Longview" would survive the Merger, as Longview formally changed its name to Butterfly Network, Inc.

69. On February 16, 2021, the Class A common stock of Butterfly Network, Inc. began trading on the NYSE under the symbol BFLY.

70. Importantly, after the Merger was completed, Butterfly securities had no nexus to the information contained within the Longview Form S-1 that had been filed in May 2020; instead, every share of BFLY trading in the market on February 16, 2021 was explicitly linked to the Merger and to the information and representations contained within the Defective Proxy/Registration Statement by which the proxy vote was executed and the Merger completed.

1. **Butterfly's Products**

a. **Ultrasound Devices**

71. In the fourth quarter of 2018, Butterfly launched its first commercial product, the Butterfly iQ. The iQ consists of a handheld ultrasound probe, which connects to a smartphone or tablet that displays the ultrasound images created by the device. The smartphone or tablet also provides a user interface whereby the operator can change the device's settings.



72. Unlike traditional ultrasound imaging probes that rely upon piezoelectric crystals, the Butterfly iQ probes use microchips, which Butterfly refers to as its "Ultrasound-on-Chip" technology. The purported benefit of using microchips rather than piezoelectric crystals is that microchips purportedly could, if manufactured at scale, significantly reduce the production costs of ultrasound imaging devices.



73. Premiering at or around $2,000 per device, the iQ was marketed as significantly less expensive than traditional cart-based ultrasound machines, which sell for as much as $60,000. Even the competing handheld devices sell for an average price between $5,000 and $7,000.

74. In October 2020, two years after the launch of the Butterfly iQ, Butterfly launched the iQ+. In form, the iQ+ appears substantially identical to the iQ, though the iQ+ is slightly shorter and has a 15% smaller probe head. Functionally, the iQ+ is the same product as the first-generation iQ, but the iQ+ boasts a few advantages over the iQ, such as longer battery life, higher framerates, and increases in continuous run time.

75. While the iQ+ debuted at a higher price than the iQ, discounts at the time of introduction to market kept the price of the probes at or around $2,000 per probe. Accordingly, during the first nine months of 2020, the average product revenue per unit sold and shipped was approximately $2,055.

76. Prior to the Merger, Butterfly articulated an anticipated product release schedule for new products. Butterfly's "Expected Product Roadmap," Figure A, shown below, was included in Butterfly's Investor Presentation materials filed with the SEC on November 20, 2020 and incorporated into the Defective Proxy/Registration Statement by reference. In the Investor Presentation materials, the Company also published slides stating that Butterfly "[p]lans to launch new probe [sic] with technological updates every other year to ensure hardware superiority." Then-CEO Laurent Faracci elaborated during a live webcast on that same day, that "[i]n a Tesla-like fashion we plan not only to innovate on the hardware side, approximately every two years, but also push out monthly software updates to expand utility."

**Figure A.**




77. As shown below in Figure B, from the time Butterfly began selling its products in Q4 2018 to the end Q3 2020, Butterfly sold and shipped less than 27,000 iQ and iQ+ probes and there had been almost no acceleration to the rate at which Butterfly was selling and shipping probes prior to the IPO.

**Figure B.**




*See Defective Proxy/Registration Statement* at 222.

78. As discussed in further detail below, Butterfly's products were still in the early stages of development in 2020 and 2021 and not ready to be adopted by large healthcare institutions or other enterprise customers. Moreover, Butterfly did not have a ramped-up enterprise sales force at the time of the IPO and only began focusing on enterprise sales in 2021 and 2022. Thus, the rate at which Butterfly was able to sell its probes, particularly because it was unable to sell to enterprise customers, increased only marginally over the relevant period. Historical results later confirmed this, as shown below in Figures C and D.

**Figure C.**

Probes Sold and Shipped, by Quarter

| Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 |
|---|---|---|---|---|---|---|---|---|
| 3,711 | 4,997 | 3,947 | 7,553 | 5,013 | 6,485 | 5,556 | 6,714 | 5,106 |

*See Defective Proxy/Registration Statement* at 222, *Form 10-K for 2021* at 72, *Form 10-Q, Q1 2021* at 25, *Form 10-Q, Q1 2022* at 18.

**Figure D.**




*See Defective Proxy/Registration Statement* at 222, *Form 10-K for 2021* at 72, *Form 10-Q, Q1 2021* at 25, *Form 10-Q, Q1 2022* at 18.

**b. Software Subscriptions**

79. Butterfly also sells software subscriptions with its devices to purportedly provide users with, among other things, HIPAA compliant cloud storage and AI-assisted ultrasound imaging. Butterfly's software sales consist of monthly or yearly subscriptions, with a typical subscription cost of $420 per year per user. While the ultrasound device can be used without storing data in the cloud, proper data storage is often a prerequisite for insurance billing purposes.

80. Prior to the Merger, and in the Defective Proxy/Registration Statement, Butterfly claimed, among other things, that its software was "fully integrated into the clinical workflow" and was a "complete solution" for the challenges that had plagued point of care medical imaging. However, CW 3 confirmed that, when this witness began employment at Butterfly in June 2021, the software was still in the early stages of development and many of its features still lacked the functionality required by enterprise customers. CW 2 corroborated CW 3's account, stating that even shortly after the IPO, the software was still in a proof-of-concept stage.

81. Accordingly, as set forth in more detail below, enterprise customers were unwilling to adopt the probes because they lacked the necessary functionality. Moreover, CW 3 confirmed that many physicians and practitioners already knew how to operate the probes and did not need Butterfly's full software solution, which contributed to lower adoption of the software. Attempting to increase software subscription sales, Butterfly began requiring a software subscription with each Butterfly probe that was sold. The initial subscription period was a full year, after which customers could choose to decline to renew the subscription.

**2. Butterfly's Supplier Contracts Obligated the Company to Purchase Minimum Amounts of Inventory**

82. Butterfly relies upon third-party vendors primarily located in China, Taiwan and Thailand to supply materials and manufacture its probes. Butterfly initially obtained its custom-

made chips from a developmental fab in Sweden, called Silex, but later contracted to have Taiwan Semiconductor Manufacturing Company Limited ("TSMC") manufacture and supply the Company's chips. All of Butterfly's probes are assembled, tested, and shipped by Benchmark Electronics, Inc. from its facilities in Thailand.

83. Before agreeing to fabricate and supply Butterfly with the highly-specialized microchips necessary for the production of the Company's probes, Butterfly's most important supplier, TSMC, required the Company to agree to purchase minimum amounts of inventory. As described in the Company's Defective Proxy/Registration Statement filed with the SEC on January 26, 2021:

> *Purchase commitments:*
>
> The Company enters into inventory purchase commitments with third-party manufacturers in the ordinary course of business. These commitments are generally ***non-cancellable and are based on sales forecasts***. These agreements range from one to five-year periods and may contain fixed or minimum annual commitments, subject to certain provisions that allow the Company to renegotiate the commitment. The aggregate amount of minimum inventory purchase commitments as of December 31, 2019 was $36.4 million, which excludes the prepaid vendor advance described below.

84. TSMC also required Butterfly to enter into a purchase commitment where it had to ***prepay*** for the inventory (the "TSMC Contract"). The Defective Proxy/Registration Statement described the March 31, 2019 agreement with TSMC:

> During 2019, the Company entered into an agreement with a certain third party manufacturing vendor. Under the agreement, during the year ended December 31, 2019, the Company made a prepayment to the vendor for certain inventory commitments of approximately $56.4 million, which is recorded as a vendor advance.
>
> * * *
>
> In August 2020 the Company and the vendor qualified the manufacturing process specified in the agreement and the Company began purchasing product from the vendor. As a result, the Company has accrued a $56.4 million liability under the

> agreement as of September 30, 2020. In the fourth quarter of 2020, the Company and the vendor amended the agreement to include provisions to increase the aggregate purchase commitments to $169.0 million and extend the time frame of the agreement.

*Defective Proxy/Registration Statement at F-59.*

85. The TSMC Contract contained specific "Wafer consumption obligations"[2] and required Butterfly to place consecutive purchase orders for certain amounts of inventory, where Butterfly had to pay for such obligations even if the Company did not place a purchase order:

> [***] TSMC [***] use commercially reasonable efforts to [***] have ready [***] wafers for Customer, [***] wafers for [***]. Additionally, for [***], Customer shall [***]. In the [***], TSMC will [***]. **Customer will also commit to consume all the raw wafers purchased by TSMC [***]. If Customer does not consume the raw wafers purchased by TSMC, Customer shall reimburse TSMC for the unused raw wafers.** For [***], TSMC and Customer will follow the arrangements set forth in Exhibit A herein (i.e. the [***]) where Customer will purchase from TSMC any unused raw wafers.
>
> In light of the [***], **Customer shall, [***], consume [***] (i.e. consuming [***] wafers [***], which is [***] wafers [***]). For example, if [***], Customer shall [***] be required to order from TSMC [***]**. TSMC and Customer will work together to develop a mutually agreeable qualification plan for the qualification of TSMC manufacturing process, and the qualification plan shall include certain acceptance criteria requested by Customer, which is also to be mutually agreed upon between TSMC and Customer (the "Customer Acceptance Criteria"). The TSMC manufacturing process will become a [***] when [***].
>
> ***
>
> **In the event Customer fails to fulfill its [***] Wafer consumption requirement from above by not placing purchase orders in accordance with TSMC's lead-time, on a [***] basis and on the [***] when the applicable purchase order is to be issued by Customer, TSMC shall have the right to deduct, from money already paid by Customer to TSMC,** a monetary amount that is [***]. By deducting the said monetary amount, TSMC will [***]. For example, if Customer plans to consume [***] Wafers in [***] (which [***]), TSMC shall have the right [***] to deduct a monetary amount (from money Customer already paid to TSMC)

[2] In this context, Wafer describes the thin, often cylindrical slice of semiconductor, such as crystalline silicon, used for the fabrication of integrated circuits and microchips, the basis of Butterfly's technology.

> that is [***]. Customer's [***] of [***] under [***] (i.e. the [***]) is [***]. After TSMC has deducted the [***].[3]

86. While the TSMC Contract contained strict obligations for Butterfly to purchase certain amounts of inventory, it only required that TSMC use "commercially reasonable efforts" in supplying the Company with the semiconductor wafers on the expected schedule.

87. Butterfly's October 1, 2015 agreement with Benchmark Electronics, Inc. ("Benchmark Contract") similarly required Butterfly to agree to minimum purchase quantities for components. Thus, Butterfly had to buy components regardless of whether there was sufficient demand for its probes. As discussed below, due to insufficient demand, Butterfly had to take massive write-offs for obsolete inventory during the relevant period.

88. Because Butterfly was at the mercy of its suppliers to deliver the component parts for its ultrasound probes while also having to meet minimum purchase commitments, any delivery delays by one vendor that required Butterfly to obtain parts elsewhere ran the risk of leaving Butterfly with excess inventory it could not sell.

89. Butterfly experienced such a delivery delay in August 2019. According to CW 1, TSMC was supposed to commence fabrication of the Company's microchips by August 2019, but TSMC did not begin fabrication until late 2020—more than a year later. The Company's Defective Proxy/Registration Statement confirms CW 1's statements:

> During 2019, the Company entered into an agreement with a certain third party manufacturing vendor. Under the agreement, as September 30, 2020 [sic], the Company has a prepaid vendor advance, net of write-downs of approximately $46.9 million. **In August 2020, the Company and the vendor qualified the manufacturing process specified in the agreement and the Company began purchasing product from the vendor.** During the year ended September 30, 2020, the Company recognized a net of loss on the vendor purchase commitment of $56.4 million, recorded as a current liability. []

[3] Certain confidential information was redacted from the contract filed with the SEC as an amendment to Form S-4 filed on November 27, 2020.

> In the fourth quarter of 2020, the Company and the vendor amended the inventory supply arrangement. The amended agreement included provisions to increase the aggregate purchase commitments to $169 million and extend the time frame of the agreement.

*Defective Proxy/Registration Statement at F-76.*

90. CW 1 reported that for months, TSMC told Butterfly it would be imminently commencing production. However, the uncertainty and delay eventually required Butterfly to place additional orders with the Silex to ensure the Company had sufficient microchips to meet expected demand. Nonetheless, Butterfly was still obligated to pay for the purchase commitments agreed to in the TSMC contract, even though Butterfly had to fulfill its requirements elsewhere due to TSMC's delays.

91. According to CW 1, after being hired as CEO in March or April 2020, Butterfly's former-CEO, Laurent Faracci, attempted to get the vendor advance back from TSMC, but TSMC refused. Instead, according to CW 1, TSMC required compliance with the minimum wafer purchase obligations pursuant to the TSMC Contract. Thus, when TSMC eventually did begin fabrication of the microchips in September of 2020, the Company was required to make certain purchases for inventory it did not need, having already purchased it from Silex. In an attempt to reduce losses from purchase commitments, Butterfly renegotiated its purchase commitments with TSMC, as described in the Defective Proxy/Registration Statement:

> *Other Purchase Commitments*
>
> In September 2020, the Company has renegotiated certain inventory purchase commitments with other third party manufacturing vendors and as a result certain inventory purchase commitments have been cancelled. As a result of the renegotiations, the Company has ***accrued the expected losses on those commitments of $7.6 million*** in the September 2020 financial statements.

92. Butterfly and TSMC amended the TSMC Contract in August of 2020 to extend the time frame over which the Company could fulfill its purchase commitments to December 2022.

The amendment, however, also increased the aggregate amount of Butterfly's minimum purchase commitments by more than double, from $80.3 million to $169 million, more than six times Butterfly's annual sales for 2019 and more than twice Butterfly's aggregate sales for 2019 and 2020, combined. Importantly, the Defective Proxy/Registration Statement only stated "[i]n the fourth quarter of 2020, the Company and the vendor amended the agreement to include provisions to increase the aggregate purchase commitments to $169.0 million and extend the time frame of the agreement," but failed to disclose that the $169 million of inventory was to be purchased within just two years, by December 2022.

**Figure E.**




93. Given the significant, increased purchase commitments that Butterfly had at the time of the IPO, it was critical that sufficient market demand for the probes exist.

94. However, prior to the IPO, Butterfly had been unable to create market demand sufficient to sell the inventory it had, let alone the inventory it was obligated to purchase. CW 4 reported that TSMC required Butterfly to "purchase a ton of chips" that ended up never being used by Butterfly, a fact that CW 4 learned from Butterfly President Gioel Molinari during a call. Accordingly, in 2019, the Company wrote-down $5.3 million of inventory and recorded purchase commitment losses of $9.5 million relating to the vendor supply agreements for inventory that

could not be sold through. Those numbers increased to $6.9 million and $64 million during the first nine months of 2020. Thus, from 2018 to 2020, Butterfly was experiencing an accelerating trend of increases in inventory write-downs and losses on purchase commitments arising primarily from its inventory supply arrangements with its key vendor, TSMC, to purchase inventory it could not sell due to a lack of enterprise customer interest. *See* Figure F, below.

**Figure F.**




95. As demonstrated in the chart above, because inventory write-downs and losses on purchases commitments are included as costs of revenue in Butterfly's unadjusted gross margins, the increasing trend of write-downs and losses on purchase commitments had a significant, negative impact on the Company's gross margins and profitability.

### 3. Butterfly's Initial Sales Strategy Focuses on Smaller E-Commerce and "Early Adopter" Customers

96. Upon launching its first ever ultrasound device, the iQ, Butterfly had to focus primarily on sales to e-Commerce customers, also referred to as direct-to-consumer, and early adopters because large institutions, like hospitals, and other enterprise customers were reluctant to

adopt an unproven technology that was not fully developed. E-Commerce and "early adopter" customers primarily consisted of individual practitioners who were willing to adopt Butterfly's new technology before it had an established track record of performance or was widely accepted.

97. CW 4 confirmed that Butterfly's sales in 2019 and 2020 had benefited from a lot of "early adopters" and individual practitioners.

98. In an interview posted to YouTube on June 24, 2020,[4] then-President of Butterfly Gioel Molinari confirmed that the Company was "focus[ed] on capturing the lower, the early adopter market" and admitted that the business had not yet "cross[ed] the chasm"[5] from early adopter to mainstream user, stating: "We've been really, really good at capturing tens of thousands of early adopters [], however, we still have to really make this mainstream."

99. Molinari also stated that Butterfly had not yet "prove[d] out the last elements of impact" necessary to "bring the product to the masses."

100. After the IPO and throughout 2021 and into 2022, the Company continued to struggle selling its probes to large institutions and enterprises. CW 5 reported that in 2021 and 2022, while Butterfly was struggling to sell to large, enterprise customers, the Company was forced to rely upon its e-Commerce sales to "keep the lights on." Butterfly's e-Commerce sales are primarily to individuals or small practices.

101. At all times relevant to this action, product sales comprised most of the Company's revenues, while software subscription sales contributed a much smaller amount of revenue, as demonstrated in the chart below:

[4] "Spotlight: Gioel Molinari - President - Butterfly Network - Portable Ultrasound" at 42:00, https://www.youtube.com/watch?v=hvvmFTIamok.
[5] Geoffrey A. Moore, building upon Everett Rogers' work, described the difficulty that many companies face in moving beyond the early adopters and into the mainstream market as a "chasm" that must be crossed.

**Figure G.**




102. In 2019 and 2020, prior to the Merger, Butterfly sold and shipped approximately 12,900 devices and 20,200 devices, respectively, generating total revenues of $27.6 million in 2019 and $46.3 million in 2020. In 2021, Butterfly's product sales increased to 23,800 units, a year over year increase of only 17.8%.

103. By comparison, Butterfly's software subscription sales in 2019 and 2020 were $2.5 million and $7.9 million, respectively, comprising 9.1% of Butterfly's sales in 2019 and 17.1% in 2020.

104. Importantly, because Butterfly did not develop its enterprise sales force until late 2021 or early 2022, well after the Merger, as set forth in Section III.E.3. *infra*, nearly all the Company's sales prior to the Merger were to individual practitioners, "early adopters," and e-Commerce customers where sales were made through the Butterfly website without the assistance of dedicated sales representatives.

### C. Before Butterfly's Ultrasound Devices are Sufficiently Developed and Reliable, and Without the Necessary Sales Force in Place, Butterfly Changes its Sales Strategy to Focus on Larger Enterprise Customers to Justify Inflated 2021 IPO Forecasts to Investors

105. At the time of the IPO, Butterfly was unable to sell its large quantities of purchased inventory commitments due to insufficient demand from its smaller e-Commerce and early adopter customers that had been Butterfly's focus thus far. CW 4 confirmed that demand among the individual practitioners, e-Commerce customers, and early adopters was insufficient to sell the volume of inventory that Butterfly had purchased or committed to purchase. Thus, it was critical for the Company to create demand from the enterprise segment of the market to avoid future losses from inventory write-offs and meet sales goals.

106. Accordingly, prior to the IPO, Butterfly changed its sales strategy to focus on larger, enterprise customers to grow sales. Enterprise customers are typically large healthcare institutions that purchase equipment in large quantities. Butterfly used its shift in sales strategy, targeting enterprise customers, to justify sales forecasts that could only be achieved through enterprise sales. CW 4 confirmed that sales representatives would never be able to achieve the sales quotas associated with the IPO forecasts if they were selling to individual practitioners and early adopters and not enterprise customers.

107. However, according to CW 3, enterprise customers are typically unwilling to try a product that is not fully developed with all the features and proven technology. CW 3 recalled that during this witness's tenure, which began shortly after the IPO, the iQ and iQ+ probes were still in the early stages of development and missing important functionality and features desired. For example, CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans. CW 3 stated that Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

108. CW 2 corroborated CW 3's account, recalling that when CW 2 joined the Company in May 2021, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

109. CW 4 corroborated CW 2 and 3's accounts, stating that when Butterfly shifted its sales focus to enterprise customers, its platform was not ready to meet enterprise customer requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records ("EHR"), lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "work flow" requirements of enterprise customers. CW 4 stated that it was not until the second half of 2021 that the probe's software began adding these features.

110. CW 5 further supported CW 2, 3, and 4's accounts, stating that Butterfly was "still building" the software at the time of this witness's departure in November 2022 and likened the situation to "building a plane as we flew it."

111. In order to sell to larger, enterprise customers, Butterfly also needed a sophisticated sales force that understood the customer's business needs and could facilitate the sale and implementation of Butterfly's products. But Butterfly had no such sales force at the time of the IPO.

112. In fact, prior to the Merger, Butterfly did not even have a leadership team in place to develop and implement a sales strategy focused on enterprise customers. According to CW 4, the shift to an enterprise sales strategy only really occurred after Stacey Pugh and Todd Fruchterman "came onto the scene."

113. But Fruchterman joined Butterfly as CEO ***only after the filing of the Defective Proxy/Registration Statement and only days before the IPO transaction closed***[6] and Chief Commercial Officer Pugh joined Butterfly ***one month after the IPO***. A press release regarding Pugh's hiring described Pugh's position as a "***newly created*** executive position" that would "oversee the ***development*** and implementation ***of Butterfly's commercial strategy***."

114. CW 4 reported that in 2019 and 2020, there had been no formal sales quotas established for Butterfly sales representatives and no focus on enterprise customers. CW 4 explained that it was only after Butterfly went public that funds were directed to "build out" a sales force that would attempt to sell to enterprise customers.

115. During the November 15, 2021 third quarter earnings call ("November 2021 Earnings Call") CEO Fruchterman confirmed CW 4's report that Butterfly's early sales strategy did not include efforts to sell to the enterprise market:

> ***[W]hen Butterfly came about, it was a real technological advance***. And we think that our single-probe whole-body ultrasound and Ultrasound-on-Chip provides a lot of advantages to the evolution of ultrasound information across the continuum of care. ***And when Butterfly came to market, it was marketed as a device that was here***. And I think that was a great way to introduce it into the market.
>
> ***As we go into 2022, we're taking a much more targeted approach and a much more connected approach to the users and both from an institution perspective, but from a specialty perspective*** so how you can incorporate Butterfly more seamlessly and -- into workflow and into practice. So, we're taking a more specialty approach and we're helping people absorb that behavior change and into the workflow. So, it's like a lot of new technologies. And when you start adopting something that's new, that you haven't had, it's about getting people comfortable with it and getting people to use it for specific cases, and then getting people to expand with it.
>
> And we made it available when Butterfly entered the market. ***Now, what we're doing is focusing very much on how people can get value by using it***. And so, with the information you can acquire from the device itself and then how we can make

[6] "Legacy Butterfly entered into a binding term sheet agreement with Dr. Fruchterman on January 23, 2021 and he began his employment as President and Chief Executive Officer of Legacy Butterfly on February 1, 2021." *Butterfly Form 10-K filed with the SEC on March 29, 2021* at 83.

> that information incorporated into the workflows. ***So, we're going to be taking a much more specialty approach with much more focused utilization to help people incorporate it into their practices and the workflow***.

116. CEO Fruchterman also admitted during the November 2021 Earnings Call that, at the time of the IPO, Butterfly had very few, if any, enterprise customer sales leads in its pipeline and almost no enterprise sales force in place, stating: "[T]here has been a significant management evolution since [the 2021 revenue and margin] projections were first made" and "***we have rapidly reoriented [the] strategy team and the company overall*** to adjust to the need ***to shift from a direct-to-user-led market approach to a more integrated commercial approach to health systems*** and specialties."

117. Both CW 2 and CW 3 recalled that when they joined Butterfly after the IPO, they were unaware of any instances of an enterprise-wide implementation of Butterfly's probes. CEO Fruchterman confirmed the CWs' recollections when, in the November 2021 Earnings Call, he described the state of the Company's enterprise sales efforts as Butterfly having "in-process discussions with large institutions to ***kick-start*** enterprise-level implementations."

118. CW 5 confirmed that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO, recalling that in late 2021 or early 2022, Butterfly "bought" a "flagship account," referring to a deal with University of Rochester Medical Center ("URMC") in which Butterfly charged URMC *only $1,000 per probe* and *gave the software away free of charge* because the Company desperately needed a flagship account to use as a reference site to promote future deals with other enterprise customers. But even with the huge pricing concessions Butterfly made to URMC and the Company's representation that the implementation of the probes at URMC would be completed within 90 days, the implementation remained incomplete six to eight months later when CW 5 left the Company.

119. As discussed below, the lack of fully developed technology and an experienced, enterprise sales force at the time of the IPO resulted in enterprise customers generally being unwilling to adopt Butterfly's probes. As previously shown in Figure D, Butterfly's probe sales remained virtually unchanged before and after the shift in sales strategy.

**Figure D.**




**D. Butterfly Reports Inflated Forecasts in the Defective Proxy/Registration <u>Statement That Were Unachievable and Lacked Any Reasonable Basis</u>**

120. Butterfly reported to investors in its Defective Proxy/Registration Statement revenue and margin forecasts for 2021 ("2021 IPO Forecasts") that were, according to former employees, inflated by at least 20% or more, because they were based on a purported growth strategy that depended on selling Butterfly's probes to enterprise customers. The 2021 IPO Forecasts were unachievable, however, because Butterfly's probes were not ready for "prime time" as they were not fully developed and lacked key features and options necessary for enterprise customers to be willing to use them in place of much more advanced and proven competitor

devices. Moreover, the forecasted margins were unachievable because Butterfly's massive purchase commitments outpaced market demand.

121. At the time of the IPO, Butterfly had not yet ramped up its enterprise sales force to enable it to break into the enterprise market and at the volume Butterfly was forecasting. CW 4 reported that it wasn't until after the IPO that funds were directed to building out an enterprise sales force and CW 3 confirmed that when this witness began employment in June 2021, Butterfly was still trying to ramp up its sales force and was continuing to do so throughout CW 3's employment.

122. The 2021 IPO Forecasts that were published in the Defective Proxy/Registration included a 2021 revenue forecast of $78.1 million and a 2021 gross margin forecast of 43%, as shown below in Figure H.

**Figure H.**

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Revenue ($ in millions)** | $44.0 | $78.1 | $137.9 | $235.2 | $334.0 |
| **% Year over year revenue growth** | 60% | 77% | 77% | 71% | 42% |
| **% gross margin** | NM | 43% | 51% | 60% | 68% |
| **Contribution from wearables** | — | — | — | 5% | 10% |

*Defective Proxy/Registration Statement* at 115.

123. The 2021 IPO Forecasts published in the Defective Proxy/Registration Statement were preceded by the following:

> *Certain Projected Financial Information of Butterfly*
>
> Butterfly does not as a matter of course make public projections as to future sales, earnings, or other results. However, the management of Butterfly has prepared the prospective financial information set forth below to present to Longview's Board in connection with its consideration of the potential business combination. The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, ***but, in the view of Butterfly's management, was prepared on a reasonable basis, reflects the best currently available estimates***

> ***and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Butterfly***. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus are cautioned not to place undue reliance on the prospective financial information.

*Defective Proxy/Registration Statement* at 115.

124. However, contrary to what was asserted in the statement above, the Company *did* make public projections as to future sales, earnings, and other results, and the Company *did not* provide the prospective financial projections solely "to Longview's Board in connection with its consideration of the potential business combination." Instead, the Company published and promoted the 2021 IPO Forecasts to the investing public multiple times, both prior to and after the completion of the Merger.

125. Moreover, any semblance of cautionary language or attempt to disclaim the reliability of the 2021 IPO Forecasts was further negated by the Defendants' explicit claim that the 2021 IPO Forecast "was prepared on a reasonable basis, ***reflects the best currently available estimates and judgments***, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Butterfly." *Defective Proxy/Registration Statement* at 115.

126. Defendants' publication of the 2021 IPO Forecasts to the investing public began in earnest on November 20, 2020 when Defendants filed a Form 8-K with the SEC announcing that Butterfly would go public through a business combination with Longview. Attached as exhibits to that Form 8-K were two presentations that contained revenue and margin forecasts identical to the 2021 IPO Forecasts, one entitled "Investor Presentation," dated November 2020, and another entitled "Webcast Presentation," dated November 20, 2020.

127. In the Investor Presentation, which Defendants published in connection with the announcement of the Merger and filed with the SEC, Butterfly reported the revenue forecasts shown below in Figure I:

**Figure I.**




*November 2020 Investor Presentation* at 23.

128. In the Webcast Presentation, which Defendants published in connection with the announcement of the Merger and filed with the SEC, Butterfly reported the same revenue forecasts, shown below in Figure J:

**Figure J.**




*November 2020 Webcast Presentation* at 34.

129. The 2021 IPO Forecasts were verbally reaffirmed by Defendant CFO Stephanie Fielding during the Webcast Presentation, as recorded in a transcript filed with the SEC in which Fielding stated: "We expect to build from $44MM revenue in 2020 to $344MM in 2024, which is equivalent to a 66% CAGR."

130. The November 20, 2020 press release described the Webcast Presentation as a "presentation made by the management teams of both Butterfly and Longview." Thus, even if the

projections had originally been prepared by Butterfly to be presented to Longview's Board, these projections were now being jointly published by Butterfly and Longview to the investing public as annual guidance in connection with the IPO.

131. Shortly after the publication of the 2021 IPO Forecasts in the Investor Presentation and Webcast Presentation on November 20, 2020, Butterfly posted the Investor Presentation to its own investor webpage, www.butterflynetwork.com/investors. Further, Butterfly guided the public to the Investor Presentation and the 2021 IPO Forecasts through a graphical link, shown in Figure K, that was displayed prominently on Butterfly's primary webpage, www.butterflynetwork.com.

**Figure K.**




*See Butterfly Network Webpage* (as it appeared December 11, 2020) https://web.archive.org/web/20201211014518/https://www.butterflynetwork.com/, last accessed 2/24/2023.

132. The Company's intended use of the 2021 IPO Forecasts as annual guidance provided to the investing public was further confirmed approximately one year later, during an earnings call on November 15, 2021, when CEO Fruchterman made remarks to analysts and investors about the "annual guidance provided by prior management 1 year ago," thereby referring to the 2021 IPO Forecasts in these presentations, first published November 20, 2020.

133. After the November 20, 2020 press release and presentations, the 2021 IPO Forecasts were again published in the initial Form S-4 drafts filed with the SEC on November 27, 2020, and amended on January 6 and 19, 2021, as shown below in Figure L:

**Figure L.**

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Revenue ($ in millions)** | $44.0 | $78.1 | $137.9 | $235.2 | $334.0 |
| **% Year over year revenue growth** | 60% | 77% | 77% | 71% | 42% |
| **% gross margin** | NM | 43% | 51% | 60% | 68% |
| **Contribution from wearables** | — | — | — | 5% | 10% |

*Draft Form S-4 filed November 27, 2020 and amended January 6 and 19, 2021* at 112, 113, and 114, respectively.

134. The 2021 IPO Forecasts were published to the investing public yet again on January 12, 2021, during Butterfly's live webcast at the 39th Annual J.P. Morgan Healthcare Conference, which was also posted on Butterfly's website. Butterfly's slide presentation from the Healthcare Conference webcast was filed with the SEC on January 12, 2021 (the "January 2021 Webcast Presentation"). In the January 2021 Webcast Presentation, Butterfly reaffirmed the same 2021 IPO Forecasts that had been repeatedly presented to the investing public, as shown below in Figure M.

**Figure M.**




*January 2021 Webcast Presentation* at 26.

135. The 2021 IPO Forecasts that Defendants presented to the public multiple times from November 2020 through the closing of the Merger in February 2021 presumed an average annual growth rate of more than 75% through 2023—something the Company had never achieved before and was not supported by its current sales pipeline. Additionally, the annual growth rate assumed in Butterfly's 2021 IPO Forecasts was far greater than what was being achieved by comparable companies in the relevant categories of High Growth Med-Tech, Software-as-a-Service, and Disruptive Technologies, as shown below in Figure N.

**Figure N.**

| | Butterfly | High Growth Med-Tech[(1)] | Software-as-a-Service[(2)] | Disruptive Technologies[(3)] |
|---|---|---|---|---|
| **EV/2022E Revenue** | 10.6x | 15.1x | 13.4x | 21.4x |
| **Revenue CAGR 2020 – 2022E** | 77% | 34% | 27% | 46% |

(1) Comparable companies considered in High Growth Med Tech field included Dexcom, Inc., iRhythm Technologies, Inc., Silk Road Medical, Inc., Insulet Corporation, Outset Medical, Inc., Shockwave Medical, Inc. and Inari Medical, Inc.

(2) Comparable companies considered in Software-as-a-Service field included Adobe Inc., Livongo Health, Inc., Square, Inc., salesforce.com, inc. and Teladoc Health, Inc.

(3) Comparable companies considered Disruptive Technologies included Adaptive, Inc., Berkeley Lights, Inc., Guardant Health, Inc., 10x Genomics, Inc. and NANO-X IMAGING LTD.

*Defective Proxy/Registration Statement* at 115.

136. The 2021 IPO Forecasts also forecasted gross margins as shown above in Figure H. The gross margins, too, were not achievable due to the significant losses on purchase commitments that would arise from excess or obsolete inventory that could not be sold due to inadequate demand and/or from inventory supply agreements where the expected losses exceed the benefit of the contracts. Notably, such losses and write-offs had already occurred and were ongoing at the time of the IPO.

137. Even after the IPO when Butterfly securities began trading publicly on February 16, 2021, the Company continued to reiterate the 2021 IPO Forecasts to the investing public. Attached as an exhibit to Form 8-K, filed with the SEC on March 5, 2021, Butterfly published a "Corporate Presentation" which included forecasts substantially identical to the 2021 IPO Forecasts, as shown below in Figure O. The Form 8-K described the Corporate Presentation as a presentation "to the investment community to provide updates and summaries of [Butterfly's] business."

**Figure O.**




*March 5, 2021 Corporate Presentation* at 22.

138. Butterfly continued to publicly reaffirm the 2021 IPO Forecasts throughout most of 2021, presenting the investing public with a forecasted revenue range of $76 million to $80 million – a range whose midpoint is virtually identical to the 2021 IPO Forecast of $78.1 million. For example, in a May 13, 2021 press release, filed with the SEC on Form 8-K, Defendants published the following:

> **2021 Financial Guidance**
>
> Revenue is expected to be approximately $76 million to $80 million, or approximately 64% to 73% growth year-over-year.
>
> Gross margin is expected to be approximately 43% to 47%. Adjusted gross margin is expected to be approximately 42% to 46%.

139. Butterfly published the same forecasted revenue range of $76 million to $80 million, as well as the same margin forecasts, throughout most of 2021, even as late as August 9, 2021. *See Q2 2021 Earnings Call, August 9, 2021*.

140. Confidential witnesses confirmed that the 2021 IPO Forecasts in the Defective Proxy/Registration Statement were inflated and not achievable. According to CW 3, Butterfly's 2021 IPO Forecasts were a "pie-in-the-sky," slapped together for investors that nobody at Butterfly, including management, took seriously because they were unsupported by any underlying

data. For example, according to CW 3, the 2021 IPO Forecasts did not factor in historical sales growth rates, deals that were currently in Butterfly's sales pipeline or whether Butterfly had a sufficient sales force to achieve the goals. CW 3 stated that Butterfly's 2021 IPO Forecasts were, instead, based on an assumed growth rate dependent upon "more penetration in enterprise" that Butterfly could not achieve, in part because it wasn't until after the Merger that Butterfly hired an executive to develop and implement a commercial sales strategy.

141. CW 2 recalled that Butterfly's 2021 IPO Forecasts were "completely ridiculous" and "out of whack" because, among other reasons, they did not reflect the current sales pipeline of potential deals.

142. CW 5 reported that "we all knew" that Butterfly's 2021 IPO Forecasts were "unattainable." CW 5 recalled that less than 10% of salespeople achieved their sales quotas in 2021 and that the majority of salespeople achieved only about 40% of their goals for that year. CW 5 contrasted this with CW5's prior sales experience at other companies, stating that typically 70% to 80% of the salesforce should be hitting their sales goals. CW 5 explained that the quotas and goals at Butterfly "came from the top down" and were not based on information and practices typically used when setting sales goals, such as looking at a salesperson's geography, prior sales, and existing opportunities in the area.

143. CW 4 also reported that the 2021 sales quotas set for Butterfly's sales representatives were "way too high," unachievable, and unrealistic. CW 4 reported that CW 4 hadn't reached even 50% of this witness's sales quota at any time in 2021 and that no one else in the entire sales organization had been close to hitting their numbers.

144. CW 4 stated that the sales quotas did not take into account the potential deals in the Salesforce.com pipeline, the sales history and performance of the sales force in prior years and

there was no bottom-up communication from the sales force to management as far as what the sales personnel believed they could achieve in sales. CW 4 stated that CW 4 believed the unachievable sales quotas in 2021 had been based on the overall revenue number that Butterfly had communicated to the public in the Defective Proxy/Registration Statement.

145. CW 2, CW 3, CW 4, and CW 5 all recalled that Butterfly tracked future sales opportunities or leads in its Salesforce.com software system. CW 3 further recalled that prior to Salesforce.com, Butterfly tracked sales leads in spreadsheets kept on a Google Drive that Butterfly used as its cloud-sharing drive.

146. CW 2 corroborated CW 3's account that the 2021 IPO Forecasts were not supported by the sales opportunities recorded in the Company's Salesforce.com system. Moreover, CW 2 stated that details for accounts listed in the Salesforce.com system were inaccurate and illusory. For example, in some instances, when it appeared a deal was not viable due to inactivity, CW 2 and other sales representatives were instructed by management to change the completion date to a later time so it appeared in Salesforce.com that the deal was still progressing and, thus, viable.

147. In other instances, the potential deals in Salesforce.com overstated the number of probes the potential customer was willing to purchase. CW 2 recalled, for example, that the City of Miami Fire and Rescue Department was marked in Salesforce.com as ordering 66 probes. But when CW 2 spoke to the City of Miami, it only expressed interest in purchasing three probes.

148. Even when the sale had been made, CW 2 stated that none of the customers had an "absolute implementation." Accordingly, throughout CW 2's employment, CW 2 could not find a single reference site—a large enterprise client that had successfully purchased, installed and implemented the probes into their business operations—to use as an example of a successful enterprise implementation.

149. CW 2 learned after CW 2's own thorough investigation that several deals marked as nearly closed in Salesforce.com were "all fluff." Following CW 2's investigation, CW 2 ultimately had to remove approximately ***half*** of the prospective enterprise deals because they were just "smoke and mirrors." Thus, by the time CW 2 began employment, Butterfly still had not developed an enterprise customer sales pipeline even close to what was necessary to meet the 2021 IPO Forecasts.

150. CW 4 also confirmed CW 2's report that prospective deals in the pipeline were often reported to be much larger than could be achieved, stating that some of the sales representatives inflated their prospective deals in the pipeline. CW 4 gave examples such as a deal with Atrium that was reported to be upwards of 700 probes, but when the deal closed in mid-2021 that Atrium purchased only 70 probes.

151. CW 5 corroborated CW 2 and CW 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 stated the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities" and CW 5 had no idea "where [the Company] got the goals from." CW 5 stated that this contributed to few salespeople reaching their yearly sales goals and high turnover in the sales organization.

152. CW 5 provided examples of deals in the Salesforce pipeline that were not actually viable. In one such example, CW 5 stated that when CW 5 was hired there was a $1.4 million software opportunity with NYU that was supposedly part of CW 5's pipeline of prospective deals. But in CW 5's first meeting with NYU, NYU stated that it had "no interest" in doing a software deal with Butterfly. CW 5 recounted that Butterfly had previously delivered an "incomplete" and

"an abbreviated version" of what NYU had expected in an earlier deal, which left the customer with "a bad taste" and resulted in the customer telling CW 5 to "pound sand." Despite CW 5 realizing there was "no opportunity there" and that a deal was "clearly not viable," CW 5 was told to keep the numbers in CW 5's pipeline. Because it was clear to CW 5 that a deal could not be closed in 2021 or ever, CW 5 ultimately pushed the close date out three years. CW 5 emphasized that there were many deals like that in the Salesforce pipeline that were not viable opportunities.

153. CW 5 also explained that CW 5's previous sales experience at other companies had taught this witness that in a typical sales organization, salespeople should have a pipeline of potential deals between 2 and 4 times the size of their actual sales goals, because it is understood that not all deals in the pipeline will be closed. CW 5 reported that even taking all the deals in Salesforce.com, including the bogus ones, Butterfly did not have enough potential deals in the pipeline to meet the 2021 IPO Forecasts.

154. CW 4 agreed with CW 5 that even with the inflated deals recorded in Salesforce there were not enough sales opportunities in the pipeline for Butterfly to achieve the 2021 IPO Forecasts. CW 4 reported that CW 4 and other sales representatives had access to the entire Salesforce.com application and not just their own areas of responsibility. CW 4 stated that it was evident from looking at Salesforce.com in 2021 that the pipeline lacked the deals necessary for the sales force to achieve their quotas or the 2021 IPO Forecasts and that the 2021 IPO Forecasts were overstated by at least 20%, if not more.

155. Accordingly, contrary to Defendants' public statements, Butterfly's 2021 IPO Forecasts were inflated and unachievable.

### E. Butterfly's Sales Flounder as Enterprise Customers are Slow or Unwilling to Adopt Butterfly's Probes

#### 1. Enterprise Customers are Slow or Unwilling to Adopt Butterfly's Products Because They Were Still in the Early Stages of Development and Lacked Critical Functionality

156. According to CW 3, throughout 2021, Butterfly was falling short of the 2021 IPO Forecasts it disclosed to investors in the Defective Proxy/Registration Statement because the Company was unable to successfully sell to enterprise customers who were slow or unwilling to adopt Butterfly's probes. One reason for the slow adoption by enterprise customers, CW 3 recalled, was because the Butterfly probes were not yet a proven technology and lacked important features and options. CW 3 recalled that enterprise customers had been particularly slow to adopt the portable ultrasound devices.

157. Moreover, CW 3 stated that many enterprise customers already had contracts with larger competitors, such as GE, and were reluctant to switch to Butterfly devices before the probes had all the features and worked.

158. CW 2 stated that customers' IT departments expressed concerns about implementing the probes due to potential HIPAA violations with patient data because the probes used cloud storage rather than customers' on-premises servers. Thus, due to the lack of integration with their existing systems, enterprise customers were reluctant to use Butterfly's probes due to concerns about the security of data obtained from Butterfly's devices.

159. CW 4 corroborated CW 2 and CW 3's accounts, reporting that, at the time of the IPO, enterprise customers were not as willing or ready "to jump on the platform" because Butterfly's software lacked various features that took "a lot of work" to develop and have available. CW 4 stated that it was not until the second half of 2021 that the software started to become closer to being integrated with enterprise workflows.

160. According to CW 4, Butterfly only began to really develop its software to integrate with enterprise workflows months after the IPO because the Company did not have the funds to do so until it received the IPO proceeds. CW 5 corroborated CW 4's statements, reporting that Butterfly was still developing its software when CW 5 left the Company in November 2022, and likened the situation to "building a plane as we flew it."

161. CW 4 also reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution. CW 4 explained that implementation across an institution would require an executive sponsor at the institution who was willing to take that risk.

162. CW 4 stated the enterprise sales cycle is very long, from 6 to 18 months, in part because enterprise customers often required the seller to first become an approved vendor to the institution and then obtain approval from the institution's IT department after demonstrating the security of the item to be sold.

163. CW 5 reported the same issues as CW 4, stating that enterprise sales deals have a long sales cycle that can take more than a year to develop and close. CW 5 explained that large customers usually require vendors like Butterfly to go through an extended vetting process.

### 2. Enterprise Customers are Slow to Adopt Butterfly Products Due to Excessive Pricing

164. CW 3 stated that another major reason why enterprise customers were slow to use Butterfly's devices was because the Company posted pricing on its website for smaller, e-Commerce customers that was five to ten times less than what Butterfly was charging enterprise customers. According to CW 3, Butterfly's product pricing was particularly egregious for the software component and discounting for hardware and software was "a huge divide" between what

Butterfly charged enterprise customers as compared to nurse practitioners and homecare providers. CW 3 recalled that Butterfly's high pricing caused it to lose enterprise customers.

165. CW 2 similarly stated that Butterfly lost deals with enterprise customers due to pricing issues. According to CW 2, Yale University Hospital was confused by Butterfly's pricing. Yale was using a Qpath software platform to serve as a repository of ultrasound images. CW 2 stated that Butterfly wanted to charge Yale more than six times what Yale was paying to Qpath for using Butterfly's platforms called Blueprint and Compass. CW 2 noted that both platforms had essentially the same functionality. As a result of these pricing issues, CW 2 recalled, the potential deal with Yale "went south." In another example, CW 2 recalled that The Medical University of South Carolina refused to purchase Butterfly probes because they were too expensive.

166. According to CW 2, Butterfly also "priced [itself] out of the software market" by overcharging for its Blueprint and Compass software and the pricing was "completely out of whack" so the sales force was unable to sell it.

167. CW 4 confirmed that website pricing caused confusion among potential enterprise customers and stated that the pricing model "scaled up terribly" and got "really expensive" for deals that included a large number of probes.

168. CW 5 corroborated CW 2, 3, and 4's accounts, stating that pricing on Butterfly's website was "a direct conflict for us" and created additional impediments to large, enterprise sales. Despite CW 5's desire to offer "strategic pricing" to enterprise customers, CW 5 was required to attempt to sell to enterprise customers at "full pricing."

### 3. Butterfly's Belated Hiring of a Sales Force with Appropriate Experience Delays Selling to Enterprise Customers

169. Despite representing to investors in the Defective Proxy/Registration Statement that "***this year we launched an enterprise salesforce*** to engage and scale adoption within large

health institutions," as of the IPO, Butterfly had not even begun in earnest to start the enterprise sales force ramp up. Because Butterfly now had to scramble to build up its enterprise sales force in 2021, the Company was hiring individuals who lacked experience in enterprise sales.

170. CW 4 confirmed the belated hiring of a sales force, reporting that Defendant Rothberg had initially not even wanted to hire sales representatives, believing the probes could be sold exclusively online. According to CW 4, Butterfly only had ten to twelve sales representatives in 2021 and that number declined in 2022 when sales representatives began to leave the Company.

171. Defendants Fielding and Fruchterman later stated as much. When asked by an analyst about the ramp up and sales cycle for enterprise sales during a May 13, 2021 earnings call, Defendant CFO Fielding responded: "And ***as we bring on a sales team*** that gets more experienced in engaging with those customers, that process also improves over time. So we do ***expect that ramp happen in the back half of the year***, both because we're investing now. And because that sales cycle takes some additional time."

172. Defendant Fruchterman's comments during the same earnings call clearly indicated that the Company was only beginning to ramp up an enterprise sales force, stating: "[W]e made ***meaningful progress in Q1 with our commercial organization***, ***doubling the size of our highly experienced sales team***. [] In particular, we expect this investment to ***help drive penetration and adoption in the enterprise segment <u>starting this year</u>***."

173. In response to a follow up question about the "doubling of a salesforce," Defendant Fruchterman elaborated: "We're at about 27 heads currently, and we're continuing to evaluate where we think we need to enhance coverage as we look at how we use our direct sales force to help with the value proposition and what we just talked about mainly in the enterprise segment[.]"

Thus, that Butterfly had only 27 sales representatives after doubling its commercial sales force meant that it had only about 13 sales representatives at the time of the IPO.

174. According to CW 3, Butterfly did not factor into its growth strategy or the 2021 IPO Forecasts how many sales representatives Butterfly needed to achieve its sales goals. CW 3 recalled that it was not until Q2 2021 that Butterfly began discussing whether it had a sufficient number of sales personnel to achieve 2021 IPO Forecasts.

175. CW 3 also observed that sales personnel did not have the experience necessary to sell to enterprise customers, nor an understanding of what Butterfly was looking for with its enterprise initiatives. CW 2 echoed CW 3's observations and explained that CW 2's direct manager, Melissa Pavri, did not have prior experience selling ultrasounds. CW 2 recalled that Pavri had never even seen an ultrasound before she visited an actual customer with CW 2. CW 2 further recalled that the Company hired Gavin Philipps to be Vice President of Sales but that Philipps also did not have experience in the ultrasound industry and, in fact, had very little sales experience.

176. Even after Butterfly finally had some sales force hired, according to CW 2, Butterfly could not ramp up and scale enterprise sales because, among other reasons, the sales territory assignments were not well planned or organized. For example, CW 2's territory was too large to be "manageable," covering the entire East Coast, from Maine to Tennessee to Florida, and that such a large area needed additional sales representatives to be covered effectively. CW 2 also stated that in 2021 the Company's sales organization was very disorganized, sales representatives' territories were sometimes geographically overlapping, and it was not always clear which sales representatives should call on certain, large accounts. CW 2 stated that this confusion caused delays in customer orders.

177. Unsurprisingly, CW 2 confirmed that *nobody* at Butterfly reached their quotas in 2021. CW 2 reached approximately 50% of this witness's 2021 quota. Through CW 2's review of Butterfly's Salesforce.com platform, CW 2 saw others achieve only 10 to 30% of their similar quotas.

178. CW 4 corroborated CW 2's account, stating that this witness never achieved 50% of the sales quota assigned to CW 4 and that neither did any of the other sales representatives, with some achieving as little as 10% of their quotas. CW 4 also stated that the average sales representative sold between 10 and 50 probes per month as compared to the 100 probes per month required to meet their quotas.

179. CW 5 reported that 90% of the salespeople were not making their sales goals in 2021 and that the majority of salespeople only achieved 40% of their sales goals.

180. Thus, Butterfly's lack of an adequate enterprise salesforce further contributed to Butterfly's inability to meet the 2021 IPO Forecasts.

#### 4. Butterfly is Forced to Hire PwC to Develop a Strategy for Targeting Enterprise Customers to Increase Sales

181. CW 3 recalled that in June 2021, Butterfly engaged PricewaterhouseCoopers ("PwC") to consult on how Butterfly could address its inability to penetrate the enterprise market. PwC was tasked with, among other things, coming up with business cases and value propositions to present to key decision-makers at enterprise accounts.

182. According to CW 3, PwC provided consulting services until at least October 2021.

### F. Butterfly Internally Revises Its 2021 IPO Forecasts Downward While Publicly Reaffirming Guidance

183. As a result of its inflated 2021 IPO Forecasts, CW 3 stated that Butterfly had to internally revise the 2021 IPO Forecasts downward. According to CW 3, starting by at least June 2021, there were discussions among CFO Fielding, CEO Fruchterman and other members of

Butterfly's executive leadership about lowering Butterfly's 2021 IPO Forecasts due mainly to shortfalls in sales to enterprise customers. Thus, CW 3 was personally instructed to create revised 2021 IPO Forecasts.

184. CW 3 undertook a bottoms-up approach to revising the 2021 IPO Forecast, which CW 3 "wrapped up" around the middle to the end of August 2021. The new forecast for 2021, according to CW 3, was intended to re-forecast the remaining six months of 2021 using historical activity from the prior six months, and to look out to 2022, 2023, and 2024. The conclusions of CW 3's re-forecast were "plugged into" Butterfly's long-term forecast and were to be used, in part, as a basis for estimates of what gross margin and EBITDA should be.

185. Butterfly reaffirmed the 2021 IPO Forecasts in the August 13, 2021 press release reporting on Q2 2021 financial results.

### G. Lack of Demand from Enterprise Customers Results in A Build-up of Unusable Inventory and Eventual Inventory Write-offs and Downward Adjustment to the 2021 IPO Forecasts

186. On May 13, 2021, Butterfly announced its first quarter 2021 financial results reporting, among other things, that Butterfly's inventory balance increased by over $10 million, or approximately 40% in just three months, indicating Butterfly was unable to sell a substantial portion of its inventory it was required to purchase from non-cancelable purchase commitments. During a conference call that same day, Defendant Fielding stated:

> Of note inventory in the first quarter was $36.1 million, a $10.3 million increase over $25.8 million reported in the fourth quarter of 2020. This increase was primarily related to our contractual wafer commitments that we described in our last earnings call.

187. Butterfly's stock price declined from $11.23 per share on May 12, 2021 to $9.45 per share on May 13, 2021, a decline of $1.78 per share, or 16%.

188. On May 27, 2021, Motley Fool published an article titled Wall Street Flies Away from Butterfly Networks after its Second Earnings Report. In one section of the article titled "The Inventory Problem," the author noted that Butterfly's inventory had increased "almost as much as its total revenue:"

> This $2-billion-market-cap company also noted that it had inventory at the end of the quarter worth $36.1 million, up $10.3 million from the end of Q4. Given that it increased its inventory by almost as much as its total revenue for the quarter, management is apparently *really* banking on sales to accelerate in the second half of the year.

189. On November 15, 2021, Butterfly announced its third quarter 2021 financial results, including an $11.6 million loss on purchase commitments. In addition, Butterfly reduced its 2021 IPO Forecast by $18 million, or 23%:

- Revenue is expected to be approximately $60 million to $62 million, or approximately 30% to 34% growth year-over-year.
- Gross margin is expected to be approximately 28% to 30%. Adjusted gross margin is expected to be approximately 48% to 50%.
- Net loss is expected to be approximately $(65) million to $(75) million. Adjusted EBITDA loss is expected to be approximately $(125) million to $(135) million.

190. During an earnings call that same day, Defendant Fruchterman stated that:

> [B]ased upon our most recent experiences and the current health care environment, we must reset expectations for revenue for the balance of the year. While our revenues for Q3 grew 44% year-over-year, ***we are falling short of what's necessary to achieve the annual guidance provided by prior management 1 year ago and reaffirmed by me in May*** of this year with the information I had, having just joined the company. For 2021, we now expect full year revenue growth in the range of 30% to 34%. This represents good progress in our current commercial activities and mounting user enthusiasm about Butterfly, but is offset by health care logistical challenges and doctor, nurse and medical technician fatigue concurrent with COVID conditions and its broad consequences.

191. Defendant Fruchterman further disclosed in the November 15, 2021 Q3 2021 Earnings Call that:

> It's important to note that there has been a significant management evolution since projections were first made that included an aggressive back half 2021 ramp. While we have rapidly reoriented strategy team and the company overall to adjust to the need to shift from a direct-to-user-led market approach to a more integrated commercial approach to health systems and specialties.

192. Defendant Fielding echoed Fruchterman's comments, stating that Butterfly fell short:

> Third quarter revenues grew 44% year-over-year to $14.6 million, and adjusted gross margin came in at 49.3%. While these numbers are healthy, they did fall short for the back half ramp that is necessary to meet our original revenue projections.

193. Defendant Fielding explained that the $11.6 million loss on purchase commitments was for a "reserve on inventory that we may not be able to use." Relatedly, Fielding explained that inventory declined by about 50% due to a write-off of purchase commitments from obsolete inventory or inventory that otherwise could not be used in Butterfly's products:

> [I]nventory in the third quarter was $23.8 million, a $23.1 million decrease from the $46.9 million reported in the second quarter of 2021. This decrease was due to a balance sheet reclassification from our purchase commitment liability. As we have continued upgrading our product to increase reliability and position us for future transformational technology, we have determined that older raw material is likely obsolete. Consequently, we reclassified $35 million of that older raw material from reserve against the inventory to a reduction in inventory.

194. Defendant Fielding further disclosed that enterprise customers had been slow to adopt Butterfly's probes, resulting in Butterfly's (belated) adjustment downward of its 2021 IPO Forecasts:

> In light of the themes Todd discussed earlier on the call, including the backdrop of COVID on health care, which is delay of system implementations in institutions, a longer sales and development cycle

> related to health systems adoption and the trends we are seeing in direct-to-user purchases, we are adjusting our 2021 guidance to reflect our views on the current pace of market adoption. For the full year 2021, total revenue is projected to be approximately $60 million to $62 million or 30% to 34% growth year-over-year. . . .

195. Butterfly's stock price declined from $8.60 per share on November 12, 2021 to $7.52 per share on November 15, 2021, a decline of $1.08 per share, or 13%.

196. Then, on February 28, 2022, Butterfly issued a press release that "introduced" the Company's new software, Butterfly Blueprint, which was described as "a system-wide platform designed to support the scaled deployment of ultrasound across hospitals and health systems[.]" Purportedly, Butterfly Blueprint "brings hospitals and health systems a complete ultrasound solution" and "[b]y integrating into health systems' clinical and administrative systems and workflows, Blueprint delivers a clinical assessment tool at scale." Notably, Butterfly's description of Blueprint's capabilities was substantially the same as the description of the Butterfly software that had been described to investors in the Defective Proxy/Registration Statement, wherein Defendants presented the software as then-currently existing and fully integrated.

197. During Butterfly's Q4 2021 earnings call that occurred that same day, February 28, 2022, Defendant Fruchterman reiterated that the Blueprint software that had been developed in 2021 would allow Butterfly to serve enterprise customers and further remarked on how the newly announced software used a partnership with a third-party who provided much of the "digital plumbing" and "infrastructure":

> And so we made a lot of investment and aggregated a lot of the components of what we put together in Butterfly and Butterfly Blueprint in '21. So Butterfly Blueprint is really the road map for us moving forward in health systems. []
>
> Our partnership with Ambra was kind of an innovative approach to helping us move Blueprint and Compass on top of an architecture and some, I guess, you think about it as digital plumbing as a way for us to accelerate to move up and to think progressively about how to get more relevant and scale faster. So we were able to work with them, collaborate and then kind of put Compass and essentially the

> Blueprint solution on top of some of their infrastructure that they have established being one of the leaders in cloud-based medical imaging management.

198. Defendant Fruchterman also stated during the fourth quarter 2021 earnings call that the recently announced partnership with URMC would be used "to really prove the embodiment of our strategy, which is the practical application of ultrasound information into the clinical workflow." Defendant Fruchterman continued:

> And so part of this whole [URMC] deployment was both looking at how do we measure and how do we learn together on what it takes to get people confident? How do you deploy this into workflows? What is best practice to learn and evolve to do that? How do we get information around that? How do we look at evolving, improving the clinical care pathways and then the returns and the economic benefits of doing that?

199. During the earnings call on February 28, 2022, Defendant Fruchterman also indicated that the URMC partnership would allow for further development of Butterfly's software to ensure Butterfly's probes could be implemented at scale by enterprise customers and incorporated into their workflows:

> But right now, what we're focused on, most importantly, is evolving [Butterfly's Compass software] to make sure that it can be scalable and deployed across other institutions, the efforts that it takes and the efficiencies that we can drive in getting people up to scale for the deployment and then seeing the incorporation into the workflows and then starting to measure the benefits. So we see this first year as a growing and learning and deploying year.

200. That same day, UBS published an analyst report stating that "[in January 2022], BFLY announced its first enterprise wide deployment" and reported that "BFLY noted it could see another 1-2 large institutional deployments this year." In other words, a full year after the IPO, Butterfly had only one enterprise customer that was scheduled to start an implementation of Butterfly probes later that year in 2022.

201. The UBS analyst report also took note of Butterfly's newly released Blueprint software and concluded: "Net-net, BFLY is making some significant progress on its business

model, but we see risk as it looks to drive a shift in care delivery, which we view as a heavy lift and valuation gives us pause." UBS lowered the target price of BLY common stock to $5.50, down from the previous target of $7.00.

202. On February 28, 2022, Butterfly's stock price closed at $5.15 per share, down from $5.71 at the close of the preceding trading day, a decline of approximately 9.8%.

203. More than 8 months later, on November 3, 2022, Defendant Fruchterman offered additional insights relating to Butterfly's software and its inability to integrate with enterprise workflows:

> Some of our initial learnings in the market, however, made us recognize that we were not where we needed to be in order to realize the full value of our technology and the impact to healthcare. So we went to work on our enterprise level software and workflow solutions. We have spent the last year investing heavily in the development of our software solutions Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, we have gone from software that was objectively lagging to software that is now highly valued and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development has now become a positive differentiator for Butterfly.

204. During that same call, Defendant Fruchterman noted delays in implementations, revenues that were below expectations, and a downward adjustment to annual revenue guidance:

> [L]eading people through behavior change takes time both in practice and implementation, but just as others are experiencing within the industry, the budgeting and workforce pressures have intensified resulting in implementation delays. Some of our future partners are simply delaying implementation and commitments until they can catch up on people. []
>
> [Revenue] is lower than our internal expectations due to increased challenges at the macro level. [T]he broader macro environment is waging a toll on health systems. The environment has placed additional demand on frontline healthcare workers and management that has pushed out their inevitable innovation in the very near-term. The impact of this environment, it's causing a delay in our growth and as a result, we are adjusting our guidance to $73 million to $76 million[.]

205. When Oppenheimer & Co. initiated coverage on Butterfly later that month, the analysts noted that Butterfly was still struggling to shift its business strategy to enterprise sales: "Butterfly is currently undergoing an evolution of its commercial strategy, which began in 2021." The Oppenheimer analysts also concluded:

> New management team is trying to implement a new business strategy in terms of product positioning, sharpening the value proposition message, improving product attributes, etc. This essentially means the story is in transition[.]

206. On November 3, 2022, after the earnings announcement and third quarter 2022 earnings call, Butterfly's stock price closed at $3.94, down from $4.79 the previous trading day, a decline of 17.7%.

## IV. ADDITIONAL ALLEGATIONS RELATING TO PLAINTIFFS' CLAIMS UNDER SECTIONS 11 AND 15 OF THE SECURITIES ACT OF 1933

207. The Company filed the Defective Proxy/Registration Statement with the SEC on January 26, 2021. The Defective Proxy/Registration Statement incorporated by reference the Investor Presentation materials that had been filed with the SEC on November 20, 2020. The Defective Proxy/Registration Statement also expressly directed investors to rely ***solely*** on the information provided or incorporated therein:

> You should rely only on the information contained or incorporated by reference into this proxy statement/prospectus. No one has been authorized to provide you with information that is different from that contained in, or incorporated by reference into, this proxy statement/prospectus. This proxy statement/prospectus is dated as of the date set forth on the cover hereof. You should not assume that the information contained in this proxy statement/prospectus is accurate as of any date other than that date. You should not assume that the information incorporated by reference into this proxy statement/prospectus is accurate as of any date other than the date of such incorporated document. Neither the mailing of this proxy statement/prospectus to Longview stockholders nor the issuance by Longview of its common stock in connection with the Business Combination will create any implication to the contrary.

*Defective Proxy/Registration Statement* at Table of Contents.

208. The Defective Proxy/Registration Statement contained materially false and misleading statements of fact detailed herein.

### A. Materially False and Misleading Statements in the Defective Proxy/Registration Statement[7]

#### 1. Butterfly's Software Was "Objectively Lagging" and Not Valued by Healthcare Institutions or Other Potential Enterprise Customers

209. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the Company's software capabilities and its integration with the clinical workflow. Specifically, the Defective Proxy/Registration Statement stated:

> Powered by Butterfly's proprietary Ultrasound-on-Chip™ technology, **Butterfly's solution addresses the needs of point of care imaging with a unique combination of software and hardware technology**. Butterfly iQ, followed by Butterfly's recently launched Butterfly iQ+, is Butterfly's first product powered by Butterfly's Ultrasound-on-Chip™, and is the only ultrasound transducer that can perform "whole-body imaging" in a single handheld probe using semiconductor technology. Butterfly's Ultrasound-on-Chip™ reduces the cost of manufacturing, while **Butterfly's software is** intended to make the product easy to use and **fully integrated with the clinical workflow**, accessible on a user's smartphone, tablet, and almost any hospital computer system connected to the Internet.

*Defective Proxy/Registration Statement* at 24.

210. The Section 11 Defendants published substantially identical statements multiple times throughout the Defective Proxy/Registration Statement. *Defective Proxy/Registration Statement* at 17-18, 24, 99, 179, 183.

211. The foregoing statements were materially false and misleading when made because Butterfly's software was unable to address the needs of point of care imaging and was not able to fully integrate with clinical workflows. Contrary to the false statements:

[7] The statements Plaintiffs allege are false and misleading are bolded and underlined. The remaining statements are included for context.

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not address the needs of point of care imaging and was not fully integrated with clinical workflows at the time of the IPO when he stated in the November 2021 Earnings Call that Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations" further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement, demonstrating that Butterfly's software at

the time of the IPO was not fully integrated into the clinical workflow and did not address the needs of point of care imaging.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software was not fully integrated with clinical workflows at the time of the IPO and did not address the needs of point of care imaging when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

212. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the ability of the Company's software to integrate seamlessly into large healthcare systems. Specifically, the Defective Proxy/Registration Statement stated:

> With its interoperability, image transfer / storage, and mobility / remote-monitoring capabilities, **our solution can integrate seamlessly into large health care systems, simplifying the enterprise workflow for scanning and increasing the effectiveness of the imaging ecosystem within the enterprise**. This has helped us to build extensive relationships and with sales to or agreements with most of the top 100 U.S. healthcare systems, leading to many of our large volume enterprise (direct) sales.

*Defective Proxy/Registration Statement* at 189.

213. The foregoing statements were materially false and misleading when made because Butterfly's software was unable to "integrate seamlessly into large health care systems," did not

simplify the enterprise workflow, and could not increase the effectiveness of the imaging ecosystem within an enterprise. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being

worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Butterfly confirmed that, at the time of the IPO, its software was unable to "integrate seamlessly into large health care systems," did not "simplify[] the enterprise workflow," and could not "increase the effectiveness of the imaging ecosystem within the enterprise" when it omitted these statements from its product descriptions in a Form 10-K it later filed with the SEC on March 29, 2021 and instead replaced the statements with the following dramatically reduced claims about the product's capabilities:

> With its interoperability, image transfer / storage, and mobility / remote-monitoring capabilities, our solution can **integrate and connect with critical healthcare interfaces such as EMR and imaging systems, critical to coordinated delivery of care.** This has helped us to build relationships with and make sales to or agreements with most of the top 100 U.S. healthcare systems, leading to many of our large volume enterprise (direct) sales.
>
> *Form 10-K for the fiscal year ended December 31, 2020*, at 12.

(11) Defendant CEO Fruchterman confirmed Butterfly's software could not integrate seamlessly into large healthcare systems at the time of the IPO and did not simplify the enterprise workflow when he stated in the November 2021 Earnings Call that Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement, demonstrating that at the time of the IPO Butterfly's software could not integrate seamlessly into large healthcare systems.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software could not integrate seamlessly into large healthcare systems at the time of the IPO and did not simplify the enterprise workflow when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

214. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the ability of the Company's software to be a

solution for governance and workflow challenges. Specifically, the Defective Proxy/Registration Statement stated:

> We continue to enhance our software to further integrate our solution with health systems to simplify workflow and governance of their imaging ecosystem. **Our unique ability to connect and govern traditional third party ultrasound systems gives enterprise customers a solution to the governance and workflow challenges that have limited the utilization and billing of point of care imaging devices**.

*Defective Proxy/Registration Statement* at 189.

215. The foregoing statements were materially false and misleading when made because Butterfly's software did not give enterprise customers a solution to governance and workflow challenges that had been limiting the use of point of care imaging devices. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into

clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not give enterprise customers a solution to governance and workflow challenges that had been limiting the

use of point of care imaging devices at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement, demonstrating that at the time of the IPO Butterfly's software did not give enterprise customers a solution to governance and workflow challenges.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software did not give enterprise customers a solution to governance and workflow challenges that had been limiting the use of point of care imaging devices at the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

216. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about Butterfly's software benefitting enterprise

customers with a streamlined clinical workflow and reduced documentation burden. Specifically, the Defective Proxy/Registration Statement stated:

> **Enterprise customers deploying Butterfly's solution benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems and connects directly with customers' electronic medical records ("EMRs")**.

*Defective Proxy/Registration Statement* at 189.

217. The foregoing statements were materially false and misleading when made because Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software

features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) In a Form 10-K filed with the SEC on March 29, 2021, Butterfly offered a substantially similar claim when describing its software, but omitted the claim that Butterfly's software "connects directly with customers' electronic medical records:

> Enterprise customers deploying our solution can benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems.
>
> *Form 10-K for the fiscal year ended December 31, 2020*, at 12

(9) Defendant CEO Fruchterman confirmed Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(10) In a Form 10-K filed with the SEC on March 29, 2021, Butterfly offered a substantially similar claim when describing its software, but omitted the claim that Butterfly's software "connects directly with customers' electronic medical records:

> Enterprise customers deploying our solution can benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems.
>
> *Form 10-K for the fiscal year ended December 31, 2020*, at 12

(11) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement, demonstrating that at the time of the IPO Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems.

(12) Defendant CEO Fruchterman further confirmed Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems at the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

218. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the ability of the Company's software to help enterprise customers manage their point of care imaging devices and derive maximum value from them. Specifically, the Defective Proxy/Registration Statement stated:

> **<u>By adopting Butterfly Enterprise software, customers can responsibly manage and drive maximum value from their fleets of point of care imaging devices</u>**.

*Defective Proxy/Registration Statement* at 189.

219. The foregoing statements were materially false and misleading when made because Butterfly's software was incapable of managing fleets of point of care imaging devices for enterprise customers and could not drive maximum value from those devices. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software was incapable of managing fleets of point of care imaging devices for enterprise customers and could not drive maximum value from those devices at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations" further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software was incapable of managing fleets of point of care imaging devices for enterprise customers and could not drive maximum value from those devices at the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

220. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the ability of the Company's software to address unmet needs and challenges regarding the complex clinical workflows associated with point of care medical imaging. Specifically, the Defective Proxy/Registration Statement stated:

> **Products & Services**
>
> **Butterfly provides a complete solution to address an unmet need in point-of-care medical imaging through a unique combination of hardware and software services**. Our hardware is powered by the first and only currently available ultrasound on a semiconductor chip. **Our software addresses the traditional ease-of-use challenges and the complex clinical workflow throughout a patient's care pre-and post-examination**. **Our integrated system with EMRs** provides healthcare practitioners with a tool that enables fast and confident clinical decision-making.

*Defective Proxy/Registration Statement* at 192.

221. The foregoing statements were materially false and misleading when made because Butterfly's software was far from a "complete solution" to the unmet needs and challenges of the

complex clinical workflows associated with point of care imaging, did not address ease-of-use issues, and was not integrated with EMRs. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being

worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software was far from a "complete solution" to the unmet needs and challenges of the complex clinical workflows associated with point of care imaging, did not address ease-of-use issues, and was not integrated with EMRs at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software was far from a "complete solution" to the unmet needs and challenges of the complex clinical workflows associated with point of care imaging, did not address ease-of-use issues, and was not integrated with EMRs at the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

222. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement that indicated that Butterfly's then-presently existing "Software Services" included a complete suite of tools, including "Enterprise Workflow" features that would be highly valued by large institutional customers. Specifically, the Defective Proxy/Registration Statement contained follow graphic and text, show below in Figure P:

**Figure P.**




*Defective Proxy/Registration Statement* at 195.

223. The foregoing statements were materially false and misleading when made because Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially

because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers at the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

224. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the Company's software linking to hospital and office systems and allowing practitioners to transfer scanned images seamlessly and securely. Specifically, the Defective Proxy/Registration Statement stated:

> In addition to social impact, we believe our solution will also have significant clinical impact. **Through our software solution, empowered by AI, users can upload scanned images to our HIPAA compliant cloud, which has unlimited storage, links to hospital and office systems, and can be accessed from a desktop computer. This allows practitioners to access and transfer their scanned images in a seamless and secure way, leading to additional opportunities for observation** and therefore, we believe, earlier diagnosis and treatment. Furthermore, our solution delivers billing codes directly in the user interface application following scanning, both enhancing practitioner compliance adherence and increasing revenue in fee-for-scan environments.

*Defective Proxy/Registration Statement* at 188-9.

225. The Section 11 Defendants published substantial similar statements later in the Defective Proxy/Registration Statement:

> **Through our software subscription options, users can upload scanned images to our HIPAA-compliant cloud, which has unlimited storage and links to hospital and office systems, allowing for seamless transfer of images that can also be accessed from a desktop computer**. As telemedicine continues to make headway through our healthcare system, our software application features TeleGuidance, which is the world's first integrated ultrasound telemedicine platform.

*Defective Proxy/Registration Statement* at 195.

226. The foregoing statements were materially false and misleading when made because Butterfly's software could not link to hospital and office systems and did not allow for a seamless and secure transfer of images. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not

perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software could not link to hospital and office systems and did not allow for a seamless and secure transfer of images at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products. At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further confirming that Butterfly's software was not capable of what had been represented in the Defective Proxy/Registration Statement.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software could not link to hospital and office systems and did not allow for a seamless and secure transfer of images the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

[] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

**2. Butterfly's 2021 IPO Forecasts Lacked Any Reasonable Basis**

227. In the Defective Proxy/Registration Statement, the Section 11 Defendants disclosed the following forecasts, which lacked any reasonable basis:

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **Revenue ($ in millions)** | $44.0 | $78.1 | $137.9 | $235.2 | $334.0 |
| **% Year over year revenue growth** | 60% | 77% | 77% | 71% | 42% |
| **% gross margin** | NM | 43% | 51% | 60% | 68% |
| **Contribution from wearables** | — | — | — | 5% | 10% |

228. The Section 11 Defendants represented that the above forecasts purportedly represented management's "reasonable estimates and assumptions" for Butterfly's "expected future financial performance:"

**The Projections were prepared in good faith by Butterfly's management based on their reasonable estimates and assumptions with respect to the expected future financial performance of Butterfly at the time the Projections were prepared and speak only as of that time….**

*Defective Proxy/Registration Statement* at 115-16.

229. The Section 11 Defendants further represented that:

**The accompanying prospective financial information [], in the view of Butterfly's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Butterfly.**

*Defective Proxy/Registration Statement* at 115.

230. The foregoing statements were materially false and misleading when made because Butterfly's 2021 IPO Forecasts lacked any reasonable basis and did not reflect management's best then-currently available estimates and judgements, as demonstrated by the following facts:

(1) CW 3 stated that the 2021 IPO Forecasts were a "top-down" model that assumed unachievable year over year growth rates in sales unsupported by any underlying data, including the current pipeline of potential sales and quality of those sales leads.

(2) CW 5 corroborated CW 3's statements, reporting that the quotas and goals "came from the top down" and were not based on information and practices typically used when setting sales goals, such as looking at a salesperson's geography, prior sales, and existing opportunities in the area.

(3) CW 3 reported that nobody, including Butterfly management and the CFO, took the 2021 IPO Forecasts seriously because the assumed growth rates were extraordinarily high and unachievable. CW 3 further stated that the model had been "slapped together for investors," based upon arbitrary growth rates that were not connected to historical performance of the Company.

(4) CW 3 further reported that the 2021 IPO Forecasts were "unrealistic" and a "pie-in-the-sky." CW 5 agreed, stating that "we all knew" that Butterfly's 2021 sales projections were "unattainable."

(5) CW 2 stated that the potential deals this witness saw in the Salesforce.com pipeline did not support the forecast. CW 2 stated that when CW 2 joined Butterfly shortly after the IPO, only about 50% the purported enterprise deals in Butterfly's Salesforce.com pipe were valid and the rest were "smoke and mirrors" and involved customers who had stopped communicating with Butterfly and deals that inflated the number of probes a

customer was willing to buy. CW 4 corroborated CW 2's account recalling that in 2021, sales representatives inflated the value of their potential deals in Salesforce.com by including more probes than the customer wanted to buy.

(6) CW 4 confirmed the reports of CW 2 and CW 3, calling the 2021 sales quotas unachievable and unrealistic. CW 4 also stated that the sales quotas did not take into account the Company's deficient sales pipeline in Salesforce.com, its sales history and performance of the sales force in prior years and there was no bottom-up communication from the sales force to management as far as what the sales personnel believed they could achieve in sales.

(7) CW 5 corroborated the accounts of a deficient pipeline as reported by CW 2, CW 3, and CW 4. CW 5 reported that the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities" and CW 5 had no idea "where [the Company] got the goals from." CW 5 stated that this contributed to few salespeople reaching their yearly sales goals and high turnover in the sales organization. CW 5 also provided detailed examples of prospective deals in the pipeline that were known to be non-viable opportunities, such as a $1.4 million deal with NYU. CW 5 stated that he was instructed to keep the number in the pipeline even after he had learned that NYU was not interested.

(8) CW 5 reported that even taking all the deals in Salesforce.com, including the bogus ones, Butterfly did not have enough potential deals in the pipeline to meet the Company's aggregated sales projections. CW 4 agreed with CW 5 that even with the

inflated deals recorded in Salesforce there were not enough sales opportunities in the pipeline for Butterfly to achieve the 2021 IPO Forecasts.

(9) CW 3 confirmed that the 2021 IPO Forecasts assumed large increases in sales to the enterprise market that Butterfly could only achieve through "more penetration in enterprise," but did not factor in that enterprise sales were only beginning to ramp up in the second half of 2021 and 2022, well after the IPO.

(10) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its Initiation of Coverage report on Butterfly published in December 2021, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"[8]

(11) CW 4 confirmed that there were significant barriers to Butterfly entering the enterprise market in 2021, including that Butterfly's platform lacked integration with EHR, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers. CW 5 corroborated this account, reporting that stating that Butterfly was "still building" the software at the time of his departure in November 2022 and likened the situation to "building a plane as we flew it."

[8] UBS Global Research, *Initiation of Coverage: Butterfly Network Inc*, December 17, 2021.

(12) Both CW 2 and CW 3 reported that the enterprise sales force was only beginning to ramp up in 2021 and, thus, Butterfly was not equipped to achieve the 2021 IPO Forecasts. CW 5 reported that in 2021 and 2022, Butterfly was struggling to sell to large, enterprise customers and the Company was forced to rely upon its e-Commerce sales to keep "the lights on."

(13) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(14) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained incomplete.

(15) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating the unreasonableness of the revenue guidance that was reliant upon sales to enterprise customers.

### 3. <u>The Risks of Excess Inventory Had Already Materialized</u>

231. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the risks of insufficient demand resulting in excess inventory. Specifically, the Defective Proxy/Registration Statement stated:

> *If Butterfly does not successfully optimize and operate its sales and distribution channels or Butterfly does not effectively expand and update infrastructure, its operating results and customer experience may be negatively impacted.*
>
> **If Butterfly does not adequately predict market demand or otherwise optimize and operate its sales and distribution channels successfully, it could result in excess or insufficient inventory or fulfillment capacity, increased costs, or immediate shortages in product or component supply, or harm Butterfly's business in other ways.** In addition, if Butterfly does not maintain adequate infrastructure to enable it to, among other things, manage its purchasing and inventory, it could negatively impact Butterfly's operating results and user experience.

*Defective Proxy/Registration Statement* at 69.

232. The foregoing statements were materially false and misleading when made because the risk of harm to Butterfly's business from excess inventory had already materialized as the Company was incurring losses from excess inventory and would continue to incur losses from excess inventory, demonstrated by the following facts:

(1) Butterfly stated in the Defective Proxy/Registration Statement that the TSMC agreement was amended to increase the purchase commitment to $169 million and to "extend the time frame of the agreement," but failed to disclose that the extended time frame to use the additional inventory was only two years, ending in December 2022. Butterfly disclosed in its SEC filings that purchase commitments were "non-cancelable" and "based on sales forecasts." Thus, given Butterfly's overstated 2021 IPO Forecast for sales that did not consider actual historical performance and the lack of potential enterprise sales in the current pipeline, which CW 2 estimated was overstated by about half, Butterfly could not sell the entire purchase commitment during a two-year period.[9]

[9] Based on product margins and information obtained from CW 3, Lead Counsel estimates that $169 million in purchase commitments obligated the Company to purchase quantities of wafers sufficient to build 9,000 to 12,000

(2) Butterfly's inventory reserves against forward purchase commitments were based upon the 2021 IPO Forecasts that were grossly inflated by, according to CW 4, at least 20% or more, meaning that the losses on purchase commitments disclosed at the time of the Merger were understated because the 2021 IPO Forecasts assumed an inflated sales figure that presumed the sale of more inventory than could ever be achieved.

(3) CW 1 attended and participated in weekly supply chain meetings throughout CW 1's tenure at Butterfly where insufficient demand for the inventory was discussed. CW 1 also stated that when this witness left Butterfly in August 2020, sales of the probes still were not ramping up. CW 1 further recalled that the Company's sales goals were at odds with prior metrics and unrealistic which CW 1 knew from CW 1's participation in weekly supply chain meetings.

(4) CW 4 reported that the TSMC Contract required Butterfly to "purchase a ton of chips" and that was one reason why the sales quotas and 2021 IPO Forecasts were set so high. According to CW 4, Butterfly would never be able to use all of the inventory based on the current pipeline and slow adoption by enterprise customers.

(5) the Defective Proxy/Registration Statement confirms this fact, showing that Butterfly had sold approximately 12,000 probes in 2019 and approximately 12,000 probes during the first three quarters of 2020; while 2020 was showing a year over year increase in sales, it was not nearly enough to cover the massive amounts of purchase commitments.

(6) Butterfly did in fact continue to suffer losses on purchase commitments in future quarters, as the Company disclosed an $11.6 million loss on purchase commitments in

---

probes per month, far more than the 1,820 probes the Company was selling each month, on average, as shown in Figures C and D.

the November 2021 Earnings Call and further disclosed $35 million in inventory write-offs relating to the previous inventory reserves against forward purchase commitments.

**4. The Risk of Write-Downs and Purchase Commitment Losses Had Already Materialized and Were Ongoing**

233. The Defective Proxy/Registration Statement contained materially false and misleading statements relating to the Company's ongoing losses from purchase commitments. Specifically, the Defective Proxy/Registration Statement stated:

> ***Subsequent to the consummation of the Business Combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges*** *that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.*
>
> Although Longview has conducted due diligence on Butterfly and New Butterfly, Longview cannot assure you that this diligence revealed all material issues that may be present in its business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of Longview's or New Butterfly's control will not later arise. As a result, **New Butterfly may incur additional costs and expenses and may be forced to later write-down or write-off assets, restructure its operations or incur impairment or other charges that could result in losses.** Even if the due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that New Butterfly reports charges of this nature could contribute to negative market perceptions about New Butterfly or its securities.

*Defective Proxy/Registration Statement* at 51-52

234. The foregoing statements were materially false and misleading when made because the risk of future losses from purchases commitments had already materialized and losses from purchase commitments were an ongoing issue. Butterfly had massive purchase obligations at the time of the false statements and expected future losses on purchase commitments in the near future, as demonstrated by the following facts:

(1) Butterfly stated in the Defective Proxy/Registration Statement that the TSMC agreement was amended to increase the purchase commitment to $169 million and to "extend the time frame of the agreement," but failed to disclose that the extended time frame to use the additional inventory was only two years, ending in December 2022. Butterfly disclosed in its SEC filings that purchase commitments were "non-cancellable" and "based on sales forecasts." Thus, given Butterfly's overstated 2021 IPO Forecast for sales that did not consider actual historical performance and the lack of potential enterprise sales in the current pipeline, which CW 2 estimated was overstated by about half, Butterfly could not sell the entire purchase commitment during a two-year period.

(2) At the time of the IPO, Butterfly had previously conducted an inventory review in November 2020 that resulted in the establishment of a $53.1 million inventory reserve against forward purchase commitments which the Company claimed "represent[ed] a reasonable range of sales outcomes, consistent with our merger forecast[.]" In other words, the Company estimated that $53.1 million in inventory would need to be written off at some point in the future. The $53.1 million inventory reserve against forward purchase commitments, however, was understated because it was based on the grossly inflated 2021 IPO Forecasts of sales that CWs 2, 3 and 4 reported were unattainable, further supporting the certainty that the Company would suffer tens of millions of dollars of inventory write-downs and losses on purchase commitments in the future.

(3) CW 1 attended and participated in weekly supply chain meetings throughout CW 1's tenure at Butterfly where insufficient demand for the inventory was discussed; CW 1 also stated that when this witness left Butterfly in August 2020, sales of the probes still

were not ramping up. CW 1 further recalled that the Company's sales goals were at odds with prior metrics and unrealistic, which CW 1 knew from his participation in weekly supply chain meetings.

(4) CW 4 reported that the TSMC Contract required Butterfly to "purchase a ton of chips" and that was one reason why the sales quotas and 2021 IPO Forecasts were set so high. According to CW 4, Butterfly would never be able to use all of the inventory based on the current pipeline and slow adoption by enterprise customers.

(5) the Defective Proxy/Registration Statement states confirms this fact, showing that Butterfly had sold approximately 12,000 probes in 2019 and approximately 12,000 probes during the first three quarters of 2020; while 2020 was showing a year over year increase in sales, it was not nearly enough to cover the massive amounts of purchase commitments.

(6) Butterfly did in fact write off at least $35 million of that inventory as obsolete and continued to suffer losses on purchase commitments in future quarters, as the Company disclosed an $11.6 million loss on purchase commitments in the November 2021 Earnings Call and further disclosed inventory write-offs: "[W]e have determined that older raw material is likely obsolete. Consequently, we reclassified $35 million of that older raw material from reserve against the inventory to a reduction in the inventory."

### 5. <u>The Risk of Obsolete Hardware Had Already Materialized</u>

235. The Section 11 Defendants published materially false and misleading statements in the Defective Proxy/Registration Statement about the risk that Butterfly's products could become obsolete. Specifically, the Defective Proxy/Registration Statement stated:

> ***<u>Medical device development is costly and involves continual technological change, which may render Butterfly's current or future products obsolete.</u>***

> The market for point-of-care medical devices is characterized by rapid technological change, medical advances and evolving industry standards. **Any one of these factors could reduce the demand for Butterfly's devices or services or require substantial resources and expenditures for research, design and development to avoid technological or market obsolescence.**
>
> […]
>
> Butterfly might have insufficient financial resources to improve existing devices, advance technologies and develop new devices at competitive prices. **Technological advances by one or more competitors or future entrants into the field may result in Butterfly's current devices becoming non-competitive or obsolete, which may decrease revenues and profits and adversely affect Butterfly's business and results of operations.**

*Defective Proxy/Registration Statement* at 63.

236. The foregoing statements were materially false and misleading when made because the risk of adverse financial effects arising from obsolete hardware had already materialized due to Butterfly's massive purchase commitments that outpaced demand for the Company's products. Contrary to the assertions in the false statements that the adverse financial effects of obsolete hardware were merely a future possibility, such adverse financial effects were presently occurring and ongoing, demonstrated by the following facts:

(1) At the time of the IPO, Butterfly had previously conducted an inventory review in November 2020 that resulted in the establishment of a $53.1 million inventory reserve against forward purchase commitments which the Company claimed "represent[ed] a reasonable range of sales outcomes, consistent with our merger forecast[.]" In other words, $53.1 million in inventory would need to be written off at a later point in time. The $53.1 million inventory reserve against forward purchase commitments, however, was understated because it was based on the 2021 IPO Forecasts that were inflated by, according to CW 4, at least 20% if not more, that CWs 2, 3 and 4 reported were unattainable, further supporting the certainty that the Company would suffer tens of

millions of dollars of inventory write-downs and losses on purchase commitments in the future.

(2) CW 1 attended and participated in weekly supply chain meetings throughout CW 1's tenure at Butterfly where the fact that there was insufficient demand for the inventory was discussed; CW 1 also stated that when this witness left Butterfly in August 2020, sales of the probes still were not ramping up. CW 1 further recalled that the Company's sales goals were at odds with prior metrics and unrealistic, which CW 1 knew from his participation in weekly supply chain meetings.

(3) CW 4 reported that the TSMC Contract required Butterfly to "purchase a ton of chips" and that was one reason why the sales quotas and 2021 IPO Forecasts were set so high. According to CW 4, Butterfly would never be able to use all the inventory based on the current pipeline and slow adoption by enterprise customers.

(4) The Defective Proxy/Registration Statement states confirms this fact, showing that Butterfly had sold approximately 12,000 probes in 2019 and approximately 12,000 probes during the first three quarters of 2020; while 2020 was showing a year over year increase in sales, it was not nearly enough to cover the massive amounts of purchase commitments.

(5) Butterfly did in fact write off at least $35 million of that inventory as obsolete, as the Company disclosed in the November 2021 Earnings Call: "[W]e have determined that older raw material is likely obsolete. Consequently, we reclassified $35 million of that older raw material from reserve against the inventory to a reduction in the inventory."

**B. Materially False and Misleading Statements in the Investor Presentation Materials Incorporated into <u>the Defective Proxy/Registration Statement by Reference</u>**

**1. No "Strong Initial Adoption" and <u>"Momentum" at Healthcare Institutions</u>**

237. The Section 11 Defendants published materially false and misleading statements about the Company's success at selling to healthcare institutions (*e.g.*, enterprise customers) in the November 20, 2020 Investor Presentation, filed with the SEC on that day as an attachment to a Form 8-K signed by Defendant Mark Horowitz, that was later incorporated by reference into the Prospectus that was part of the Defective Proxy/Registration Statement, below as Figure Q.

**Figure Q.**




238. Specifically, the Investor Presentation falsely stated:

> **<u>Healthcare Institutions to Drive Adoption at Scale: Strong initial adoption, excitement, and momentum</u>**
>
> **<u>Butterfly has an existing footprint in most of the Top 100 US Health Systems</u>**

*Investor Presentation* at 30.

239. The foregoing statements were materially false and misleading when made because Butterfly did not have "momentum" with or "strong initial adoption" of its products by healthcare institutions (e.g., enterprise customers). Contrary to the above false statements:

(1) CW 1 reported that throughout 2019 and 2020 Butterfly's customer base were primarily "home users" and enterprise sales were only beginning to be discussed toward the end of CW 1's tenure at Butterfly. According to CW 1, it takes years to develop the sales cycle for enterprise sales because, as reported by CW 3, enterprise customers take longer to enter into deals, enterprise customers often already have contracts with large, established companies like GE and Philips, and it is more difficult to convince enterprise customers to adopt a new, unproven product. CW 4 also reported that Butterfly's primary customers in 2019 and 2020 were individual practitioners, e-Commerce customers, and "early adopters" and that the sales cycle for enterprise customers is six to eighteen months due to all the steps that need to be taken, from finding interest, to becoming a recognized vendor, to negotiating the contract. CW 5 corroborated the reports of CW 1, CW 3, and CW 4, stating that enterprise sales deals have a long sales cycle that can take more than a year to develop and close and recalling that in 2021 and 2022 Butterfly was struggling to sell to enterprise customers and the Company was forced to rely upon its e-Commerce sales to keep "the lights on."

(2) CW 3 stated that enterprise customers had been slow to adopt Butterfly's probes because the technology was not fully developed and still unproven. CW 3 confirmed that when this witness joined Butterfly in June 2021, there were still a lot of features that needed to be worked out and were still being developed with regards to the probe's software. CW 3 also stated that healthcare institutions were price sensitive to a product

that was still in development. CW 3 reported that Butterfly's software pricing for enterprise customers was particularly egregious, with a "huge divide" between what Butterfly quoted to enterprise customers as compared to nurse practitioners and homecare providers, and recalled that Butterfly's high pricing caused it to lose enterprise customers. CW 5 similarly reported that pricing on Butterfly's website was "a direct conflict for us" and created additional impediments to large, enterprise sales. CW 5 recalled that despite CW 5's desire to offer "strategic pricing" to enterprise customers, CW 5 was required to attempt to sell to enterprise customers at "full pricing."

(3) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its December 2021 report, Initiation of Coverage report on Butterfly, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(4) CW 4 reported additional barriers to entering the enterprise market, stating that the sales cycle is very long, from six to eighteen months, in part because enterprise customers often required the seller to first become an approved vendor to the institution and then obtain approval from the institution's IT department after demonstrating the security of the item to be sold. CW 5 corroborated CW 4's account, explaining that

large customers usually require vendors like Butterfly to go through an extended vetting process.

(5) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(6) CW 1 recalled one meeting discussing enterprise sales in 2020 during which the Company discussed the need to resolve how clinicians could appropriately bill clients and insurance companies for procedures completed with the Butterfly, an issue which seriously limited healthcare institution's interest in Butterfly's probes.

(7) CW 2 stated that when CW 2 joined the Company in May 2021, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time," further confirming that the probes were insufficiently developed to achieve market penetration at healthcare institutions at the time of the IPO. CW 5 reported that Butterfly was still developing its software when CW 5 left the Company in November 2022, and likened the situation to "building a plane as we flew it."

(8) CW 3 confirmed that Butterfly's business case and value proposition of its probes was not clear to healthcare institutions at the time of the false statement and, thus, in June or July 2021, the Company hired PwC to develop the "business case" and "value propositions" that would be presented to key decision makers at healthcare institutions.

(9) CW 2 stated that there were no enterprise-wide implementations of Butterfly probes at any healthcare institution at the time of the false statement. CW 2 recalled that for more than one year after the Merger, Butterfly did not have a single example of a successful, enterprise-wide implementation of Butterfly's products by a large healthcare

institution. CW 3 corroborated CW 2's account, stating that CW 3 was unaware of any enterprise-wide implementations of Butterfly's probes during this witness's tenure at Butterfly. CW 5 further corroborated this, stating that in late 2021 or 2022 the Company was attempting to "buy" a flagship account at URMC that could be used as a reference site, but that when CW 5 left six or eight months later, the implementation of Butterfly's probes was still incomplete, despite the heavy discounts on probes and free software offered to URMC.

(10) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating there had not been "strong initial adoption" at healthcare institutions at the time of the IPO.

(11) CW 5 recalled that some potential enterprise customers, such as NYU, had "no interest" in completing any deals with Butterfly because the Company had previously delivered "an abbreviated version" of what had been expected in an earlier deal, leaving a "bad taste" with the potential customers.

(12) A full year after the false statement, Butterfly was still only beginning to shift its efforts toward selling to large healthcare institutions, as confirmed by Defendant Fruchterman's comments in the November 2021 Earnings Call, stating that Butterfly was still "early in [the] journey" of introducing Butterfly to healthcare institutions. The infancy of the Company's shift to enterprise customers was reiterated by Butterfly's CEO during the November 2021 Earnings Call where, in response to a question about the momentum of enterprise sales, stated that "this is a lot less about things not happening and more about **things not happening yet.**"

(13) CW 2, CW 3, and CW 5 all confirmed that the Company was still ramping up its enterprise sales force throughout 2021 and into 2022.

### 2. Near Term Growth was Not Supported by a Pipeline of Enterprise Bookings

240. The Section 11 Defendants published materially false and misleading statements about the Company's near-term growth being supported by a pipeline of enterprise bookings in the Investor Presentation materials that were incorporated by reference into the Defective Proxy/Registration Statement. Specifically, the Investor Presentation stated:

> **Near term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets.**

241. The foregoing statement was materially false and misleading when made because:

(1) The potential deals in Butterfly's pipeline were illusory, as confirmed by CW 2 who stated that when CW 2 joined the Company shortly after the IPO, Butterfly's Salesforce.com application appeared to have many opportunities in the pipeline that were nearly closed deals, but once CW 2 investigated, these purported potential deals were illusory and CW 2 removed approximately half of the deals in Salesforce.com for this witness' own region because the potential customer was no longer interested, did not have the authority to make purchasing decisions, had been misinformed about the product or pricing, had stopped communicating with Butterfly, or wished to purchase far fewer probes than was represented in the Salesforce.com application. Thus, CW 2 referred to the pipeline of potential deals as "smoke and mirrors."

(2) CW 2 recalled that in some instances the potential deals in Salesforce.com overstated the number of probes the potential customer was willing to purchase. CW 4 confirmed

CW 2's report, stating that in 2021 sales representatives inflated the value of the deals in the Salesforce.com pipeline by including more probes than could be sold.

(3) CW 5 corroborated CW 2 and CW 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities."

(4) CW 2 reported that when it appeared a deal was not viable due to inactivity, CW 2 and other sales representatives were instructed by management to change the completion date to a later time so it appeared in Salesforce.com that the deal was still progressing and, thus, viable. CW 5 reported that CW 5 was also told to keep opportunities in the sales pipeline even when an opportunity was "clearly not viable."

(5) CW 5 reported that even taking all the deals in Salesforce.com, including the bogus ones, Butterfly did not have enough potential deals in the pipeline to meet the Company's aggregated sales projections. CW 4 agreed with CW 5 that even with the inflated deals recorded in Salesforce there were not enough sales opportunities in the pipeline for Butterfly to achieve the 2021 IPO Forecasts.

(6) Butterfly did not have the sales force needed to achieve near term growth from enterprise bookings, as confirmed by CWs 2, 3 4 and 5 who all stated that the Company was still ramping up its enterprise sales force well into and throughout 2021 and into 2022. In the May 2021 Earnings Call, Butterfly's CEO described a "doubling" of the Company's sales force in Q1 2021, to reach a total of 27 sales representatives; thus, even as late as Q1 2021, the Company's sales force had only 13 sales representatives.

(7) Butterfly's CEO, Defendant Fruchterman, also confirmed the Company's lack of sales force dedicated to executing enterprise bookings in November 2020 when he described, during the November 2021 Earnings Call, "an aggressive back half 2021 ramp."

(8) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating there had not been "pipeline bookings across the enterprise" market segment at the time of the IPO.

(9) Enterprise clients were very unlikely to purchase Butterfly's products because they were not fully developed and lacked key functionality, as confirmed by CW 3 who reported that when CW 3 joined Butterfly in June 2021, there were still a lot of features that needed to be worked out and were still being developed with regards to the probe's software. CW 4 confirmed that Butterfly's probes lacked integration with enterprise workflows until, at the earliest, the second half of 2021.

(10) CW 3 also stated that healthcare institutions were price sensitive to a product that was still in development throughout CW 3's tenure. CW 3 reported that Butterfly's software pricing for enterprise customers was particularly egregious, with a "huge divide" between what Butterfly quoted to enterprise customers as compared to nurse practitioners and homecare providers, and also recalled that Butterfly's high pricing caused it to lose enterprise customers. CW 5 corroborated CW 3's account, stating that pricing on Butterfly's website was "a direct conflict for us" and created additional impediments to large, enterprise sales. Despite CW 5's desire to offer "strategic pricing" to enterprise customers, CW 5 was required to attempt to sell to enterprise customers at "full pricing."

(11) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its December 2021 Initiation of Coverage report on Butterfly, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(12) CW 4 reported additional barriers to entering the enterprise market, stating that the sales cycle is very long, from six to eighteen months, because enterprise customers often required the seller to first become an approved vendor to the institution and then obtain approval from the institution's IT department after demonstrating the security of the item to be sold.

(13) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(14) CW 2 stated that when CW 2 joined the Company in May 2021, Butterfly's products were still in a proof of concept phase and not ready for "prime time," further confirming that the probes were insufficiently developed to be sold to enterprise clients at the time of the IPO. CW 5 corroborated CW 2's account, reporting that Butterfly was "still building" the software at the time of his departure in November 2022 and likened the situation to "building a plane as we flew it."

(15) CW 2 stated that during CW 2's tenure at the Company, Butterfly did not have a single example of a successful, enterprise-wide implementation of Butterfly's products by an enterprise client. CW 5 confirmed that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO.

(16) CW 3 corroborated CW 2 and CW 5's reports, stating that CW 3 was unaware of any enterprise-wide implementations of Butterfly's probes during his tenure at Butterfly.

(17) Defendant CEO Fruchterman also confirmed that in November 2020, at the time of the false statement, the Company's products were not ready to be sold to enterprise clients, stating in the November 2021 Earnings that the Company had "in only a matter of months [] reoriented [Butterfly's] technology group [] to include industry-leading best practices for enterprise and workflow software development to bring agility and speed to our enablement of larger scale enterprise collaborations." During that same earnings call, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further demonstrating a lack of demand from enterprise customers at the time the false statement was made.

### 3. **Butterfly's 2021 IPO Forecasts Lacked Any Reasonable Basis**

242. The Section 11 Defendants published materially false and misleading statements about the Company's 2021 revenues in the Investor Presentation that was incorporated by reference into the Defective Proxy/Registration Statement. Specifically, the Investor Presentation stated that the Company expected revenues of $78.1 million in 2021, as shown below in Figure R:

**Figure R.**




243. The foregoing statements were materially false and misleading when made because Butterfly's 2021 IPO Forecasts lacked any reasonable basis and did not reflect management's best then-currently available estimates and judgements, as demonstrated by the following facts:

(1) CW 3 stated that the 2021 IPO Forecasts were a "top down" model that assumed unachievable year over year growth rates in sales unsupported by any underlying data, including the current pipeline of potential sales and quality of those sales leads.

(2) CW 5 corroborated CW 3's statements, reporting that the quotas and goals "came from the top down" and were not based on information and practices typically used when setting sales goals, such as looking at a salesperson's geography, prior sales, and existing opportunities in the area.

(3) CW 3 reported that nobody, including Butterfly management and the CFO, took the 2021 IPO Forecasts seriously because the assumed growth rates were extraordinarily high and unachievable. CW 3 further stated that the model had been "slapped together

for investors," based upon arbitrary growth rates that were not connected to historical performance of the Company.

(4) CW 3 further reported that the 2021 IPO Forecasts were "unrealistic" and a "pie in the sky." CW 5 agreed, stating that "we all knew" that Butterfly's 2021 sales projections were "unattainable."

(5) CW 2 stated that the potential deals this witness saw in the Salesforce.com pipeline did not support the forecast. CW 2 stated that when CW 2 joined Butterfly shortly after the IPO, only about 50% the purported enterprise deals in Butterfly's Salesforce.com pipe were valid and the rest were "smoke and mirrors" and involved customers who had stopped communicating with Butterfly and deals that inflated the number of probes a customer was willing to buy. CW 4 corroborated CW 2's account recalling that in 2021, sales representatives inflated the value of their potential deals in Salesforce.com by including more probes than the customer wanted to buy.

(6) CW 4 confirmed the reports of CW 2 and CW 3, calling the 2021 sales quotas unachievable and unrealistic. CW 4 also stated that the sales quotas did not take into account the Company's deficient sales pipeline in Salesforce.com, its sales history and performance of the sales force in prior years and there was no bottom-up communication from the sales force to management as far as what the sales personnel believed they could achieve in sales.

(7) CW 5 corroborated the accounts of a deficient pipeline as reported by CW 2, CW 3, and CW 4. CW 5 reported that the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified

opportunities" and CW 5 had no idea "where [the Company] got the goals from." CW 5 stated that this contributed to few salespeople reaching their yearly sales goals and high turnover in the sales organization. CW 5 also provided detailed examples of prospective deals in the pipeline that were known to be non-viable opportunities, such as a $1.4 million deal with NYU. CW 5 stated that he was instructed to keep the number in the pipeline even after he had learned that NYU was not interested.

(8) CW 5 reported that even taking all the deals in Salesforce.com, including the bogus ones, Butterfly did not have enough potential deals in the pipeline to meet the Company's aggregated sales projections. CW 4 agreed with CW 5 that even with the inflated deals recorded in Salesforce there were not enough sales opportunities in the pipeline for Butterfly to achieve the 2021 IPO Forecasts.

(9) CW 3 confirmed that the 2021 IPO Forecasts assumed large increases in sales to the enterprise market that Butterfly would achieve through "more penetration in enterprise," but did not factor in that enterprise sales were only beginning to ramp up in the second half of 2021 and 2022, well after the IPO.

(10) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its Initiation of Coverage report on Butterfly published in December 2021, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(11) CW 4 confirmed that there were significant barriers to Butterfly entering the enterprise market in 2021, including that Butterfly's platform lacked integration with EHR, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers. CW 5 corroborated this account, reporting that stating that Butterfly was "still building" the software at the time of his departure in November 2022 and likened the situation to "building a plane as we flew it."

(12) Both CW 2 and CW 3 reported that the enterprise sales force was only beginning to ramp up in 2021 and, thus, Butterfly was not equipped to achieve the 2021 IPO Forecasts. CW 5 reported that in 2021 and 2022, Butterfly was struggling to sell to large, enterprise customers and the Company was forced to rely upon its e-Commerce sales to "keep the lights on."

(13) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(14) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained.

(15) During the November 2021 Earnings Call, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further demonstrating a lack of demand from enterprise customers at the time the false statement was made.

(16) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating the unreasonableness of the revenue guidance that was reliant upon sales to enterprise customers.

#### 4. Butterfly's Gross Margin Forecasts for 2021 Ignored the Company's Minimum Purchase Commitments and the Historical Lack of Demand

244. The Section 11 Defendants published materially false and misleading statements about the Company's 2021 margins in the Investor Presentation materials that were incorporated by reference into the Defective Proxy/Registration Statement. Specifically, the Investor Presentation stated that the Company expected gross margins of 43% in 2021, as shown above in Figure R.

245. The foregoing statement that the Company expected gross margins of 43% in 2021 was materially false and misleading when made because:

(1) Butterfly failed to disclose in the Defective Proxy/Registration Statement that the time frame relating to TSMC's required $169 million purchase commitments was just over two years, ending in December 2022. The 2021 IPO Forecasts underlying the purchase commitment did not consider actual historical performance and the current potential sales in the pipeline, which did not support the ability to sell anywhere close to $169 million worth of inventory in two years. Thus, Butterfly would incur losses from being unable to sell its inventory.

(2) Butterfly's inventory reserves against forward purchase commitments were based upon the 2021 IPO Forecasts that were grossly inflated, meaning that the losses on purchase commitments disclosed at the time of the Merger were understated because the 2021 IPO Forecasts assumed an inflated sales figure that presumed the sale of more inventory than could ever be achieved.

(3) At the time of the IPO, Butterfly had previously conducted an inventory review in November 2020 that resulted in the establishment of a $53.1 million inventory reserve against forward purchase commitments which the Company claimed "represent[ed] a reasonable range of sales outcomes, consistent with our merger forecast[.]" In other words, the Company estimated that $53.1 million in inventory would need to be written off at some point in the future. The $53.1 million inventory reserve against forward purchase commitments, however, was understated because it was based on the grossly inflated 2021 IPO Forecasts of sales that CWs 2, 3 and 4 reported were unattainable, further supporting the certainty that the Company would suffer tens of millions of dollars of inventory write-downs and losses on purchase commitments in the future.

(4) Butterfly did in fact continue to suffer losses on purchase commitments in future quarters, as the Company disclosed an $11.6 million loss on purchase commitments in the November 2021 Earnings Call and further disclosed $35 million in inventory write-offs relating to the previous inventory reserves against forward purchase commitments.

### C. <u>The Section 11 Defendants Violated Items 303 and 105 of Regulation S-K</u>

246. In addition to excluding information necessary to make the inaccurate statements provided not misleading under the circumstances in which they were made, the Defective Proxy/Registration Statement also omitted material information it was affirmatively required to

include under Item 303 of SEC Regulation S-K (17 C.F.R. §§229.303, 229.503). Item 303 requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's financial condition. SEC Regulation S-K required the Section 11 Defendants to disclose in the Defective Proxy/Registration Statement: "any known trends or any known demands, commitments, events, or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and…the extent to which income was so affected"; and "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

247. The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.

248. In violation of Item 303 and Regulation S-K, the Defective Proxy/Registration Statement omitted the following known adverse trends that were not only "reasonably likely" but virtually certain to have a material adverse effect on Butterfly's financial condition or results: (a) potential enterprise customers were unwilling to adopt Butterfly's ultrasound technology, and (b)

Butterfly's minimum purchase commitments had resulted in and would continue to result in rapidly growing inventories and losses on purchase commitments.

249. Further, Item 105 of Regulation S-K, as promulgated by the SEC, 17 C.F.R. § 229.105, imposes an affirmative duty on issuers to provide "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." "This discussion must … adequately describe[] the risk." (17 C.F.R. § 229.105(a)). Item 105, which contains language formerly housed under Item 503, is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform,* S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The SEC instructs that "[t]he presentation of risks that could apply generically to any registrant or any offering is discouraged", instead providing that registrants should "explain how each risk affects the registrant or the securities being offered... in plain English". (17 C.F.R. § 229.105(a) and (b)). Generic or boilerplate discussions of risk factors do not adequately inform investors how the risks might affect their investment. *See Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

250. Defendants' risk disclosures were wholly insufficient, as they did not disclose that, by the time of the IPO, the risks of inventory write-downs, write-offs, losses on purchase commitments, obsolete hardware, and excess inventory had already materialized.

251. As detailed herein, Defendants wholly failed to meet its disclosure obligations with respect to the IPO.

## V. ADDITIONAL ALLEGATIONS RELATING TO PLAINTIFFS' CLAIMS UNDER SECTION 14(a) AND 20(a) OF THE EXCHANGE ACT AND RULE 14a-9.

252. The 14(a) Class was harmed by the 14(a) Defendants' false and misleading statements in the Defective Proxy/Registration Statement.

### A. Materially False and Misleading Statements in the Defective Proxy/Registration Statement and Documents Incorporated Therein by Reference

253. To avoid duplication, Plaintiffs incorporate the false statements alleged in Sections IV.A. and IV.B., *supra*.

### B. Causation

254. Every public shareholder of the Longview SPAC was negatively impacted by the Defective Proxy/Registration Statement in the following three ways:

a. Redemption: public shareholders were provided the right to redeem Longview shares for approximately $10 per share if they preferred to receive their money back rather than obtain Butterfly shares in the Merger.

b. Merger Vote: whether or not they redeemed shares, the Defective Proxy/Registration Statement called for Longview public shareholders to vote to approve or reject the merger between Longview and Butterfly.

c. Replacement Share Issuance: Longview shareholders who did not redeem shares had their Longview shares "converted, on a one-for-one basis, into a share of New Butterfly Class A common stock."

255. As a result of the false and misleading statements made in the Defective Proxy/Registration Statement, 14(a) Class members were harmed. To avoid unnecessary duplication, Plaintiffs incorporate herein, the loss causation allegations from Section VI.H., *infra*.

# VI. ADDITIONAL ALLEGATIONS RELATING TO PLAINTIFFS' CLAIMS UNDER SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT AND RULE 10b-5[10]

## A. Materially False and Misleading Statements in the Defective Proxy/Registration Statement and Documents Incorporated Therein by Reference

256. To avoid duplication, Plaintiffs incorporate the false statements alleged in Section IV.A. and IV.B, *supra*, and further allege that the 10(b) Defendants made the same materially false and misleading statements.

## B. Materially False and Misleading Statements Published in the 39th Annual J.P. Morgan Healthcare Conference Webcast on January 12, 2021

257. On January 12, 2021, Butterfly presented a live webcast at the 39th Annual J.P. Morgan Healthcare Conference, which was posted on Butterfly's website. The slide presentation from the January 2021 Webcast was filed with the SEC on January 12, 2021.

258. The 10(b) Defendants reaffirmed the previous false statements published in the Investor Presentation materials as described in Section IV.B., *supra*, in the January 2021 Webcast Presentation. Specifically, the January 2021 Webcast Presentation included the materially false and misleading statements that (1) Butterfly had "**Strong Initial Adoption**" and "**Momentum**" at Healthcare Institutions, (2) "**Near-term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets**," and (3) Butterfly was forecasting **78.1 million of revenue for 2021**. The January 2021 Webcast Presentation also included materially false and misleading statements relating to the capabilities of Butterfly's software.

[10] Statements that Plaintiffs allege are false and misleading are underlined and bolded. The remaining statements are provided for context.

**1. No "Strong Initial Adoption" and <u>"Momentum" At Healthcare Institutions</u>**

259. The Section 10(b) Defendants published materially false and misleading statements about the Company's success at selling to healthcare institutions (*e.g.*, enterprise customers) in the January 2021 Webcast Presentation, as shown below in Figure S.

**Figure S.**




*January 2021 Webcast Presentation* at 21.

260. Specifically, the 2021 Webcast Presentation falsely stated:

> **<u>Healthcare Institutions to Drive Adoption at Scale: Strong initial adoption, excitement, and momentum</u>**
>
> **<u>Butterfly has an existing footprint in most of the Top 100 US Health Systems</u>**

*January 2021 Webcast Presentation* at 21.

261. The foregoing statements were materially false and misleading when made because Butterfly did not have "momentum" with or "strong initial adoption" of its products by healthcare institutions (e.g., enterprise customers). Contrary to the above false statements:

(1) CW 1 reported that throughout 2019 and 2020 Butterfly's customer base were primarily "home users" and enterprise sales were only beginning to be discussed toward the end

of CW 1's tenure at Butterfly. According to CW 1, it takes years to develop the sales cycle for enterprise sales because, as reported by CW 3, enterprise customers take longer to enter into deals, enterprise customers often already have contracts with large, established companies like GE and Philips, and it is more difficult to convince enterprise customers to adopt a new, unproven product. CW 4 also reported that Butterfly's primary customers in 2019 and 2020 were individual practitioners, e-Commerce customers, and "early adopters" and that the sales cycle for enterprise customers is six to eighteen months due to all the steps that need to be taken, from finding interest, to becoming a recognized vendor, to negotiating the contract. CW 4 reported additional barriers to entering the enterprise market, stating enterprise customers often required the seller to first become an approved vendor to the institution and then obtain approval from the institution's IT department after demonstrating the security of the item to be sold. CW 5 corroborated CW 4's account, explaining that large customers usually require vendors like Butterfly to go through an extended vetting process. CW 5 corroborated the reports of CW 1, CW 3, and CW 4, stating that enterprise sales deals have a long sales cycle that can take more than a year to develop and close and recalling that in 2021 and 2022 Butterfly was struggling to sell to enterprise customers and the Company was forced to rely upon its e-Commerce sales to "keep the lights on."

(2) CW 3 stated that enterprise customers had been slow to adopt Butterfly's probes because the technology was not fully developed and still unproven. CW 3 confirmed that when this witness joined Butterfly in June 2021, there were still a lot of features that needed to be worked out and were still being developed with regards to the probe's

software. CW 3 also stated that healthcare institutions were price sensitive to a product that was still in development. CW 3 reported that Butterfly's software pricing for enterprise customers was particularly egregious, with a "huge divide" between what Butterfly quoted to enterprise customers as compared to nurse practitioners and homecare providers, and also recalled that Butterfly's high pricing caused it to lose enterprise customers. CW 5 similarly reported that pricing on Butterfly's website was "a direct conflict for us" and created additional impediments to large, enterprise sales. CW 5 recalled that despite CW 5's desire to offer "strategic pricing" to enterprise customers, CW 5 was required to attempt to sell to enterprise customers at "full pricing."

(3) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its December 2021 report, Initiation of Coverage report on Butterfly, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(4) CW 4 reported additional barriers to entering the enterprise market, stating that the sales cycle is very long, from six to eighteen months, in part because enterprise customers often required the seller to first become an approved vendor to the institution and then obtain approval from the institution's IT department after demonstrating the security of the item to be sold. CW 5 corroborated CW 4's account, explaining that

large customers usually require vendors like Butterfly to go through an extended vetting process.

(5) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(6) CW 1 recalled one meeting discussing enterprise sales in 2020 during which the Company discussed the need to resolve how clinicians could appropriately bill clients and insurance companies for procedures completed with the Butterfly, an issue which seriously limited healthcare institution's interest in Butterfly's probes.

(7) CW 2 stated that when CW 2 joined the Company in May 2021, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time," further confirming that the probes were insufficiently developed to achieve market penetration at healthcare institutions at the time of the IPO. CW 5 reported that Butterfly was still developing its software when CW 5 left the Company in November 2022, and likened situation to "building a plane as we flew it."

(8) CW 3 confirmed that Butterfly's business case and value proposition of its probes was not clear to healthcare institutions at the time of the false statement and, thus, in June or July 2021, the Company hired PwC to develop the "business case" and "value proposition" that would be presented to key decision makers at healthcare institutions.

(9) CW 2 stated that there were no enterprise-wide implementations of Butterfly probes at any healthcare institution at the time of the false statement. CW 2 recalled that for more than one year after the Merger, Butterfly did not have a single example of a successful, enterprise-wide implementation of Butterfly's products by a large healthcare

institution. CW 3 corroborated CW 2's account, stating that CW 3 was unaware of any enterprise-wide implementations of Butterfly's probes during this witness's tenure at Butterfly. CW 5 further corroborated this, stating that in late 2021 or 2022 the Company was attempting to "buy" a flagship account at URMC that could be used as a reference site, but that when CW 5 left six or eight months later, the implementation of Butterfly's probes was still incomplete, despite the heavy discounts on probes and free software offered to URMC.

(10) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating there had not been "strong initial adoption" at healthcare institutions at the time of the IPO.

(11) CW 5 recalled that some potential enterprise customers, such as NYU, had "no interest" in completing any deals with Butterfly because the Company had previously delivered "an abbreviated version" of what had been expected in an earlier deal, leaving a "bad taste" with the potential customers.

(12) A full year after the false statement, Butterfly was still only beginning to shift its efforts toward selling to large healthcare institutions, as confirmed by Defendant Fruchterman's comments in the November 2021 Earnings Call, stating that Butterfly was still "early in [the] journey" of introducing Butterfly to healthcare institutions. The infancy of the Company's shift to enterprise customers was reiterated by Butterfly's CEO during the November 2021 Earnings Call where, in response to a question about the momentum of enterprise sales, stated that "this is a lot less about things not happening and more about **things not happening yet.**" Defendant Fruchterman also stated that Butterfly was having "discussions with large institutions to ***kick-start***

enterprise level implementations," further demonstrating a lack of demand from enterprise customers at the time the false statement was made.

(13) CW 2, CW 3, and CW 5 all confirmed that the Company was still ramping up its enterprise sales force throughout 2021 and into 2022.

### 2. Near Term Growth Was Not Supported <u>By a Pipeline of Enterprise Bookings</u>

262. The Section 10(b) Defendants published materially false and misleading statements about the Company's near-term growth being supported by a pipeline of enterprise bookings in the January 2021 Webcast Presentation. Specifically, the Presentation stated:

> **<u>Near term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets.</u>**

*January 2021 Webcast Presentation* at 25.

263. The foregoing statement was materially false and misleading when made because:

(1) The potential deals in Butterfly's pipeline were illusory, as confirmed by CW 2 who stated that when CW 2 joined the Company shortly after the IPO, Butterfly's Salesforce.com application appeared to have many opportunities in the pipeline that were nearly closed deals, but once CW 2 investigated, these purported potential deals were illusory and CW 2 removed approximately half of the deals in Salesforce.com for this witness' own region because the potential customer was no longer interested, did not have the authority to make purchasing decisions, had been misinformed about the product or pricing, had stopped communicating with Butterfly, or wished to purchase far fewer probes than was represented in the Salesforce.com application. Thus, CW 2 referred to the pipeline of potential deals as "smoke and mirrors."

(2) CW 2 recalled that in some instances the potential deals in Salesforce.com overstated the number of probes the potential customer was willing to purchase. CW 4 confirmed CW 2's report, stating that in 2021 sales representatives inflated the value of the deals in the Salesforce.com pipeline by including more probes than could be sold.

(3) CW 5 corroborated CW 2 and CW 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities."

(4) CW 2 reported that then it appeared a deal was not viable due to inactivity, CW 2 and other sales representatives were instructed by management to change the completion date to a later time so it appeared in Salesforce.com that the deal was still progressing and, thus, viable. CW 5 reported that CW 5 was also told to keep opportunities in the sales pipeline even when an opportunity was "clearly not viable."

(5) CW 5 reported that even taking all the deals in Salesforce.com, including the bogus ones, Butterfly did not have enough potential deals in the pipeline to meet the Company's aggregated sales projections. CW 4 agreed with CW 5 that, even with the inflated deals recorded in Salesforce, there were not enough sales opportunities in the pipeline for Butterfly to achieve the 2021 IPO Forecasts.

(6) Butterfly's CEO, Defendant Fruchterman, also confirmed the Company's lack of sales force dedicated to executing enterprise bookings in November 2020 when he described, during the November 2021 Earnings Call, "an aggressive back half 2021 ramp."

(7) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating there had not been "pipeline bookings across the enterprise" market segment at the time of the IPO.

(8) Enterprise clients were very unlikely to purchase Butterfly's products because they were not fully developed and lacked key functionality, as confirmed by CW 3 who reported that when CW 3 joined Butterfly in June 2021, there were still a lot of features that needed to be worked out and were still being developed with regards to the probe's software. CW 4 confirmed that Butterfly's probes lacked integration with enterprise workflows until, at the earliest, the second half of 2021.

(9) CW 3 also stated that healthcare institutions were price sensitive to a product that was still in development throughout CW 3's tenure. CW 3 reported that Butterfly's software pricing for enterprise customers was particularly egregious, with a "huge divide" between what Butterfly quoted to enterprise customers as compared to nurse practitioners and homecare providers, and also recalled that Butterfly's high pricing caused it to lose enterprise customers. CW 5 corroborated CW 3's account, stating that pricing on Butterfly's website was "a direct conflict for us" and created additional impediments to large, enterprise sales. Despite CW 5's desire to offer "strategic pricing" to enterprise customers, CW 5 was required to attempt to sell to enterprise customers at "full pricing."

(10) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales;

UBS Research confirmed these barriers to entry in its December 2021 Initiation of Coverage report on Butterfly, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(11) CW 4 reported additional barriers to entering the enterprise market, stating that the sales cycle is very long, from six to eighteen months, because enterprise customers often required the seller to first become an approved vendor to the institution and then obtain approval from the institution's IT department after demonstrating the security of the item to be sold.

(12) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(13) CW 2 stated that when CW 2 joined the Company in May 2021, Butterfly's products were still in a proof of concept phase and not ready for "prime time," further confirming that the probes were insufficiently developed to be sold to enterprise clients at the time of the IPO. CW 5 corroborated CW 2's account, reporting that Butterfly was "still building" the software at the time of his departure in November 2022 and likened the situation to "building a plane as we flew it."

(14) CW 2 stated that during CW 2's tenure at the Company, Butterfly did not have a single example of a successful, enterprise-wide implementation of Butterfly's products by an enterprise client. CW 5 confirmed that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO.

(15) CW 3 corroborated CW 2 and CW 5's reports, stating that CW 3 was unaware of any enterprise-wide implementations of Butterfly's probes during his tenure at Butterfly.

(16) Defendant CEO Fruchterman also confirmed that in November 2020, at the time of the false statement, the Company's products were not ready to be sold to enterprise clients, stating in the November 2021 Earnings that the Company had "in only a matter of months [] reoriented [Butterfly's] technology group [] to include industry-leading best practices for enterprise and workflow software development to bring agility and speed to our enablement of larger scale enterprise collaborations."

### 3. Butterfly's 2021 IPO Forecasts Lacked Any Reasonable Basis

264. The Section 10(b) Defendants published materially false and misleading statements about the Company's expectations for 2021 revenues and margins in the January 2021 Webcast Presentation. Specifically, the Presentation stated that the Company expected revenues of $78.1 million in 2021 and gross margins of 43%, as shown below in Figure T:

**Figure T.**




*January 2021 Webcast Presentation* at 26.

265. The foregoing statement that the Company expected revenue of $78.1 million in 2021 was materially false and misleading when made because Butterfly's 2021 IPO Forecasts lacked any reasonable basis and did not reflect management's best then-currently available estimates and judgements, as demonstrated by the following facts:

(1) CW 3 stated that the 2021 IPO Forecasts were a "top down" model that assumed unachievable year over year growth rates in sales unsupported by any underlying data, including the current pipeline of potential sales and quality of those sales leads.

(2) CW 5 corroborated CW 3's statements, reporting that the quotas and goals "came from the top down" and were not based on information and practices typically used when setting sales goals, such as looking at a salesperson's geography, prior sales, and existing opportunities in the area.

(3) CW 3 reported that nobody, including Butterfly management and the CFO, took the 2021 IPO Forecasts seriously because the assumed growth rates were extraordinarily high and unachievable. CW 3 further stated that the model had been "slapped together for investors," based upon arbitrary growth rates that were not connected to historical performance of the Company.

(4) CW 3 further reported that the 2021 IPO Forecasts were "unrealistic" and a "pie in the sky." CW 5 agreed, stating that "we all knew" that Butterfly's 2021 sales projections were "unattainable."

(5) CW 2 stated that the potential deals this witness saw in the Salesforce.com pipeline did not support the forecast. CW 2 stated that when CW 2 joined Butterfly shortly after the IPO, only about 50% the purported enterprise deals in Butterfly's Salesforce.com pipe were valid and the rest were "smoke and mirrors" and involved customers who had

stopped communicating with Butterfly and deals that inflated the number of probes a customer was willing to buy. CW 4 corroborated CW 2's account recalling that in 2021, sales representatives inflated the value of their potential deals in Salesforce.com by including more probes than the customer wanted to buy.

(6) CW 4 confirmed the reports of CW 2 and CW 3, calling the 2021 sales quotas unachievable and unrealistic. CW 4 also stated that the sales quotas did not take into account the Company's deficient sales pipeline in Salesforce.com, its sales history and performance of the sales force in prior years and there was no bottom-up communication from the sales force to management as far as what the sales personnel believed they could achieve in sales.

(7) CW 5 corroborated the accounts of a deficient pipeline as reported by CW 2, CW 3, and CW 4. CW 5 reported that the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities" and CW 5 had no idea "where [the Company] got the goals from." CW 5 stated that this contributed to few salespeople reaching their yearly sales goals and high turnover in the sales organization. CW 5 also provided detailed examples of prospective deals in the pipeline that were known to be non-viable opportunities, such as a $1.4 million deal with NYU. CW 5 stated that he was instructed to keep the number in the pipeline even after he had learned that NYU was not interested.

(8) CW 5 reported that even taking all the deals in Salesforce.com, including the bogus ones, Butterfly did not have enough potential deals in the pipeline to meet the Company's aggregated sales projections. CW 4 agreed with CW 5 that even with the

inflated deals recorded in Salesforce there were not enough sales opportunities in the pipeline for Butterfly to achieve the 2021 IPO Forecasts

(9) CW 3 confirmed that the 2021 IPO Forecasts assumed large increases in sales to the enterprise market that Butterfly would achieve through "more penetration in enterprise," but did not factor in that enterprise sales were only beginning to ramp up in the second half of 2021 and 2022, well after the IPO.

(10) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its Initiation of Coverage report on Butterfly published in December 2021, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(11) CW 4 confirmed that there were significant barriers to Butterfly entering the enterprise market in 2021, including that Butterfly's platform lacked integration with EHR, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers. CW 5 corroborated this account, reporting that stating that Butterfly was "still building" the software at the time of his departure in November 2022 and likened the situation to "building a plane as we flew it."

(12) Both CW 2 and CW 3 reported that the enterprise sales force was only beginning to ramp up in 2021 and, thus, Butterfly was not equipped to achieve the 2021 IPO

Forecasts. CW 5 reported that in 2021 and 2022, Butterfly was struggling to sell to large, enterprise customers and the Company was forced to rely upon its e-Commerce sales to "keep the lights on."

(13) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(14) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained.

(15) UBS analysts reported that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating the unreasonableness of the revenue guidance that was reliant upon sales to enterprise customers.

266. The foregoing statement that the Company expected gross margins of 43% in 2021 was materially false and misleading when made because:

(1) Butterfly failed to disclose in the Defective Proxy/Registration Statement that the time frame relating to TSMC's required $169 million purchase commitments was just over two years, ending in December 2022. The 2021 IPO Forecasts underlying the purchase

commitment did not consider actual historical performance and the current potential sales in the pipeline, which did not support the ability to sell anywhere close to $169 million worth of inventory in two years. Thus, Butterfly would incur losses from being unable to sell its inventory.

(2) Butterfly's inventory reserves against forward purchase commitments were based upon the 2021 IPO Forecasts that were grossly inflated, meaning that the losses on purchase commitments disclosed at the time of the Merger were understated because the 2021 IPO Forecasts assumed an inflated sales figure that presumed the sale of more inventory than could ever be achieved.

(3) At the time of the IPO, Butterfly had previously conducted an inventory review in November 2020 that resulted in the establishment of a $53.1 million inventory reserve against forward purchase commitments which the Company claimed "represent[ed] a reasonable range of sales outcomes, consistent with our merger forecast[.]" In other words, the Company estimated that $53.1 million in inventory would need to be written off at some point in the future. The $53.1 million inventory reserve against forward purchase commitments, however, was understated because it was based on the grossly inflated 2021 IPO Forecasts of sales that CWs 2, 3 and 4 reported were unattainable, further supporting the certainty that the Company would suffer tens of millions of dollars of inventory write-downs and losses on purchase commitments in the future.

(4) Butterfly did in fact continue to suffer losses on purchase commitments in future quarters, as the Company disclosed an $11.6 million loss on purchase commitments in the November 2021 Earnings Call and further disclosed $35 million in inventory write-offs relating to the previous inventory reserves against forward purchase commitments.

267. The Section 10(b) Defendants published materially false and misleading statements in the January 2021 Webcast Presentation that indicated that Butterfly's then-presently existing "Software Services" included a complete suite of tools, including "Enterprise Workflow" features that would be highly valued by large institutional customers. Specifically, the Presentation contained the follow graphic and text, shown below as Figure U:

**Figure U.**




*January 2021 Webcast Presentation* at 14.

268. The foregoing statements were materially false and misleading when made because Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not

perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers at the time of the IPO when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers at the time of the IPO when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise***

> ***level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

### C. Materially False and Misleading Statements in the Form 10-K for the Year Ended December 31, 2020, Filed with the SEC on March 29, 2021

269. On March 29, 2021, Butterfly filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 Form 10-K"), as amended on May 12, 2021 ("2020 Form 10-K/A"), and signed by Defendants Todd Fruchterman, Stephanie Fielding, Jonathan Rothberg, Larry Robins, Dawn Carfora, Elazer Edelman, John Hammergren, Gianluca Pettiti, and Louise Phanstiel. The 2020 Form 10-K contained materially false and misleading statements as detailed below.

#### 1. Butterfly's Software Was "Objectively Lagging" and Not Valued by Healthcare Institutions or Other Potential Enterprise Customers

270. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K about the Company's software capabilities and its integration with the clinical workflow. Specifically, the 2020 Form 10-K stated:

> We are an innovative digital health business with a mission of democratizing healthcare by making medical imaging accessible to everyone around the world. Powered by our proprietary Ultrasound-on-Chip™ technology, **our solution addresses the needs of point of care imaging with a unique combination of software and hardware technology**. Butterfly iQ, followed by our recently launched Butterfly iQ+, is our first product powered by Butterfly's Ultrasound-on-Chip™, and is the only ultrasound transducer that can perform "whole-body imaging" in a single handheld probe using semiconductor technology. Our Ultrasound-on-Chip™ reduces the cost of manufacturing, while **our software is […] fully integrated with the clinical workflow**, accessible on a user's smartphone, tablet, and almost any hospital computer system connected to the Internet. Through our portable proprietary, handheld solution, protected by a robust

> intellectual property portfolio and empowered in part by its proprietary software and Artificial Intelligence ("AI"), Butterfly aims to enable earlier detection throughout the body and remote management of health conditions around the world.

*2020 Form 10-K* at 7.

271. The Section 10(b) Defendants published substantially identical statements a second time in the 2020 Form 10-K. *2020 Form 10-K* at 69.

272. The foregoing statements were materially false and misleading when made because Butterfly's software was unable to address the needs of point of care imaging and was not able to fully integrate with clinical workflows. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features,

and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not address the needs of point of care imaging and was not fully integrated with clinical workflows in March 2021 when he stated in the November 2021 Earnings Call that Butterfly had

experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software was not fully integrated with clinical workflows in March 2021 and did not address the needs of point of care imaging when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

273. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K about the ability of the Company's software to be a solution for governance and workflow challenges. Specifically, the 2020 Form 10-K stated:

> We are working towards increasingly integrated solutions to maximize our value to large healthcare customers, as well as continuing to improve our sales and support infrastructure. **Our ability to connect and govern traditional third party ultrasound systems gives enterprise customers a solution to the governance and workflow challenges that have limited the utilization and billing of point of care imaging devices.**

*2020 Form 10-K* at 12.

274. The foregoing statements were materially false and misleading when made because Butterfly's software did not give enterprise customers a solution to governance and workflow challenges that had been limiting the use of point of care imaging devices. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not give enterprise customers a solution to governance and workflow challenges that had been limiting the use of point of care imaging devices in March 2021 when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software did not give enterprise customers a solution to governance and workflow challenges that had been limiting the use of point of care imaging devices in March 2021 when he stated in a November 2022 Earnings Call, nearly 2 years later, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

275. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K about Butterfly's software benefitting enterprise customers with a streamlined clinical workflow and reduced documentation burden. Specifically, the 2020 Form 10-K stated:

> **Enterprise customers deploying our solution can benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems.**

*2020 Form 10-K* at 12.

276. The foregoing statements were materially false and misleading when made because Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not

perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems in March 2021 when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software did not streamline the clinical workflows of enterprise customers and did not reduce the documentation burden associated with traditional ultrasound systems in March 2021 when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and

> external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

277. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K about the ability of the Company's software to help enterprise customers manage their point of care imaging devices and optimize value from them. Specifically, the 2020 Form 10-K stated:

> **<u>By adopting Butterfly Enterprise software, customers can responsibly manage and optimize value from their fleets of point of care imaging devices.</u>**

*2020 Form 10-K* at 12.

278. The foregoing statements were materially false and misleading when made because Butterfly's software was incapable of managing fleets of point of care imaging devices for enterprise customers and could not optimize value from those devices. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially

because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software was incapable of managing fleets of point of care imaging devices for enterprise customers and could not optimize value from those devices in March 2021 when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software was incapable of managing fleets of point of care imaging devices for enterprise customers and could not optimize value from those devices in March 2021 when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

279. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K about the ability of the Company's software to address unmet needs and

challenges regarding the complex clinical workflows associated with point of care medical imaging. Specifically, the 2020 Form 10-K stated:

> **Products & Services**
>
> **We provide a complete solution to address an unmet need in point-of-care medical imaging through a unique combination of hardware and software services.** Our hardware is powered by the first and only currently available ultrasound on a semiconductor chip. **Our software addresses the traditional ease-of-use challenges and the complex clinical workflow throughout a patient's care pre-and post-examination.**

*2020 Form 10-K* at 14.

280. The foregoing statements were materially false and misleading when made because Butterfly's software was far from a "complete solution" to the unmet needs and challenges of the complex clinical workflows associated with point of care imaging, did not address ease-of-use issues, and was not integrated with EMRs. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software was far from a "complete solution" to the unmet needs and challenges of the complex clinical workflows associated with point of care imaging, did not address ease-of-use issues, and was not integrated with EMRs in March 2021 when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software was far from a "complete solution" to the unmet needs and challenges of the complex clinical workflows associated with point of care imaging, and did not address ease-of-use issues when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

281. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K that indicated that Butterfly's then-presently existing "Software Services" included a complete suite of tools, including "Enterprise Workflow" features that would be highly

valued by large institutional customers. Specifically, the 2020 Form 10-K contained the follow graphic and text, shown below as Figure V:

**Figure V.**




*2020 Form 10-K* at 17.

282. The foregoing statements were materially false and misleading when made because Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers. Contrary to the false statements:

(11) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(12) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud

storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(13) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(14) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(15) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(16) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(17) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(18) Defendant CEO Fruchterman confirmed Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers in March 2021 when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(19) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(20) Defendant CEO Fruchterman further confirmed Butterfly's software did not have the capabilities asserted in those statements, particularly regarding "Enterprise Workflow & Analytics," and Butterfly's software was not valued by enterprise customers in March 2021 when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal

> and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

283. The Section 10(b) Defendants published materially false and misleading statements in the 2020 Form 10-K about the Company's software linking to hospital and office systems and allowing practitioners to transfer scanned images seamlessly and securely. Specifically, the 2020 Form 10-K stated:

> In addition to social impact, we believe our solution will also have significant clinical impact. **Through our software solution, empowered by AI, users can upload scanned images to our HIPAA-compliant cloud, which has unlimited storage, links to hospital and office systems, and can be accessed from a desktop computer. This allows practitioners to access and transfer their scanned images in a seamless and secure way, leading to additional opportunities for observation** and therefore, we believe, earlier diagnosis and treatment. Furthermore, our solution delivers billing codes directly in the user interface application following scanning, both enhancing practitioner compliance adherence and increasing revenue in fee-for-scan environments.

*2020 Form 10-K* at 11.

284. The Section 10(b) Defendants published substantial similar statements later in the 2020 Form 10-K:

> **Through our software subscription options, users can upload scanned images to our HIPAA-compliant cloud, which has unlimited storage and links to hospital and office systems, allowing for seamless transfer of images that can also be accessed from a desktop computer.** As telemedicine continues to make headway through our healthcare system, our software application features TeleGuidance, which is the world's first integrated ultrasound telemedicine platform.

*2020 Form 10-K* at 17.

285. The foregoing statements were materially false and misleading when made because Butterfly's software could not link to hospital and office systems and did not allow for a seamless and secure transfer of images. Contrary to the false statements:

(1) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time."

(2) CW 2 confirmed that throughout this witness's employment, storage of the ultrasound images generated with the Butterfly probe during an examination or procedure, a necessary action in the clinical workflow, was limited to Butterfly's cloud storage and did not include enterprises' on-premises storage solutions. CW 2 recalled that enterprise customers' IT departments, thus, frequently had concerns about implementing the probes and potential HIPAA violations with patient data, especially because the probes used Butterfly's cloud storage rather than integrating with the enterprises' on-premises servers.

(3) CW 3 confirmed that when this witness joined the Company in June 2021, shortly after the IPO, Butterfly's software was not sufficiently developed to be fully integrated into clinical workflows, as evidenced by the fact Butterfly's probes still had a lot of software features that needed to be developed, was missing important functionality and features, and lacked sufficient security protections. CW 3 recalled that Butterfly was still developing tutorials with nurse practitioners on how to even use the probes for different applications, such as lung scans, and Butterfly was also still trying to get "more options" for how the probes could be used during pregnancy.

(4) CW 3 also recalled being "surprised [Butterfly was] so bullish about software adoption" in 2021 because CW 3 was aware that there were many issues still being worked out with the software to make it more compelling to customers. CW 3 reiterated that Butterfly's software "definitely needed more development."

(5) CW 4 recalled that, at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements. CW 4 explained that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR" scoring, and could not meet various "workflow" requirements of enterprise customers.

(6) CW 4 stated that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(7) CW 5, who joined Butterfly around the time of the IPO in February 2021, stated that when CW 5 left the Company in November 2022 Butterfly was "still building" its software and likened the situation to "building a plane as we flew it."

(8) Defendant CEO Fruchterman confirmed Butterfly's software could not link to hospital and office systems and did not allow for a seamless and secure transfer of images in March 2021 when he stated in the November 2021 Earnings Call Butterfly had experienced "implementation barriers" that were preventing easy use of the Company's products.

(9) In a February 28, 2022 press release, Butterfly announced new software, Butterfly Blueprint, which was substantially identical to the software that had been described in the Defective Proxy/Registration Statement.

(10) Defendant CEO Fruchterman further confirmed Butterfly's software could not link to hospital and office systems and did not allow for a seamless and secure transfer of images in March 2021 when he stated in a November 2022 Earnings Call, nearly 2 years after the IPO, that:

> [] ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions***. We have ***spent the last year investing heavily in the development of our software solutions*** Blueprint and Compass. ***Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms***, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development ***has now become*** a positive differentiator for Butterfly.

### 2. **<u>The Risks of Excess Inventory Had Already Materialized</u>**

286. The 10(b) Defendants issued materially false and misleading statements in the 2020 Form 10-K about the risks of too few sales resulting in excess inventory. Specifically, the 10-K stated:

> *If we do not successfully optimize and operate our sales and distribution channels or we do not effectively expand and update infrastructure, our operating results and customer experience may be negatively impacted.*
>
> **<u>If we do not adequately predict market demand or otherwise optimize and operate our sales and distribution channels successfully, this could result in excess or insufficient inventory or fulfillment capacity, increased costs, or immediate shortages in product or component supply, or harm our business in other ways.</u>** In addition, if we do not maintain adequate infrastructure to enable us to, among other things, manage our purchasing and inventory, this could negatively impact our operating results and user experience.

*2020 Form 10-K* at 40.

287. The foregoing statements were materially false and misleading when made because the risk of harm to Butterfly's business from excess inventory had already materialized as the Company was incurring losses from excess inventory and would continue to incur losses from excess inventory, demonstrated by the following facts:

(1) Butterfly stated in the Defective Proxy/Registration Statement that the TSMC agreement was amended to increase the purchase commitment to $169 million and to

"extend the time frame of the agreement," but failed to disclose that the extended time frame to use the additional inventory was only two years, ending in December 2022. Butterfly disclosed in its SEC filings that purchase commitments were "non-cancellable" and "based on sales forecasts." Thus, given Butterfly's overstated 2021 IPO Forecast for sales that did not consider actual historical performance and the lack of potential enterprise sales in the current pipeline, which CW 2 estimated was overstated by about half, Butterfly could not sell the entire purchase commitment during a two-year period.[11]

(2) Butterfly's inventory reserves against forward purchase commitments were based upon the 2021 IPO Forecasts that were grossly inflated, meaning that the losses on purchase commitments disclosed at the time of the Merger were understated because the 2021 IPO Forecasts assumed an inflated sales figure that presumed the sale of more inventory than could ever be achieved.

(3) CW 1 attended and participated in weekly supply chain meetings throughout CW 1's tenure at Butterfly where the fact that there was insufficient demand for the inventory was discussed. CW 1 also stated that when this witness left Butterfly in August 2020, sales of the probes still were not ramping up. CW 1 further recalled that the Company's sales goals were at odds with prior metrics and unrealistic, which CW 1 knew from his participation in weekly supply chain meetings.

(4) CW 4 reported that the TSMC Contract required Butterfly to "purchase a ton of chips" and that was one reason why the sales quotas and 2021 IPO Forecasts were set so high.

[11] Based on product margins and information obtained from CW 1, Lead Counsel estimates that $129 million in purchase commitments obligated the Company to purchase quantities of wafers that sufficient to build 9,000 to 12,000 probes per month, far more than the 1,820 probes the Company was selling each month, on average, as shown in Figures C and D.

According to CW 4, Butterfly would never be able to use all the inventory based on the current pipeline and slow adoption by enterprise customers.

(5) The Defective Proxy/Registration Statement confirms this fact, showing that Butterfly had sold approximately 12,000 probes in 2019 and approximately 12,000 probes during the first three quarters of 2020; while 2020 was showing a year over year increase in sales, it was not nearly enough to cover the massive amounts of purchase commitments.

(6) Butterfly did in fact continue to suffer losses on purchase commitments in future quarters, as the Company disclosed an $11.6 million loss on purchase commitments in the November 2021 Earnings Call and further disclosed $35 million in inventory write-offs relating to the previous inventory reserves against forward purchase commitments.

### 3. The Risk of Obsolete Hardware Had Already Materialized

288. The 10(b) Defendants issued materially false and misleading statements in the 2020 Form 10-K about the risk that Butterfly's products could become obsolete. Specifically, the 2020 Form 10-K stated:

> ***Medical device development is costly and involves continual technological change, which may render our current or future products obsolete.***
>
> The market for point-of-care medical devices is characterized by rapid technological change, medical advances and evolving industry standards. **Any one of these factors could reduce the demand for our devices or services or require substantial resources and expenditures for research, design and development to avoid technological or market obsolescence.**
>
> […]
>
> We might have insufficient financial resources to improve existing devices, advance technologies and develop new devices at competitive prices. **Technological advances by one or more competitors or future entrants into the field may result in our current devices becoming non-competitive or obsolete, which may decrease revenues and profits and adversely affect our business and results of operations.**

*2020 Form 10-K* at 34-35.

289. The foregoing statements were materially false and misleading when made because the risk of adverse financial effects arising from obsolete hardware had already materialized due to Butterfly's massive purchase commitments that outpaced demand for the Company's products. Contrary to the assertions in the false statements that the adverse financial effects of obsolete hardware were merely a future possibility, such adverse financial effects were presently occurring and ongoing, demonstrated by the following facts:

(1) At the time of the IPO, Butterfly had previously conducted an inventory review in November 2020 that resulted in the establishment of a $53.1 million inventory reserve against forward purchase commitments which the Company claimed "represent[ed] a reasonable range of sales outcomes, consistent with our merger forecast[.]" In other words, $53.1 million in inventory would need to be written off at a later point in time. The $53.1 million inventory reserve against forward purchase commitments, however, was understated because it was based on the grossly inflated 2021 IPO Forecasts of sales that CWs 2, 3 and 4 reported were unattainable, further supporting the certainty that the Company would suffer tens of millions of dollars of inventory write-downs and losses on purchase commitments in the future.

(2) CW 1 attended and participated in weekly supply chain meetings throughout CW 1's tenure at Butterfly where insufficient demand for the inventory was discussed; CW 1 also stated that when this witness left Butterfly in August 2020, sales of the probes still were not ramping up. CW 1 further recalled that the Company's sales goals were at odds with prior metrics and unrealistic, which CW 1 knew from his participation in weekly supply chain meetings.

(3) CW 4 reported that the TSMC Contract required Butterfly to "purchase a ton of chips" and that was one reason why the sales quotas and 2021 IPO Forecasts were set so high. According to CW 4, Butterfly would never be able to use all the inventory based on the current pipeline and slow adoption by enterprise customers.

(4) The Defective Proxy/Registration Statement confirms this fact, showing that Butterfly had sold approximately 12,000 probes in 2019 and approximately 12,000 probes during the first three quarters of 2020; while 2020 was showing a year over year increase in sales, it was not nearly enough to cover the massive amounts of purchase commitments.

(5) Butterfly did in fact write off at least $35 million of that inventory as obsolete, as the Company disclosed in the November 2021 Earnings Call: "[W]e have determined that older raw material is likely obsolete. Consequently, we reclassified $35 million of that older raw material from reserve against the inventory to a reduction in the inventory."

### D. Materially False and Misleading Statements <u>in the March 29, 2021 Earnings Call</u>

290. On March 29, 2021, Butterfly conducted a call (the "March 2021 Earnings Call") with securities analysts to discuss the Company's quarterly and annual 2020 financial results.

291. When asked during the March 2021 Earnings Call about the Company "rapidly scaling up" its enterprise customer base and how analysts should think of the enterprise sales channel, Defendant Fruchterman falsely stated that there was strong demand for Butterfly's products and solutions in the enterprise segment:

> So thanks for the question. We absolutely -- one of the things in me coming in right now as a new CEO and taking a look at the opportunities that we have as Butterfly is to challenge all the opportunities that we have in our business model. And enterprise is an area that we're definitely excited about. **<u>There's strong demand in enterprise right now for Butterfly, not only as a unique ultrasound device, but for our total solution too</u>**. Our sales force expansion is on track there. We continue to -- we're continuing to drive that expansion to help us take advantage of the opportunity in enterprise. We're focused also on customer success to help usability

and deployment of the solutions. **<u>And we're lining up to enterprise. So we see a lot of opportunities in the enterprise channel, not just using point-of-care ultrasound, but also the ability to deploy our Butterfly solution across the enterprise</u>** and get maximum value out of the information.

292. The foregoing statements were materially false and misleading when made because there was not strong demand for Butterfly's products in the enterprise sales channel at that time. Rather, there was very little demand, given that:

(1) Butterfly's products and software were insufficiently developed and lacked functionality needed to attract enterprise customers. CW 3 reported that, throughout CW 3's tenure, Butterfly's probes and software were not yet proven technologies and lacked important features and options, also recalling that enterprise customers had been particularly slow or unwilling to adopt the Company's portable ultrasound devices. CW 5 corroborated this, stating that in 2021 and 2022 Butterfly was struggling to sell to large, enterprise customers.

(2) CW 2 stated that enterprise customers' IT departments were unwilling to adopt Butterfly's technology because of security concerns due to potential HIPAA violations with patient data where the probes used cloud storage rather than on premises servers.

(3) CW 2 recalled that when CW 2 joined the Company in May 2021, shortly after the IPO, Butterfly's products were still in a proof-of-concept phase and not ready for "prime time." CW 5 recalled that when CW 5 left the Company in December 2022 that Butterfly was "still building" the probe's software.

(4) CW 4 confirmed that there were significant barriers to Butterfly entering the enterprise market in 2021, including that Butterfly's platform lacked integration with Electronic Healthcare Records, lacked the ability to create reports, could not perform "QR"

scoring, and could not meet various "workflow" requirements of enterprise customers. CW 4 reported that it was not until the second half of 2021 that the probe's software started to get closer to integration with enterprise workflows.

(5) According to CW 3, enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed this fact in its December 2021 Initiation of Cover report on Butterfly, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(6) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution. CW 5 reported the same issues as CW 4, stating that enterprise sales deals have a long sales cycle that can take more than a year to develop and close. CW 5 explained that large customers usually require vendors like Butterfly to go through an extended vetting process.

(7) According to CWs 2 and 3, generating demand in the enterprise segment required an experienced, well-qualified sales force which Butterfly did not have at the time. According to CW 3, Butterfly did not factor into its growth strategy or the 2021 IPO Forecasts how many sales representatives Butterfly needed to achieve its sales goals. CW 3 recalled that it was not until Q2 2021 that Butterfly began discussing whether it had a sufficient number of sales personnel to achieve 2021 IPO Forecasts. CW 2 reported that throughout his tenure at Butterfly, the Company hired several General

Managers and VPs of Sales who did not have any experience in the ultrasound industry, including some who did not have much sales experience. For example, CW 2 reported that one of his direct managers, Melissa Pavri, did not have prior experience selling ultrasounds and had never seen an ultrasound until she visited an account with CW 2.

(8) CW 2 reported that during CW 2's tenure at Butterfly, approximately half of the potential enterprise deals recorded in the Salesforce.com application were illusory and merely "smoke and mirrors" because, among other reasons, potential customers were not willing to purchase the probes at the Butterfly's prices and were often interested in purchasing far fewer probes than had been represented by the potential deals recorded in the Salesforce.com application.

(9) CW 4 confirmed CW 2's assessment of the potential deals reported in Salesforce.com, stating that the pipeline was frequently inflated by sales representatives who would overstate the size of the potential deal and the timeline of the potential deal.

(10) CW 5 corroborated CW 2 and 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 stated the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities."

(11) Pricing issues deterred enterprise customers from adopting Butterfly's probes; CW 2 stated that Butterfly lost deals with enterprise customers due to its prices being too high and/or higher than what Butterfly offered on its website to direct consumers; CW 3 recalled that Butterfly's high pricing caused it to lose enterprise customers. CW 4

confirmed that website pricing caused confusion among potential enterprise customers and stated that the "pricing model scaled terribly" and "got really, really expensive" for deals that included a large number of probes.

(12) CW 5 corroborated CW 2, 3, and 4's accounts, stating that pricing on Butterfly's website was "a direct conflict for us" and created additional impediments to large, enterprise sales. Despite CW 5's desire to offer "strategic pricing" to enterprise customers, CW 5 was required to attempt to sell to enterprise customers at "full pricing." CW 5 stated that for some customers, like NYU, the high pricing was "the last straw" that prevented sales deals from being struck.

(13) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(14) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained.

(15) UBS analysts confirmed that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating the

unreasonableness of the revenue guidance that was reliant upon sales to enterprise customers.

(16) During the November 2021 Earnings Call, Butterfly's CEO, Defendant Todd Fruchterman, admitted that Butterfly still had not built up its enterprise customer base or pipeline, stating "this is a lot less about things not happening and more about **things not happening *yet***." At that same time, Defendant Fruchterman stated that Butterfly was having "discussions with large institutions to ***kick-start*** enterprise level implementations," further confirming there had not been strong demand from enterprise customers for Butterfly's devices as was asserted during the March 2021 Earnings Call.

### E. Materially False and Misleading Statements in the May 2021 Earnings Call, Presentation, and Press Release

#### 1. Butterfly and its CEO and CFO Reaffirm the Company's Previously-Stated, Materially False and Misleading 2021 IPO Forecasts

293. The 10(b) Defendants issued materially false and misleading statements during the May 13, 2021 Earnings Call, reaffirming the 2021 IPO Forecasts that had been included in the Defective Proxy/Registration Statement. Specifically, Defendant Fruchterman falsely stated:

> And while we intend to continuously refine our longer term strategy, **we are excited about the demand in the marketplace today, and are pleased to reaffirm revenue guidance** and provide additional transparency for 2021. Stephanie will walk through our guidance details later in the call.

294. Defendant Fielding confirmed during the May 13, 2021 Earnings Call that:

> **For the full year 2021, total revenue is projected to be approximately $76 million to $80 million, or 64% to 73% growth year-over-year.**

295. The 10(b) Defendants' May 2021 Earnings Call slide presentation confirmed the same 2021 IPO Forecasts, shown below as Figure W:

**Figure W.**

## Full Year 2021 Guidance

A reconciliation of Adjusted EBITDA and Adjusted gross margin to corresponding GAAP measures is not available on a forward-looking basis because the Company is unable to predict with reasonable certainty the non-cash component of employee compensation expense, changes in its working capital needs, variances inits supply chain, the impact of earnings or charges resulting from matters the Company considers not to be reflective, on a recurring basis, of its ongoing operations, and other such items without unreasonable effort. These items are uncertain, depend on various factors, and could be material to the Company's results computed in accordance with GAAP. Management strongly encourages investors to review the Company's financial statements and publicly-filed reports in their entirety and not rely on any single financial measure.

| Metric | Guidance Range |
|---|---|
| Revenue<br>Revenue Growth | $76mm – $80mm<br>64% – 73% |
| Gross Margin<br>Adjusted Gross Margin | 43% – 47%<br>42% – 46% |
| Net Loss<br>Adjusted EBITDA | ($135mm) – ($155mm)<br>($140mm) – ($160mm) |

296. Butterfly's press release announcing the Company's Q1 2021 earnings also repeated the materially false and misleading 2021 IPO Forecast numbers:

> **Revenue is expected to be approximately $76 million to $80 million, or approximately 64% to 73% growth year-over-year.**
>
> **Gross margin is expected to be approximately 43% to 47%. Adjusted gross margin is expected to be approximately 42% to 46%.**

297. The foregoing statements were materially false and misleading when made because Butterfly's reaffirmation of its 2021 IPO Forecasts lacked any reasonable basis, as demonstrated by the following facts:

(1) The 2021 IPO Forecasts were unsupported by any underlying data, including historical sales performance, the current pipeline of potential deals with enterprise customers or any consideration of whether Butterfly had a sufficient enterprise sales force or whether its products were fully developed enough for enterprise customers to purchase it. Instead, the 2021 IPO Forecasts assumed a compounded annual growth rate of 75%,

which was more than double that of comparable companies in the High Growth Med-Tech and Software-as-a-Service industries.

(2) CW 3 confirmed the 2021 IPO Forecasts that the 10(b) Defendants reaffirmed were a "top down" model that assumed year over year growth rates in sales without providing any underlying support for that growth. CW 3 also reported that the growth rate assumption in the 2021 IPO Forecasts did not incorporate other relevant, Butterfly-specific information relating to sales growth such as the pipeline of potential sales, which were substantially less than what was forecasted.

(3) CW 5 corroborated CW 3's statements, reporting that the quotas and goals "came from the top down," were set by "C-Suite" management including CEO Fruchterman and Chief Commercial Officer Stacey Pugh, and were not based on information and practices typically used when setting sales goals, such as looking at a salesperson's geography, prior sales, and existing opportunities in the area.

(4) CW 3 also reported that the 2021 IPO Forecasts were "unrealistic" and a "pie in the sky" that nobody, including Butterfly's management and Defendant CFO Fielding, took seriously because everyone knew they were inflated. CW 3 further stated that the 2021 IPO Forecasts were "slapped together for investors," based upon arbitrary growth rates that were not connected to historical performance of the Company and which nobody took seriously.

(5) CW 5 reported that "we all knew" that Butterfly's 2021 IPO Forecasts were "unattainable," including Butterfly's management who had guaranteed the three Strategic Account Directors would still receive 60% of the annual bonus even if they did not make their full sales quotas.

(6) CW 5 also reported that in 2021 and 2022, Butterfly was struggling to sell to large, enterprise customers, and the Company was forced to rely upon its e-Commerce sales to "keep the lights on."

(7) CW 2 stated that the potential deals CW 2 saw in the pipeline did not support the forecast. CW 2 stated that when he joined Butterfly shortly after the IPO, only about 50% the purported enterprise deals in Butterfly's Salesforce.com pipeline were valid and the rest were "smoke and mirrors" and involved customers who had stopped communicating with Butterfly and deals that inflated the number of probes a customer was willing to buy. CW 4 corroborated CW 2's account recalling that in 2021, sales representatives inflated the value of their potential deals in Salesforce.com by including more probes than the customer wanted to buy.

(8) CW 5 corroborated CW 2 and 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 stated the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities."

(9) CW 4 confirmed the reports of CW 2 and CW 3, calling the 2021 sales quotas unachievable and unrealistic. CW 4 also stated that the sales quotas did not take into account the deficient sales pipeline, sales history and performance of the salesforce in prior years and there was no bottom-up communication from the salesforce to management as far as what the sales personnel believed they could achieve in sales.

(10) According to CW 3, the 2021 IPO Forecasts assumed large increases in sales to the enterprise market from "more penetration in enterprise," but ignored the fact that

throughout their tenure, enterprise customers were slow or unwilling to adopt Butterfly's probes because it was not fully developed and lacked functionality. CWs 3 and 4 reported that enterprise customers were also unwilling to pay Butterfly's higher pricing, particularly with respect to its software, which was much more than what Butterfly would charge e-commerce customers. Thus, enterprise sales were slow to ramp up in 2021 and 2022.

(11) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(12) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained.

(13) UBS analysts confirmed that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating the unreasonableness of the revenue guidance that was reliant upon sales to enterprise customers.

(14) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(15) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its Initiation of Coverage report on Butterfly published in December 2021, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(16) Both CW 2 and CW 3 reported that the enterprise sales force was only beginning to ramp up in 2021 and Butterfly, thus, lacked the necessary number of sales personnel to achieve the growth assumed in the 2021 IPO Forecasts. By Q1 2021, Butterfly had only hired 13 enterprise sales personnel, which was made clear by CFO Fielding during the May 2021 Earnings Call when she told analysts that Butterfly had "about 27 heads" in Q2 2021 after a "doubling" of the sales force had occurred in Q1, meaning as late as Q1 2021 the Butterfly sales force had only 13 sales personnel. CW 4 confirmed the size of the sales force, stating that in 2021 he recalled there being 10-12 sales representatives.

(17) CW 4 reported that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(18) According to CW 2 and CW 3, the enterprise sales force that Butterfly belatedly began to hire in 2021 did not have the experience necessary to sell to enterprise customers. Nor did they have an adequate understanding of what Butterfly was looking for with its enterprise initiatives. CW 4 confirmed that Butterfly's belated hiring in 2021 included young and inexperienced sales personnel.

(19) CW 5 reported that 90% of the salespeople were not making their sales goals in 2021 and that the majority of salespeople only achieved 40% of their sales goals. CW 5 knew this because CW 5 had access to the Salesforce.com software and because it had resulted in very high turnover among Butterfly's salesforce during 2021 and 2022.

(20) Starting in May 2021, Butterfly executives were internally discussing the need to reduce the 2021 IPO Forecasts. CW 3 recalled that by *at least* June 2021, CW 3 participated in discussions with CFO Fielding, CEO Fruchterman, and other members of Butterfly's executive leadership about the need to lower the 2021 IPO Forecasts due to shortfalls in enterprise sales. CW 3 was eventually tasked with preparing a reduced re-forecast for 2021, which he completed around the middle to the end of August 2021

(21) CW 3 also recalled that in June 2021, Butterfly engaged PwC to consult Butterfly on how to address its inability to penetrate the enterprise market. PwC was tasked with coming up with business cases and value propositions that could be presented to decision-makers at enterprise accounts.

298. Importantly, the slow development of Butterfly's enterprise sales division and its lackluster sales at the time of the 10(b) Defendants' reaffirmation of the 2021 IPO Forecasts further evidences the falsity of their reaffirmations. For example, the projections the 10(b) Defendants reaffirmed assumes 2021 revenues will exceed 2020 revenues by approximately 67%— a growth

rate that Butterfly had never achieved before and which was more than double that of comparable companies— when Butterfly's revenue for the first quarter of 2021 only increased 44% over the first quarter of 2020.

### F. Materially False and Misleading Statements in the August 2021 Earnings Call and Presentation

#### 1. There Was No Strong Pipeline or Demand for Butterfly's Products

299. The 10(b) Defendants issued materially false and misleading statements about the demand for Butterfly's products and the Company's pipeline during an August 9, 2021 call with analysts and investors discussing the Company's quarterly performance (the "August 2021 Earnings Call"). Specifically, Butterfly's CFO stated:

> Despite some of these challenges, we remain on track with important momentum and interest from a wide range of customers. As we continue to execute our commercial strategies, there may still be some variability in the timing of deals in our pipeline over the next quarters.
>
> **That said, we believe we have a strong pipeline and demand for our solution across the breadth of use cases afforded by our team, and still see our annual performance shaping up to be in the guidance range we've provided in Q1[.]**

300. The foregoing statements were materially false and misleading when made because Butterfly's did not have a strong pipeline and was not experiencing strong demand for its products, as demonstrated by the following facts:

(1) CW 5 also reported that in 2021 and 2022, Butterfly was struggling to sell to large, enterprise customers, and the Company was forced to rely upon its e-Commerce sales to "keep the lights on."

(2) CW 2 stated that when he joined Butterfly shortly after the IPO, only about 50% the purported enterprise deals in Butterfly's Salesforce.com pipeline were valid and the rest were "smoke and mirrors" and involved customers who had stopped communicating with Butterfly and deals that inflated the number of probes a customer

was willing to buy. CW 4 corroborated CW 2's account recalling that in 2021, sales representatives inflated the value of their potential deals in Salesforce.com by including more probes than the customer wanted to buy.

(3) CW 5 corroborated CW 2 and 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 stated the salespeople at Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities."

(4) According to CW 3, enterprise customers were slow or unwilling to adopt Butterfly's probes because the product was not fully developed and lacked functionality. CWs 3 and 4 reported that enterprise customers were also unwilling to pay Butterfly's higher pricing, particularly with respect to its software, which was much more than what Butterfly would charge e-commerce customers. Thus, enterprise sales were slow to ramp up in 2021 and 2022.

(5) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(6) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a

reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained.

(7) UBS analysts confirmed that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating there had not been strong demand or a strong pipeline.

(8) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(9) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its Initiation of Coverage report on Butterfly published in December 2021, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(10) According to CW 2, most sales personnel achieved only 10% to 30% of their sales quotas for 2021. CW 4 also stated that he never achieved 50% of the sales quota and that other sales representatives were achieving as little as 10% of quotas. CW 4 also stated that the average sales representative sold between 10 and 50 probes per month.

(11) CW 5 reported that 90% of the salespeople were not making their sales goals in 2021 and that the majority of salespeople only achieved 40% of their sales goals. CW

5 knew this because CW 5 had access to the Salesforce.com software and because it had resulted in very high turnover among Butterfly's salesforce during 2021 and 2022.

(12) Starting in May 2021, Butterfly executives were internally discussing the need to reduce the 2021 IPO Forecasts. CW 3 recalled that by *at least* June 2021, CW 3 participated in discussions with CFO Fielding, CEO Fruchterman, and other members of Butterfly's executive leadership about the need to lower the 2021 IPO Forecasts due to shortfalls in enterprise sales. CW 3 was eventually tasked with preparing a reduced re-forecast for 2021, which he completed around the middle to the end of August 2021.

(13) CW 3 also recalled that in June 2021, Butterfly engaged PwC to consult Butterfly on how to address its inability to penetrate the enterprise market. PwC was tasked with coming up with business cases and value propositions that could be presented to decision-makers at enterprise accounts.

### 2. Butterfly's CFO Reaffirms the Company's Previously-Stated, <u>Materially False and Misleading 2021 IPO Forecasts</u>

301. The August 2021 Earnings Call was accompanied by a slide presentation that included a reaffirmation of the 2021 IPO Forecasts, as shown below in Figure X:

**Figure X.**

**Full Year 2021 Guidance**

A reconciliation of Adjusted EBITDA and Adjusted gross margin to corresponding GAAP measures is not available on a forward-looking basis because the Company is unable to predict with reasonable certainty the non-cash component of employee compensation expense, changes in its working capital needs, variances in its supply chain, the impact of earnings or charges resulting from matters the Company considers not to be reflective, on a recurring basis, of its ongoing operations, and other such items without unreasonable effort. These items are uncertain, depend on various factors, and could be material to the Company's results computed in accordance with GAAP. Management strongly encourages investors to review the Company's financial statements and publicly-filed reports in their entirety and not rely on any single financial measure.

| Metric | Guidance Range |
|---|---|
| Revenue | \$76mm – \$80mm |
| Revenue Growth | 64% – 73% |
| Gross Margin | 43% – 47% |
| Adjusted Gross Margin | 42% – 46% |
| Net Loss | (\$135mm) – (\$155mm) |
| Adjusted EBITDA | (\$140mm) – (\$160mm) |

302. The foregoing statements were materially false and misleading when made because Butterfly's reaffirmation of its 2021 IPO Forecasts lacked any reasonable basis, as demonstrated by the following facts:

(1) Butterfly's 2021 IPO Forecasts initially disclosed in the Defective Proxy/Registration Statement were unsupported by any underlying data, including historical sales performance, the current pipeline of potential deals with enterprise customers or any consideration of whether Butterfly had a sufficient enterprise sales force or whether its products were fully developed enough for enterprise customers to purchase it. Instead, the 2021 IPO Forecasts assumed a compounded annual growth rate of 75%, which was more than double that of comparable companies in the High Growth Med-Tech and Software-as-a-Service industries.

(2) CW 3 confirmed the 2021 IPO Forecasts that the 10(b) Defendants reaffirmed were a "top down" model that assumed year over year growth rates in sales without providing any underlying support for that growth. CW 3 also reported that the growth rate assumption in the 2021 IPO Forecasts did not incorporate other relevant, Butterfly-specific information relating to sales growth such as the pipeline of potential sales, which were substantially less than what was forecasted.

(3) CW 5 corroborated CW 3's statements, reporting that the quotas and goals "came from the top down," were set by "C-Suite" management including CEO Fruchterman and Chief Commercial Officer Stacey Pugh, and were not based on information and practices typically used when setting sales goals, such as looking at a salesperson's geography, prior sales, and existing opportunities in the area.

(4) CW 3 also reported that the 2021 IPO Forecasts were "unrealistic" and a "pie in the sky" that nobody, including Butterfly's management and Defendant CFO Fielding, took seriously because everyone knew they were inflated. CW 3 further stated that the 2021 IPO Forecasts were "slapped together for investors," based upon arbitrary growth rates that were not connected to historical performance of the Company and which nobody took seriously.

(5) CW 5 reported that "we all knew" that Butterfly's 2021 IPO Forecasts were "unattainable," including Butterfly's management who had guaranteed the three Strategic Account Directors would still receive 60% of the annual bonus even if they did not make their full sales quotas.

(6) CW 5 also reported that in 2021 and 2022, Butterfly was struggling to sell to large, enterprise customers, and the Company was forced to rely upon its e-Commerce sales to "keep the lights on."

(7) CW 2 stated that the potential deals CW 2 saw in the pipeline did not support the forecast. CW 2 stated that when he joined Butterfly shortly after the IPO, only about 50% the purported enterprise deals in Butterfly's Salesforce.com pipeline were valid and the rest were "smoke and mirrors" and involved customers who had stopped communicating with Butterfly and deals that inflated the number of probes a customer was willing to buy. CW 4 corroborated CW 2's account recalling that in 2021, sales representatives inflated the value of their potential deals in Salesforce.com by including more probes than the customer wanted to buy.

(8) CW 5 corroborated CW 2 and 4's accounts that the sales pipeline in 2021 and 2022 contained prospective deals that were "out of whack." CW 5 stated the salespeople at

Butterfly were told their sales goals had been based upon "the pipeline in Salesforce," but CW 5 observed that many of the prospective deals recorded in the pipeline were "either fake or not qualified opportunities."

(9) CW 4 confirmed the reports of CW 2 and CW 3, calling the 2021 sales quotas unachievable and unrealistic. CW 4 also stated that the sales quotas did not take into account the deficient sales pipeline, sales history and performance of the salesforce in prior years and there was no bottom-up communication from the salesforce to management as far as what the sales personnel believed they could achieve in sales.

(10) According to CW 3, the 2021 IPO Forecasts assumed large increases in sales to the enterprise market from "more penetration in enterprise," but ignored the fact that throughout their tenure, enterprise customers were slow or unwilling to adopt Butterfly's probes because it was not fully developed and lacked functionality. CWs 3 and 4 reported that enterprise customers were also unwilling to pay Butterfly's higher pricing, particularly with respect to its software, which was much more than what Butterfly would charge e-commerce customers. Thus, enterprise sales were slow to ramp up in 2021 and 2022.

(11) CW 2 and CW 3 both confirmed that there had never been a successful enterprise-wide implementation of Butterfly probes at any healthcare institution when they joined Butterfly in May 2021 and June 2021, respectively.

(12) CW 5 corroborated CW 2 and CW 3's account that Butterfly had no successful enterprise-wide implementations at the time of the IPO, recalling that Butterfly was attempting to kick-start enterprise level implementations nearly a year after the IPO. CW 5 reported that in late 2021 or early 2021, the Company sold probes at a heavily

discounted rate and gave the software away free of charge to the University of Rochester Medical Center in a desperate attempt to create a flagship account as a reference site, but when CW 5 left six to eight months later, the implementation of Butterfly's probes at URMC remained.

(13) UBS analysts confirmed that Butterfly announced its first enterprise-wide deployment in January of 2022, a full year after the IPO, further demonstrating the unreasonableness of the revenue guidance that was reliant upon sales to enterprise customers.

(14) CW 4 reported that enterprise customers were slow to adopt Butterfly's probes, in part because of the operational and reputational risk arising from adopting an unproven ultrasound solution.

(15) CW 3 also reported barriers to Butterfly entering the enterprise market, stating that enterprise customers generally had existing contracts with large, established companies like GE and were reluctant to switch to Butterfly devices before the probes had all the features and worked, which created barriers to increasing enterprises sales; UBS Research confirmed these barriers to entry in its Initiation of Coverage report on Butterfly published in December 2021, noting advantages for Butterfly's competitors "mostly around contracting for large players (e.g. bundling/service) [] that favored GE and Philips, e.g.[.]"

(16) Both CW 2 and CW 3 reported that the enterprise sales force was only beginning to ramp up in 2021 and Butterfly, thus, lacked the necessary number of sales personnel to achieve the growth assumed in the 2021 IPO Forecasts. By Q1 2021, Butterfly had only hired 13 enterprise sales personnel, which was made clear by CFO Fielding during

the May 2021 Earnings Call when she told analysts that Butterfly had "about 27 heads" in Q2 2021 after a "doubling" of the sales force had occurred in Q1, meaning as late as Q1 2021 the Butterfly sales force had only 13 sales personnel. CW 4 confirmed the size of the sales force, stating that in 2021 he recalled there being 10-12 sales representatives.

(17) CW 4 reported that Butterfly only began to really build out its enterprise sales force and develop its software to integrate with enterprise workflows after the IPO because the Company did not have the funds to do so until after the IPO.

(18) According to CW 2 and CW 3, the enterprise sales force that Butterfly belatedly began to hire in 2021 did not have the experience necessary to sell to enterprise customers. Nor did they have an adequate understanding of what Butterfly was looking for with its enterprise initiatives. CW 4 confirmed that Butterfly's belated hiring in 2021 included young and inexperienced sales personnel.

(19) According to CW 2, most sales personnel achieved only 10% to 30% of their sales quotas for 2021. CW 4 also stated that he never achieved 50% of the sales quota and that other sales representatives were achieving as little as 10% of quotas. CW 4 also stated that the average sales representative sold between 10 and 50 probes per month.

(20) CW 5 reported that 90% of the salespeople were not making their sales goals in 2021 and that the majority of salespeople only achieved 40% of their sales goals. CW 5 knew this because CW 5 had access to the Salesforce.com software and because it had resulted in very high turnover among Butterfly's salesforce during 2021 and 2022.

(21) Starting in May 2021, Butterfly executives were internally discussing the need to reduce the 2021 IPO Forecasts. CW 3 recalled that by *at least* June 2021, CW 3

participated in discussions with CFO Fielding, CEO Fruchterman, and other members of Butterfly's executive leadership about the need to lower the 2021 IPO Forecasts due to shortfalls in enterprise sales. CW 3 was eventually tasked with preparing a reduced re-forecast for 2021, which he completed around the middle to the end of August 2021.

(22) CW 3 also recalled that in June 2021, Butterfly engaged PwC to consult Butterfly on how to address its inability to penetrate the enterprise market. PwC was tasked with coming up with business cases and value propositions that could be presented to decision-makers at enterprise accounts.

### G. The 10(b) Defendants Acted with Scienter

303. As alleged herein, the 10(b) Defendants acted with scienter in that the 10(b) Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The 10(b) Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The 10(b) Defendants, by virtue of their receipt of information reflecting the true facts regarding Butterfly, and their control over and/or receipt and/or modification of Butterfly's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

#### 1. Defendants Fielding and Fruchterman Disregarded Internal Reports and Data that Directly Contradicted Their Public Statements

304. Defendants Fielding and Fruchterman were aware at the time of the IPO, and at all other times throughout the Class Period, that the 2021 IPO Forecasts were not achievable because

they approved them and had access to and reviewed spreadsheets and reporting packages sent to them via email every month, detailing Butterfly's actual sales data.

305. According to CWs 2 and 3, the 2021 IPO Forecasts reported in the Defective Proxy/Registration Statement were set and approved by Butterfly's CFO and CEO. CW 3 further stated that throughout this witness's employment, defendant Stephanie Fielding, Butterfly's CFO, defendant Todd Fruchterman, Butterfly's CEO and Jan Grimm, the Chief Revenue Officer, received by email a monthly reporting package that contained detailed Excel spreadsheets reporting on sales by probe, channel and region. CW 3 recalled that the reporting packages were distributed to defendants Fielding and Fruchterman by either defendant Fielding or a Director that reported to Fielding. Thus, defendants Fielding and Fruchterman were aware or recklessly disregarded that Butterfly did not have demand from enterprise customers, that the Company's sales were well below what was needed to achieve the 2021 IPO Forecasts, and that Butterfly, thus, was accumulating inventory it could not sell.

306. CWs 2, 3 and 4 confirmed that defendants Fielding and Fruchterman had direct access to the Salesforce.com system used to track sales leads. CW 3 further confirmed that both defendant Fruchterman and defendant Fielding had access to a spreadsheet kept on a Google Drive that was used to track sales leads prior to Salesforce.com. CW 4 stated that it was evident from looking at Salesforce.com that none of the sales personnel had deals in their pipelines that would be sufficient for them to achieve their quotas or for the Company to achieve its forecasted revenues in 2021. CW 5 also reported that it was apparent that there were not enough potential deals in the pipeline to meet the Company's aggregated sales projections.

307. CW 4 also recalled that Stacey Schmidt assisted Jan Grimm in creating a weekly report regarding the sales pipeline that was provided to defendants Fielding and Fruchterman on a

weekly basis. According to CW 4, this report contained sales data for the entire sales funnel and could be sliced and diced any which way to obtain different views of the sales data, including by state, sales region and sales representative and for any period.

308. Thus, defendants Fielding and Fruchterman could see in real-time, the Company's actual sales performance, as well as, among other information from Salesforce.com, the quality of the sales pipeline, what potential customers were in there and whether deals in there were stale and would have known or recklessly disregarded that Butterfly was missing its 2021 sales forecasts provided to investors in the 2021 IPO Forecasts every quarter in 2021.

309. Additionally, CW 3 reported that, starting by at least June 2021, there were discussions among CFO Fielding, CEO Fruchterman and other members of Butterfly's executive leadership about lowering Butterfly's 2021 IPO Forecasts due mainly to shortfalls in sales to enterprise customers. Thus, CW 3 was personally instructed to create revised 2021 IPO Forecasts. But in spite of the 10(b) Defendants' knowledge that the 2021 IPO Forecasts were not being met and needed to be revised, Butterfly reaffirmed the 2021 IPO Forecasts in the August 13, 2021 press release reporting on Q2 2021 financial results.

### 2. **Insufficient Demand Was Frequently <u>Discussed at Internal Company Meetings</u>**

310. Throughout the Class Period, demand shortfalls were frequently discussed at internal Company meetings that the defendants Fielding and/or Fruchterman attended.

311. For instance, throughout CW 2's tenure, this witness attended sales team meetings every three weeks during which the sales numbers were discussed. CW 2 recalled that CEO Fruchterman attended some of these the sales team meeting calls.

312. CW 3 similarly reported that there were discussions among CFO Fielding, CEO Fruchterman, and other executive leadership about the need to lower Butterfly's 2021 IPO

forecasts due mainly to shortfalls in sales to enterprise customers. In June 2021, CW 3 was instructed by Butterfly management to revise the 2021 IPO Forecasts.

313. CW 4 reported that throughout 2021, CW 4 attended and participated in weekly sales meetings every Friday attended by all sales representatives at Butterfly and led by Jan Grimm, Chief Revenue Officer, and Chief Operating Officer Stacey Pugh. CW 4 described Grimm as "very meticulous" and stated that at the Friday meetings, Grimm reviewed "every detail to the nth degree" for each deal in the Salesforce.com pipeline. According to CW 4, it was discussed at these weekly Friday meetings that Butterfly was consistently falling short of the 2021 IPO Forecasts and Butterfly's sales were "not where they needed to be." It was also discussed that sales personnel were not meeting their quotas and they felt like they were on a "sinking ship." CW 4 stated that Grimm went over the pipeline in such detail because he had to then report the sales results at weekly meetings he had with defendants Fielding and Fruchterman where he presented the report described in the prior Section G.1, *supra*.

314. CW 4 also recalled that Butterfly executives held "all hands" meetings on a monthly basis and that during these meetings Defendant Fruchterman discussed the Company's sales goals and the difficulty Butterfly was having achieving them.

315. Thus, Defendants Fielding and Fruchterman would have been aware from various internal Company meetings that Butterfly was continuously falling short of the 2021 IPO Forecasts throughout the Class Period.

### 3. <u>Laurent Faracci's Departure Supports Scienter</u>

316. In March 2020, Butterfly brought on a new CEO, Laurent Faracci. Butterfly expected that Laurent Faracci would continue as CEO after the Merger. In the Company's November 20, 2020 press release announcing the Merger, Butterfly stated that "Butterfly's management team, led by Chief Executive Officer, Laurent Faracci, will continue to lead the

combined company following the transaction[.]" Further, in the Company's initial draft of its registration filed with the SEC on November 27, 2020, the Company stated that "Butterfly's future success depends on its ability to attract, recruit, train, retain, motivate and integrate key personnel, including [] its Chief Executive Officer, Laurent Faracci[.]"

317. During his tenure, CEO Faracci had attempted to undo or renegotiate the onerous terms of the TSMC Contract that had initially been signed by Butterfly founder, Defendant Rothberg. According to CW 1, Faracci attempted to claw back the more-than-$50 million deposit that TSMC had required of Butterfly before TSMC would agree to begin manufacturing the highly specialized microchips used in Butterfly's probes.

318. Faracci was unsuccessful in his efforts to undo the TSMC contract and, presumably, understood the materially negative impact that the TSMC Contract would have upon Butterfly in the future.

319. In addition to his knowledge of the TSMC Contract and the Company's purchase commitments, as CEO since March 2020, Faracci would have also been fully aware that (1) the Company did not yet have an enterprise sales team, (2) the Company had no existing examples of an enterprise implementing Butterfly's products, (3) Butterfly's software was not yet ready for prime time and was still being developed, and (4) the forecasts presented to the investing public in presentations before the IPO and in the drafts of the proxy/registration statement were unattainable and not based upon the facts known to the Company at the time. Accordingly, Faracci would have known that the Defective Proxy/Registration Statement contained materially false and misleading statements and omissions.

320. On January 23, 2021, just three days before the Defendants would file the Defective Proxy/Registration Statement in its final form, Faracci suddenly and unexpectedly resigned from

his position as CEO, avoiding being named in the Defective Proxy/Registration Statement and thereby avoiding liability for the false statements contained therein.

321. The timing of CEO Faracci's departure is highly unusual and raises an inference that Faracci knew that the Defective Proxy/Registration Statement in its final form contained materially false and misleading statements, particularly with regard to the ongoing losses Butterfly was suffering from the minimum purchase requirements of the TSMC Contract.

322. Additionally, it is reasonable to infer from Faracci's departure that Faracci would have made his concerns about the materially false and misleading statements known to the Defendants.

#### 4. Defendants Fielding and Fruchterman Were Aware Enterprise Customers Were Slow or Unwilling to Adopt Butterfly's Probes Because It Was Butterfly's Core Business

323. Butterfly's core business is the sale of ultrasound probes. Prior to the IPO, and continuing throughout the Class Period, Butterfly's primary source of revenue was the sale of probes, accounting for more than 80% of sales in 2020 and more than 75% of sales in 2021.

324. Accordingly, as the sale of probes was the Company's core business, Defendants Fielding and Fruchterman had knowledge of (1) the size, experience, and capability of the Company's sales force, (2) the issues preventing probes from being sold to enterprise customers (3) the lack of pipeline of potential sales to enterprise customers, (4) the Company's key agreements and relationships with suppliers and manufacturers, and (5) the losses and write-downs resulting from inventory growth outpacing demand. CW statements confirm that Defendants Fielding and Fruchterman had knowledge of these matters.

325. Accordingly, Defendants Fielding and Fruchterman's knowledge of Butterfly's core business, the development and sale of ultrasound probes, is strong evidence that Defendants

Fielding and Fruchterman knew that the false statements detailed in this complaint were materially false and misleading when made and/or were reckless in making those false statements.

### 5. Defendants Fielding and Fruchterman Provided Due Diligence Materials on the Specific Subject Matters of the False Statements

326. Defendants Fielding and Fruchterman gathered and provided extensive due diligence materials to Longview in connection with the Merger concerning the specific subject matters of the false statements and held lengthy and detailed telephonic calls and meetings to discuss Butterfly's business:

> Butterfly provided Longview and its representatives with due diligence materials, including financial information for Longview to use in preparing its financial model. Representatives of Longview and Butterfly held telephonic conferences, face-to-face meetings and virtual meetings to discuss many commercial and legal elements of Butterfly's business to assist Longview and its advisors in developing Longview's financial model of Butterfly.

*Defective Proxy/Registration Statement* at 109.

327. The due diligence materials Butterfly gathered and provided to Longview in connection with the Merger included, among other things, Butterfly's ability to sell to enterprise customers and its financial projections:

> [D]uring the course of Longview management's evaluation of Butterfly's operating business and its public company potential, management conducted detailed due diligence on certain potential challenges. Some factors that both Longview management and the Longview Board considered were **(i) competition in the marketplace for handheld ultrasound devices and Butterfly's product pipeline**, **(ii) the ability of Butterfly to sell into large enterprises and the associated integration challenges within that market**, (iii) the fact that some key executives only recently joined Butterfly and the ability of Butterfly to adequately staff for the needs of a public company on the relevant timeline and **(iv) the ability of Butterfly to meet its financial projections and other financial and operating metrics**.

*Defective Proxy/Registration Statement* at 14.

328. Among the diligence materials provided to the Longview board members were the following:

Before reaching its decision, our board of directors reviewed the results of management's due diligence, which included:

- research on Butterfly's market, as well competitors to Butterfly and dynamics with other essential industry players;
- ***extensive meetings (virtually and in person) and calls with Butterfly's management team*** and representatives regarding operations, financial prospects, customers, sales and marketing strategy, its product pipeline, the regulatory landscape, hiring and retention, cybersecurity and supply chain management, among other customary due diligence matters;
- review of Butterfly's material business contracts and certain other legal and commercial diligence;
- review of Butterfly's regulatory compliance;
- review of Butterfly's intellectual property protections, including patents, trademarks and trade secrets;
- ***review of customer feedback from current users of Butterfly's products and its competitors' products***;
- ***financial and accounting diligence***; and
- ***diligence on Butterfly's financial model*** in conjunction with management of Butterfly and each party's respective financial advisors.

* * *

In considering the Business Combination, the Longview Board concluded that it met the above criteria. **In particular, the Longview Board considered the following** positive factors, although not weighted or in any order of significance:

- ***historical information regarding Butterfly's business, financial performance, and results of operations***;
- current information and forecast projections from Butterfly and Longview's management regarding ***(i) Butterfly's business, prospects, financial condition,*** operations, technology, products, services, management, competitive position, and strategic business goals and objectives, (ii) general economic, industry, and financial market conditions and ***(iii) opportunities and competitive factors within Butterfly's industry***;

[…]

- the potential value that Longview can bring to Butterfly's business based upon Longview's existing relationships in the healthcare industry, including with healthcare providers and payors;

- information of comparable companies in certain industries;
  […]

- ***Butterfly's ability to demonstrate the value of its technology to existing and potential users and its ability to integrate into and add value to large healthcare enterprise systems***; and

- all other factors the Longview Board deemed relevant.

*Defective Proxy/Registration Statement* at 112-14.

329. Defendants Fielding's and Fruchterman's admissions in the Defective Proxy/Registration Statement that they provided Longview with "detailed due diligence" that they then discussed with Longview at in-person and virtual meetings and calls is strong evidence that Defendants Fielding and Fruchterman knew that the false statements set forth in this complaint were materially false and misleading when made and/or they were reckless in issuing those false statements.

### 6. Chief Operating Officer David Perri Was Motivated to Use Insider Knowledge of Future Losses on Purchase Commitments to Sell Shares and Avoid the Future Losses in Stock Value

330. The Defective Proxy/Registration Statement disclosed that in Q4 2020, the Company agreed to amend the terms of the TSMC Contract to increase the aggregate amount of minimum purchase commitments from $80.3 million to $169.0 million.

331. The amended contract with TSMC was filed, in redacted form, with the SEC as an exhibit to Form S-4/A on January 6, 2021. The amendment to the TSMC Contract was signed and executed by David Perri, Butterfly's Chief Operating Officer at the time.

332. Butterfly's formal offer of employment to David Perri was filed with the SEC as an attachment to form S-4/A, filed on January 6, 2021. The offer of employment specified that

David Perri's position at Butterfly was Chief Hardware Product and Operations Officer. Presumably, David Perri was responsible for both Butterfly's hardware and operations at the time he signed the amended contract with TSMC.

333. Accordingly, David Perri knew the terms of the amended TSMC Contract and, as the chief officer of operations and product, also knew that Butterfly would be required to take additional write-downs and losses on purchase commitments in the future due to the rate of inventory growth outpacing demand for Butterfly's products.

334. Butterfly's formal offer of employment to David Perri specified that David Perri would receive 500,000 stock options in Butterfly Network that would vest over a four-year period.

335. On June 8, 2021, David Perri exercised a large amount of his vested stock options, purchasing more than 150,000 shares at a purchase price of $4.84 per share and immediately selling those shares at an average price of $14.00 per share for a profit of approximately $9.16 per share. Perri made approximately $1.37 million in profits in this transaction. Just ten days later, Perri was terminated, effective June 30, 2021.

336. On August 23, 2021, David Perri again exercised a significant portion of his vested stock options, purchasing approximately 75,000 shares at a purchase price of $4.84 and immediately selling those shares at an average price of $11.06 per share for a profit of approximately $6.22 per share. Perri made approximately $470,000 in profits in this transaction.

337. On August 25, 2021, David Perri again exercised a significant portion of his vested stock options, purchasing 70,000 shares at a purchase price of $9.40 and immediately selling those shares at an average price of $12.01 per share for a profit of approximately $2.61 per share. Perri made approximately $180,000 in profits in this transaction.

338. In total, David Perri made more than $2 million in profits while trading Butterfly stock before the truth about the Company's purchase commitments was known to the public.

339. As an insider with specific knowledge of facts that would cause the price of Butterfly's stock to decline when the truth was revealed, David Perri's massive sales of stock prior to the November 15, 2021 corrective disclosures that informed the market of additional write-downs and losses on purchase commitments and his subsequent departure from the Company, raises an inference that Butterfly's management, including Defendants Fielding and Fruchterman, acted knowingly or recklessly when issuing the false and misleading statements about inventory, hardware, and purchase commitments detailed in this complaint.

### 7. High Executive Turnover Supports Scienter

340. Immediately following the IPO, Butterfly began to experience extremely high turnover, particularly in the C-Suite, as shown below in Figure Y.

**Figure Y**.

| Position | Name | Months in Position | Position Start Date | Termination or Resignation |
|---|---|---|---|---|
| **Chief Executive Officer** | Laurent Faracci | 10 | Mar 2020 | Jan 2021 |
| **Chief Operating Officer** | David Perri | 15 | Mar 2020 | Jun 2021 |
| **Chief Marketing Officer** | Joao Rodrigues | 18 | Mar 2020 | Sep 2021 |
| **Chief Revenue Officer** | Jan Grimm | 18 | Feb 2020 | Aug 2021 |
| **Chief Clinical and Scientific Officer** | Jill Kalman, MD | 7 | Mar 2021 | Oct 2021 |
| **Chief Financial Officer** | Stepahnie Fielding | 15 | Nov 2020 | Jan 2022 |
| **Chief Human Resources Officer** | Timothy Trodden | 9 | Apr 2021 | Jan 2022 |
| **Chief Commercial Officer** | Stacey Pugh | 20 | Mar 2021 | Nov 2022 |
| **Chief Communications Officer** | Holly Spring | 13 | Oct 2021 | Nov 2022 |
| **Chief Executive Officer** | Todd Fruchterman | 22 | Feb 2021 | Dec 2022 |

341. The sheer number of executive departures in such a short period and that they occurred at suspicious times and/or under suspicious circumstances supports a strong inference of Defendants' knowledge, recklessness and/or scienter with respect to the issues facing Butterfly, particularly with regard to the deficient sales pipeline, the inadequate sales force, the incomplete

state of Butterfly's software, the inventory and purchase commitments that outpaced demand, and the inability to sell to enterprise customers.

342. As previously discussed, Chief Executive Officer Laurent Faracci left the Company just days before he would have been required to sign the Defective Proxy/Registration Statement, and Chief Operating Officer David Perri left the Company soon after he began exercising and selling his stock options, but before the market became aware of the extent of the inventory and purchase commitment issues.

343. The subsequent departures of the Chief Marketing Officer, the Chief Revenue Officer, the Chief Clinical Officer, the Chief Financial Officer, and the Chief Human Resources Officer, all departing within a 4-month window, at a time when the truth of Butterfly's condition was becoming known to the market, supports a strong inference of Defendants' knowledge, recklessness and/or scienter with regard to the deficient sales pipeline, the inadequate sales force, the incomplete state of Butterfly's software, the inventory and purchase commitments that outpaced demand, and the inability to sell to enterprise customers.

### H. <u>Loss Causation</u>

344. During the Class Period, as detailed herein, the 10(b) Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Butterfly Class A common stock and operated as a fraud or deceit on Class Period purchasers of Butterfly stock by failing to disclose and misrepresenting the adverse facts detailed herein. When the 10(b) Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Butterfly common stock declined significantly as the prior artificial inflation came out of the stock's price.

345. On May 13, 2021, the 10(b) Defendants issued Butterfly's first quarter 2021 press release reporting, among other things, that Butterfly's inventory balance increased by over $10

million, or approximately 40% in just three months, indicating Butterfly was unable to sell a substantial portion of the inventory it was required to purchase as part of its minimum purchase commitments.

346. Upon the news, Butterfly's stock price declined from $11.23 per share on May 12, 2021 to $9.45 per share on May 13, 2021, a decline of $1.78 per share, or 16%, on unusually heavy trading volume.

347. On May 27, 2021, Motley Fool reported on Butterfly's "Inventory Problem" resulting from a 40% increase in inventory during the quarter, noting that the Company "increased its inventory by almost as much as its total revenue for the quarter" and expressing concern that sales had not yet ramped up. "Investors at this point are being asked to take a leap of faith and believe that management will come through with increased sales in the second half of the year."

348. Then, on November 15, 2021, the 10(b) Defendants issued Butterfly's third quarter 2021 earnings release reporting that Butterfly was adjusting its 2021 IPO Forecasts downward from revenue of $78.1 million[12] to $60 to $62 million, a decline of approximately 22%, citing a need to "reset expectations for revenue" purportedly due to "our most recent experiences and the current healthcare environment." The 10(b) Defendants attributed the reduction in guidance to a "confluence of factors." CEO Fruchterman explained that the Company's sales were "falling short of what's necessary to achieve the annual guidance." CEO Fruchterman further stated:

> It's important to note that there has been a significant management evolution since projections were first made that included an aggressive back half, 2021 ramp. While we have rapidly reoriented strategy team, and the company overall to adjust to the need to shift from a direct-to-user-led market approach to a more integrated commercial approach to health systems and specialties.

---

[12] The Defective Proxy/Registration Statement forecasted 2021 revenues at $78.1 million. During the May 2021 Earnings Call, the Company provided full year revenue guidance of $76 to $80 million. That range was reaffirmed in the August 2021 Earnings Call, which was accompanied by a slide presentation showing full year 2021 revenues forecasted as $76 to $80 million.

349. CFO Fielding echoed the CEO's comments, stating that "[the Company] did fall short in the back half ramp" of what was "necessary to meet our original revenue projections," and attributed the shortfall, in part, to the "abate[ment]" of direct-to-user sales because the Company was "seeing the end of the individual early adopter curve." CFO Fielding also reported additional losses on purchase commitment arising from Butterfly's contracts with one of its manufacturing vendors: "Excluded from the adjusted gross profit in Q3 2021, is a non-recurring $11.6 million loss on our purchase commitment with a third-party manufacturing vendor."

350. In other words, the 10(b) Defendants admitted for the first time that the 2021 IPO Forecasts were not achievable, that Butterfly was unable to penetrate the enterprise market and that Butterfly continued to have substantial losses from purchase commitments of inventory that could not be sold through.

351. Upon the news, Butterfly's stock price declined from $8.60 per share on November 12, 2021 to $7.52 per share on November 15, 2021, a decline of $1.08 per share, or 13% on unusually high trading volume.

352. Analysts understood the 10(b) Defendants' statements to be revealing a revenue shortfall resulting from a lack of enterprise sales and system implementations at institutions and that the Company would not be meeting its 2021 IPO Forecasts.

353. Cowen analysts understood the 10(b) Defendants' statements as revealing that Butterfly had fallen short of its sales forecasts because it was unable to generate demand from enterprise customers. According to a November 15, 2021 Cowen analyst report, Butterfly's "***revenue shortfall was driven by headwinds in the enterprise [channel]***" and that those headwinds "***extended the enterprise sales cycle and extended system implementation[s] within institutions***." The November 15, 2021 Cowen analyst report further noted that enterprise clients

had not adopted Butterfly's products due, in part, to the fact Butterfly's probes were still in early development and lacked the features and functionality enterprise customers require, stating: "The pipeline [of ongoing conversations with potential enterprise accounts] should provide a tailwind in 2022 and beyond ***as software updates & the next-gen Butterfly iQ device [] should drive adoption decisions***."

354. According to the November 15, 2021 Cowen analyst report, the 10(b) Defendants' statements revealed that the Company's sales force in 2021 was not sufficient, in number or experience, to achieve the 2021 IPO Forecasts, stating that "revenue growth acceleration is achievable in '22" due, in part, to "recent additions to [Butterfly's] commercial team (e.g., new VP of Sales & Strategic Partnerships)" that "will help optimize the enterprise sales strategy," and due to recently "increased salesforce productivity."

355. The market similarly understood the 10(b) Defendants' statements as revealing additional losses on purchase commitments negatively impacted the Company's margins. Nasdaq and The Motley Fool both published an article by Brett Schafer on November 15, 2021 titled "Why Butterfly Network Was Down 20% on Monday" which attributed the drop in Butterfly's stock price to several factors, including: (1) Butterfly "drastically reduced its full-year guidance," which Schafer called the "worst part of the report," and (2) "Butterfly's gross margin was negative 35% in Q3" which was "mostly because of a non-cash charge on purchase commitments."
*See also*, Section III.G., *supra*.

356. Then, on February 28, 2022, Butterfly issued a press release that "introduced" the Company's new software, Butterfly Blueprint, which was described as "a system-wide platform designed to support the scaled deployment of ultrasound across hospitals and health systems." Purportedly, Butterfly's newly developed software "brings hospitals and health systems a

complete ultrasound solution" and "[b]y integrating into health systems' clinical and administrative systems and workflows, Blueprint delivers a clinical assessment tool at scale." Notably, Butterfly's description of Blueprint's capabilities was substantially the same as the description of the Butterfly software that had been described to investors in the Defective Proxy/Registration Statement, wherein Defendants presented the software as then-currently existing.

357. During the February 28, 2022 earnings call, Defendant Fruchterman admitted that the Company's software had not been developed as was represented at the time of the IPO and during the Class Period. However, the extent of this problem was not fully revealed, as Defendant Fruchterman asserted that the software was now fully developed:

> Let's start with ***hospitals and health systems***. [] We are confident that ***in time, we will prove our value across this ecosystem***, reducing time to diagnosis, accelerating treatment, driving efficiency, enhancing patient experiences and enabling higher quality care. [] Health care systems are the hub of care delivery and often where novel standards of care are born. They represent the greatest complexity of integration and have the potential to yield the greatest impact tutorial cost of care. [] Given the complexity of the medical ecosystem, practitioners require a comprehensive solution that brings the value of ultrasound information into their workflow needs and improves clinical practice. ***Today, as mentioned in our press release, we officially bring that solution to market. Butterfly Blueprint represents our comprehensive offering*** that includes hardware, Compass software and services***, specifically designed to support health care institutions to achieve enterprise-wide imaging*** from the ***bedside and encounter-based workflow across multiple care disciplines and settings***. Blueprint's broad set of services includes AI-powered image capture and interpretation powered by Caption Health as well as Butterfly Academy courses and curricular.

358. Defendant Fruchterman reiterated during the February 28, 2022 earnings call that the new Blueprint software that had been developed in 2021 was the key to move forward with enterprise customers:

> And so we made a lot of investment and aggregated a lot of the components of what we put together in Butterfly and Butterfly Blueprint in '21. So Butterfly Blueprint is really the road map for us moving forward in health systems. []

359. Defendant Fruchterman also admitted that the newly announced software used a partnership with a third-party who provided much of the "digital plumbing" and "infrastructure":

> Our partnership with Ambra was kind of an innovative approach to helping us move Blueprint and Compass on top of an architecture and some, I guess, you think about it as digital plumbing as a way for us to accelerate to move up and to think progressively about how to get more relevant and scale faster. So we were able to work with them, collaborate and then kind of put Compass and essentially the Blueprint solution on top of some of their infrastructure that they have established being one of the leaders in cloud-based medical imaging management.

360. Defendant Fruchterman also stated during the February 28, 2022 earnings call that the recently announced partnership with URMC would be used "to really prove the embodiment of our strategy, which is the practical application of ultrasound information into the clinical workflow" and admitted that Butterfly was still early in learning how to deploy its probes into enterprise workflows:

> And so part of this whole [URMC] deployment was both looking at how do we measure and how do we learn together on what it takes to get people confident? How do you deploy this into workflows? What is best practice to learn and evolve to do that? How do we get information around that? How do we look at evolving, improving the clinical care pathways and then the returns and the economic benefits of doing that?

361. During the earnings call on February 28, 2022, Defendant Fruchterman also indicated that the URMC partnership would allow for further development of Butterfly's software to ensure Butterfly's probes could be implemented at scale by enterprise customers and incorporated into their workflows:

> But right now, what we're focused on, most importantly, is evolving [Butterfly's Compass software] to make sure that it can be scalable and deployed across other institutions, the efforts that it takes and the efficiencies that we can drive in getting people up to scale for the deployment and then seeing the incorporation into the workflows and then starting to measure the benefits. So we see this first year as a growing and learning and deploying year.

362. That same day, UBS published an analyst report stating that "[in January 2022], BFLY announced its ***first enterprise wide deployment***" and reported that "BFLY noted it could

see another 1-2 large institutional deployments this year." In other words, a full year after the IPO, Defendants admitted that, contrary to prior statements, Butterfly was engaging in its "***first***" enterprise deployment and did not have the pipeline of enterprise customers it previously told investors. Rather, Butterfly had only one enterprise customer so far that was scheduled to start an implementation of Butterfly probes later that year in 2022.

363. The UBS analyst report also took note of Butterfly's newly released Blueprint software and concluded: "Net-net, BFLY is making some significant progress on its business model but we see risk as it looks to drive a shift in care delivery, which we view as a heavy lift and valuation gives us pause." UBS lowered the target price of BLY common stock to $5.50, down from the previous target of $7.00.

364. On February 28, 2022, Butterfly's stock price closed at $5.15 per share, down from $5.71 at the close of the preceding trading day, a decline of approximately 9.8%.

365. The market understood the Defendants press releases and earnings call comments to be correcting previous misstatements about the state of Butterfly's pipeline, software development, strategy, and ability to sell to enterprise customers.

366. More than 8 months later, on November 3, 2022, Defendant Fruchterman would further reveal the extent to which Butterfly's software had not been as developed as previously represented:

> Some of our initial learnings in the market, however, made us recognize that ***we were not where we needed to be*** in order to realize the full value of our technology and the impact to healthcare. ***So we went to work on our enterprise level software and workflow solutions. We have spent the last year investing heavily in the development of our software solutions Blueprint and Compass.*** Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, ***we have gone from software that was objectively lagging to software that is now highly valued*** and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that

> software is the enterprise enabler. We are proud that ***enterprise level software development has now become a positive differentiator for Butterfly.***

367. When Oppenheimer & Co. initiated coverage on Butterfly later that month, the analysts noted that Butterfly was still struggling to shift its business strategy to enterprise sales: "Butterfly is currently undergoing an evolution of its commercial strategy, which began in 2021[.]" The Oppenheimer analysts also concluded:

> New management team is trying to implement a new business strategy in terms of product position, sharpening the value proposition message, improving product attributes, etc. This essentially means the story is in transition[.]

368. Analysts understood Defendant Fruchterman's comments on November 3, 2022 as revealing that the Company did not have an enterprise sales model at the time of the IPO and was still struggling to develop its product for enterprise use and provide a value proposition to enterprise customers.

369. On November 3, 2022, after the earnings announcement and third quarter 2022 earnings call, Butterfly's stock price closed at $3.94, down from $4.79 the previous trading day, a decline of 17.7%

370. Thus, as demonstrated above, the market understood the 10(b) Defendants' disclosures to be correcting their prior Class Period misstatements that misrepresented: (1) Butterfly's software was fully developed and ready for enterprise use, (2) that Butterfly expected to achieve $78 to $80 million in sales in 2021, (3) the risks relating to Butterfly's minimum purchase commitments, including excess inventory and inventory write-downs and losses on purchase commitments, (4) that there was strong demand and initial adoption of Butterfly's products by enterprise customers, and (5) that near-term growth was supported by a pipeline of enterprise bookings.

371. As a result of their purchases of Butterfly Class A common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The 10(b) Defendants' false and misleading statements had the intended effect and caused Butterfly Class A common stock to trade at artificially inflated prices throughout the Class Period, trading as high as $29.13 per share on February 18, 2021 and closing that day at $27.14 per share.

372. By concealing from investors the adverse facts detailed herein, the 10(b) Defendants presented a misleading picture of Butterfly's business, risks and future financial prospects. When the truth about the Company was revealed to the market, the price of Butterfly Class A common stock fell significantly, dropping to $9.45 per share on May 13, 2021, then to $7.52 per share on November 15, 2021, then to $5.15 per share on February 28, 2022, and finally to $3.94 per share on November 3, 2022 removing the inflation therefrom and causing economic loss to investors who had purchased Butterfly Class A common stock during the Class Period.

373. The decline in the price of Butterfly Class A common stock after the corrective disclosures came to light was a direct result of the nature and extent of the 10(b) Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Butterfly Class A common stock negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the 10(b) Defendants' fraudulent conduct.

374. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of the 10(b) Defendants' fraudulent scheme to artificially inflate the price of Butterfly Class A common stock and the subsequent significant declines in the value of

Butterfly Class A common stock when the 10(b) Defendants' prior misrepresentations and other fraudulent conduct were revealed. During the Class Period, as detailed herein, the 10(b) Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Butterfly Class A common stock and operated as a fraud or deceit on Class Period purchasers of Butterfly stock by failing to disclose and misrepresenting the adverse facts detailed herein. When the 10(b) Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Butterfly common stock declined significantly as the prior artificial inflation came out of the stock's price.

### I. <u>Presumption of Reliance</u>

375. Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all relevant times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

a. Butterfly's Class A common stock was actively traded on the New York Stock Exchange;

b. The market price of Butterfly's Class A common stock reacted promptly to the dissemination of public information regarding the Company;

c. The Company's stock was followed by multiple financial analysts from different institutions,[13] including those cited in

[13] UBS Investment Bank, Research Division and Cowen & Company, LLC, Research Division.

this complaint, who participated in Butterfly's quarterly earnings calls;

d. The average weekly trading volume for Butterfly's stock during the Class Period was approximately 13.19 million shares; [14]

e. As a regulated issuer, Butterfly filed with the SEC periodic public reports during the Class Period;

f. Butterfly regularly communicated with public investors via established market communication mechanisms; and

g. During the Class Period, the Company's market capitalization was as high as $5.19 billion and the Company had over 197.26 million shares outstanding.

376. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results and business operations. During this period, the 10(b) Defendants continued to pump materially false and misleading information into the marketplace regarding the Company, the readiness of its products for enterprise implementation, and the demand for its products in the enterprise sales channel. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

377. As a result of the misconduct alleged herein (including the 10(b) Defendants' false and misleading statements and omissions), the market for Butterfly's Class A common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the

[14] Source: S&P Capital IQ (2.77 million average daily volume).

"fraud-on-the market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which the 10(b) Defendants are each responsible.

378. Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Butterfly's Class A common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

379. Plaintiffs and the other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this complaint against the 10(b) Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

380. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by the 10(b) Defendants or been aware of the truth behind the 10(b) Defendants' material misstatements, they would not have purchased Butterfly's Class A common stock at artificially inflated prices.

## X. NO SAFE HARBOR

381. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

382. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

383. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## XI. CLASS ACTION ALLEGATIONS

384. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil procedure on behalf of three Classes:

a. Securities Act Class: a class consisting of all persons who purchased or otherwise acquired public shares in Butterfly (including by way of exchange of publicly-listed Longview Acquisition Corp. shares) pursuant to or traceable to the Defective Proxy/Registration Statement that Defendants filed with the SEC on Form S-4 on November 27, 2020, and that was thereafter amended on Forms S-4/A on January 6, 2021, January 19, 2021, and January 26, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on January 26, 2021. The Securities Act Class asserts claims under §§ 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) in connection with Butterfly's initial public offering. These claims arise from the Section 11 Defendants' negligence, and do not assert that the Section 11 Defendants, in their capacity as defendants of the Section 11 claim, acted with scienter.

b. 14(a) Class: a class consisting of all persons who were solicited to approve the merger of Butterfly and Longview and who exchanged publicly-listed Longview shares for Butterfly Class A common stock rather than redeeming the same pursuant to the Defective Proxy/Registration Statement. The 14(a) Class asserts claims pursuant to Section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)). These claims arise from the 14(a) Defendants' negligence and do not assert that the 14(a) Defendants acted with scienter.

c. 10(b) Class: a class consisting of all persons who purchased or otherwise acquired public Butterfly Class A common stock or other public Butterfly securities between January 12, 2021 and November 15, 2021, both dates inclusive (the 10(b) Class Period). The 10(b) Class asserts claims under §§

10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director or controlling person of Butterfly; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

385. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Indeed, as of November 15, 2021, Butterfly had 197.26 million outstanding shares of Class A common stock.

386. Members of the Class may be identified from records maintained by Butterfly or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

387. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

a) As to all three classes, whether Defendants violated the federal securities laws;

b) As to all three classes, whether the statements made were materially false or misleading, or omitted material facts;

c) As to the 10(b) Class, whether the 10(b) Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

d) As to all three classes, whether the IPO price and the prices of Butterfly's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

e) As to all three classes, whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

388. Plaintiffs' claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this complaint.

389. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

390. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

391. Plaintiffs will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Butterfly securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

## COUNT I

### Violation of Section 11 of the Securities Act of 1933 Against the Section 11 Defendants

392. Plaintiffs restate and reallege Paragraphs 15 through 251 as though fully set forth herein.

393. This Count is based on negligence and strict liability and does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

394. This count is asserted against the Section 11 Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs, who purchased and/or otherwise acquired Butterfly securities pursuant or traceable to the Defective Proxy/Registration Statement.

395. The Company is the issuer of the stock issued via the Defective Proxy/Registration Statement. As such, the Company is strictly liable for each false and misleading statement contained therein, even for innocent misrepresentations.

396. Defendants Larry Robbins, John Rodin, Mark Horowitz, Westley Moore, Derek Cribbs, and Randy Simpson were all directors of Longview at the time the Defective Proxy/Registration Statement was effectuated and each consented to be identified as a director in the Defective Proxy/Registration Statement. Therefore, each had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration Statement. As such, each of these Defendants is liable to Plaintiffs and the Securities Act Class.

397. Defendants Todd Fruchterman, Jonathan M. Rothberg, Larry Robbins, Dawn Carfora, John Hammergren, Gianluca Pettiti and S. Louise Phanstiel were named in the Defective Proxy/Registration Statement as persons who were about to become directors in the merged Company and consented to being so named. Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Defective Proxy/Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of reasonable care, these Defendants should have known of the material misstatements and omissions contained in the Defective Proxy/Registration Statement. As such, each of these Defendants is liable to Plaintiffs and the Securities Act Class.

398. Plaintiffs and other members of the Securities Act Class acquired Butterfly securities without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Securities Act Class were thus damaged by the Section 11 Defendants' material misstatements and omissions.

399. This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

**COUNT II**

**Violation of Section 15 of the Securities Act of 1933**
**Against Defendant Fruchterman**

400. Plaintiffs restate and realleges Paragraphs 15 through 251, as though fully set forth herein.

401. This Count is asserted pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendant Fruchterman. Defendant Fruchterman, in addition to his own primary liability

under the Securities Act, is also secondarily liable for the primary violations of Section 11 of the Securities Act.

402. As the CEO of Butterfly, Defendant Fruchterman was involved with the day-to-day operations of the Company prior to the Merger and was involved in reviewing and providing the inflated 2021 Financial Projections and other disclosures in the Defective Proxy/Registration Statement. Defendant Fruchterman had the ability to control the contents thereof.

403. Plaintiffs and other members of the Securities Act Class acquired Butterfly securities without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Securities Act Class were thus damaged by the primary violations of the Company. By virtue of the conduct alleged herein, and defendant Fruchterman's status as a control person of the Company, Fruchterman is secondarily liable to Plaintiffs and the Securities Act Class for the primary violations of Section 11 of the Securities Act.

## COUNT III

### Violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Against the Company and the 14(a) Defendants

404. Plaintiffs restate and reallege Paragraphs 15 through 245 and 252 through 255 as though fully set forth herein.

405. This Count is asserted pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. §78n, and Rule 14a-9 promulgated thereunder, against the Company and the 14(a) Defendants and does not sound in fraud. Plaintiffs do not allege that the 14(a) Defendants acted with scienter or fraudulent intent with respect to this Count as that intent is not an element of a Section 14(a) claim.

406. SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

407. The 14(a) Defendants prepared, reviewed, and disseminated the Defective Proxy/Registration Statement, which as specified above made false statements, omitted material information that was required to be set forth therein, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

408. By virtue of their positions within the pre-merger Company and their due diligence regarding Butterfly and the Merger, the 14(a) Defendants were aware of the undisclosed or misrepresented information and of their duty to disclose this information in the Defective Proxy/Registration Statement. The Defective Proxy/Registration Statement was prepared, reviewed, and/or disseminated by the 14(a) Defendants named herein. It misrepresented and/or omitted material facts, as detailed above. The 14(a) Defendants were at least negligent in filing the Defective Proxy/Registration Statement with these materially false and misleading statements.

409. As a direct result of the 14(a) Defendants' negligent preparation, review and dissemination of the Defective Proxy/Registration Statement, members of the 14(a) Class were induced to vote their shares and accept inadequate consideration in connection with the Merger. The Defective Proxy/Registration Statement used to obtain shareholder approval of the Merger deprived 14(a) Class members of their right to a fully informed shareholder vote in connection therewith, and deprived them of their right to the information necessary to make an informed

redemption decision. At all times relevant to the dissemination of the Defective Proxy/Registration Statement, these Defendants were aware of and/or had access to the true facts concerning Butterfly. Thus, as a direct and proximate result of the dissemination of the Defective Proxy/Registration Statement that the 14(a) Defendants used to obtain shareholder approval of and thereby consummate the Merger, the 14(a) Class suffered damages and actual economic losses in an amount to be determined at trial.

410. The omissions and false and misleading statements in the Defective Proxy/Registration Statement were material in that a reasonable stockholder would have considered them important in deciding how to vote on the merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Defective Proxy/Registration Statement and in other information reasonably available to stockholders.

411. As stated herein, the Defective Proxy/Registration Statement contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. It was an essential link in the consummation of the Merger and described itself as the sole source of information investors were to rely upon in making the Merger vote and redemption decisions. These Defendants failed to correct the Defective Proxy/Registration Statement prior to the merger vote or redemption deadline, and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

412. By reason of the foregoing, the 14(a) Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

## COUNT IV

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the 10(b) Defendants

413. Plaintiffs restate and reallege Paragraphs 1 through 383 as though fully set forth herein.

414. This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against the 10(b) Defendants.

415. The 10(b) Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

416. The 10(b) Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

417. The 10(b) Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their

control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

**COUNT V**

**For Violations of Section 20(a) of the Exchange Act**
**Against Defendants Fruchterman and Fielding**

418. Plaintiffs restate and reallege Paragraphs 1 through 383 as though fully set forth herein.

419. This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants Fruchterman and Fielding (the "Count V Defendants").

420. The Count V Defendants, by reason of their status as senior executive officers and/or directors of Butterfly, directly or indirectly controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of §20(a) of the Exchange Act.

421. The Count V Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiffs' and the Class's investments in Butterfly securities within the meaning of §20(a) of the Exchange Act. Therefore, the Count V Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

422. The Count V Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count V Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

423. The Count V Defendants knew or recklessly disregarded the fact that Butterfly's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count V Defendants did not act in good faith.

424. By virtue of their high-level positions and their participation in and awareness of Butterfly's operations and public statements, the Count V Defendants were able to and did influence and control Butterfly's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

425. The Count V Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, as set forth more fully above.

426. As set forth herein, the Count V Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Count V Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Count V Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of Butterfly securities.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Declaring that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives and Lead Counsel as Class Counsel;

B. Awarding Plaintiffs and each Class compensatory damages;

C. Awarding Plaintiffs and each Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, and any appropriate state law remedies; and

E. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and each Class demand a trial by jury.

DATED: February 24, 2023

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Eduard Korsinsky*
Eduard Korsinsky
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 992-4523
Fax: (212) 363-7171
ek@zlk.com

Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
David Jaynes (admitted *pro hac vice*)
Nicholas R. Lange (*pro hac vice* forthcoming)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
djaynes@zlk.com
nlange@zlk.com

*Counsel for Plaintiffs and the Class*