**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| CRAIG M. ROSE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORP., TODD M. FRUCHTERMAN, STEPHANIE FIELDING, JONATHAN M. ROTHBERG, JOHN RODIN, LARRY ROBBINS, MARK HOROWITZ, WESTLEY MOORE, DEREK CRIBBS, and RANDY SIMPSON,<br><br>Defendants. | Case No. 2:22-CV-00854-EP-JBC<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Motion Date: August 7, 2023<br><br>*Document Filed Electronically* |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT</u>**

Seth R. Goldman
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
919 Third Avenue
New York, NY 10022
Tel: 212-692-6845
srgoldman@mintz.com

John F. Sylvia (*admitted pro hac vice*)
Patrick E. McDonough (*admitted pro hac vice*)
Evelyn Limon (*admitted pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
One Financial Center

April 24, 2023
Page ii

Boston, MA 02111
Tel:  (617) 348-1820
jfsylvia@mintz.com
pemcdonough@mintz.com
elimon@mintz.com

*Attorneys for Defendants Butterfly Network, Inc.*
*f/k/a Longview Acquisition Corp., Todd. M.*
*Fruchterman, Jonathan M. Rothberg, John Rodin,*
*Larry Robbins, Mark Horowitz, Westley Moore,*
*Derek Cribbs, and Randy Simpson*


Jim Walden
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
Tel:  212-335-2030
jwalden@wmhlaw.com


*Attorneys for Defendant Stephanie Fielding*


Dated:  April 24, 2023

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................2

    I.      The Longview-Butterfly Combination. ...................................................................2

    II.     The Plaintiffs' Claims. ...........................................................................................3

        A.     The Plaintiffs. .........................................................................................3

        B.     The Plaintiffs' Claims. ...........................................................................3

ARGUMENT ..................................................................................................................................5

    I.      Counts I, III, And IV: The SAC Does Not Allege That Any Defendant Made An Actionably False Statement. ...........................................................................5

        A.     Software Quality and Integration with Clinical Workflow (¶¶209-26) ...................6

        B.     2021 "IPO Forecasts" (¶¶227-30) ...........................................................11

        C.     "Materialized" Risks (¶¶231-36) ...........................................................15

        D.     Statements in Investor Presentation Materials (¶¶237-45) ...................18

        E.     Other Alleged False Statements (¶¶257-302) ........................................19

    II.     Counts I, III, And IV: The SAC Does Not Allege Facts Sufficient To Generate The Requisite Inferences Of Intent To Defraud Or Recklessness, And Of Actual Knowledge Of Falsity. ...........................................................................19

        A.     Counts I And III: The Safe Harbor Provisions Defeat The Section 11 and Section 14 Claims. ...........................................................................21

            1.     The Alleged Misstatements In The Form S-4 Were Forward-Looking. ................21

            2.     The Forward-Looking Statements Are Exempt From Liability Under The Safe Harbor Provisions. ...........................................................................23

               a.     The Forward-Looking Statements Were Accompanied By Meaningful Cautionary Statements. ...........................................................................23

               b.     The SAC Does Not Allege That Any Defendant Made A Forward-Looking Statement With Actual Knowledge Of Its Falsity. ...................24

         B.     Count IV: The Section 10(b) Claim Fails Because The SAC Does Not Allege Specific Facts Giving Rise To A Strong Inference Of Scienter. ................25

    III.    Counts II And V Fail To State Claims For Derivative Liability ...............................30

CONCLUSION ..............................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................................6

*Baum v. Harman Int'l Indus.*,
  408 F. Supp. 3d 70 (D. Conn. 2019).................................................................20

*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007)............................................................................................6

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
  114 F. Supp. 2d 316 (D.N.J. 2000)...................................................................20

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*,
  908 F.3d 872 (3d Cir. 2018)..............................................................................17

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 U.S. Dist. LEXIS 11278 (S.D.N.Y. Jan. 21, 2021)....................................................................................28

*Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Amer. Holdings, Inc.*,
  12 Civ. 4025 (AT), 2013 U.S. Dist. LEXIS 178462 (S.D.N.Y. Dec. 17, 2013).......................28

*DeVito v. Liquid Holdings Grp., Inc.*,
  No. 15-6969 (KM)(JBC), 2018 U.S. Dist. LEXIS 217963 (D.N.J. Dec. 18, 2018) ....................................................................................................................6

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)...............................................................27

*Howard v. Arconic Inc.*,
  No. 2:17-cv-1057, 2021 U.S. Dist. LEXIS 116935 (W.D. Pa. June 23, 2021) .......................20

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)........................................................................16, 20

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
  413 F. Supp. 2d 378 (E.D.Pa. 2005) .................................................................30

*In re ARIAD Pharms. Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2016)...........................................................................6, 26

*In re Aspeon Sec. Litig.*,
  168 Fed. Appx. 836 (9th Cir. 2006)...................................................................29

ii

*In re Boston Sci. Corp. Sec. Litig.*,
   No. 10-10593-DPW, 2011 U.S. Dist. LEXIS 106042 (D. Mass. Sept. 19,
   2011) ..................................................................................................................27

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)...............................................................................2

*In re Carlotz, Inc. Sec. Litig.*,
   No. 21-cv-5906 (RA), 2023 U.S. Dist. LEXIS 57126 (S.D.N.Y. Mar. 31,
   2023) ..................................................................................................................27

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ..............................................................................6

*In re ECOtality, Inc. Sec. Litig.*,
   No. 13-03791-SC, 2014 U.S. Dist. LEXIS 130499 (N.D. Cal. Sept. 16. 2014).....................22

*In re Harman Int'l Ind., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) .......................................................................16, 17

*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d (S.D.N.Y. 2008) ........................................................................26

*In re Intelligroup Sec. Litig.*,
   527 F. Supp. 2d 262 (D.N.J. 2007) ...............................................................25, 29

*In re MobileMedia Sec. Litig.*,
   28 F. Supp. 2d 901 (D.N.J. 1998) .......................................................................17

*In re ShengdaTech, Inc. Sec. Litig.*,
   No. 11 Civ. 1918 (LGS), 2014 U.S. Dist. LEXIS 112190 (S.D.N.Y. Aug. 12,
   2014) ..................................................................................................................27

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)..................................................................................6

*In re Wilmington Trust Sec. Litig.*,
   29 F. Supp. 3d 432 (D. Del. 2014).......................................................................30

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)....................................................................21, 28, 30

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)............................................................................................27

*Kurtzman v. Compaq Computer Corp.*,
   2000 U.S. Dist. LEXIS 22476 (S.D. Tex. Dec. 12, 2000) ....................................20

*Laasko v. Endo Int'l, PLC*,
No. 20cv07536(EP)(MAH), 2022 U.S. Dist. LEXIS 147122 (D.N.J. Aug. 17, 2022) ............................................................................................................ *passim*

*Laborers Local No. 231 Pension Fund v. Cowan*,
837 Fed. Appx. 886 (3d Cir. 2020) ..........................................................................13

*Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*,
838 F.3d 76 (1st Cir. 2016) ......................................................................................29

*Martin v. GNC Holdings, Inc.*,
757 Fed. Appx. 151 (3d Cir. 2018) ..........................................................................28

*Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
99 Civ. 1944 (NRB), 2000 U.S. Dist. LEXIS 7444 (S.D.N.Y. May 31, 2000) .......................28

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
834 F.3d 481 (3d Cir. 2016)............................................................................... *passim*

*PAMCAH-UA Local 675 Pension Fund v. BT Group PLC*,
No. 20-2106, 2021 U.S. App. LEXIS 23189 (3d Cir. Aug. 5, 2021) ......................................25

*Plumbers & Pipefitters Local Union No. 620 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858 (N.D. Ill. 2011) .........................................27

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ...............................................................................27

*Kiger ex rel. Qualcomm, Inc. v. Mollenkopf*,
2021 U.S. Dist. LEXIS 220509 (D. Del. Nov. 15, 2021) ....................................................5

*Ret. Sys. v. Boston Sci. Corp.*,
523 F.3d 75 (1st Cir. 2008)......................................................................................26

*Saslaw v. Al Askari*,
95 Civ. 7641 (LAP), 1997 U.S. Dist. LEXIS 5621 (S.D.N.Y. Apr. 23, 1997).........................22

*Slayton v. American Express Co.*,
604 F.3d 758 (2d Cir. 2010)......................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................................29

*Williams v. Globus Med., Inc.*,
869 F.3d 235 (3d Cir. 2017).................................................................................16, 17

*Woodell v. Weiner, M.D.O.*,
   No. 20-3044, 2022 U.S. App. LEXIS 33532 (3d Cir. Dec. 6, 2022) ........................................5

**Statutes**

15 U.S.C. §77z-2(i)(1) ..............................................................................................21, 22

15 U.S.C. §77z-2(c) .........................................................................................................20

15 U.S.C. §78u-5(i)(1) ...............................................................................................21, 22

15 U.S.C. §78u-5(c) .........................................................................................................20

Securities Act of 1933 Section 11............................................................................. *passim*

Securities Act of 1933 Section 15...........................................................................3, 4, 30

Securities and Exchange Act of 1934 Section 10(b) .............................................. *passim*

Securities and Exchange Act of 1934 Section 14(a)....................................3, 13, 21, 25

Securities and Exchange Act of 1934 Section 20(a)...........................................3, 4, 30

Private Securities Litigation Reform Act of 1995 .................................................. *passim*

**Other Authorities**

17 C.F.R. §240.10b-5(b)...................................................................................................5

Fed. R. Civ. P. 12(b)(6)....................................................................................................6

Webster's Third New Int'l Dictionary (2002) ................................................................7

v

**INTRODUCTION**

This is a securities "fraud" suit without a hint of actionable fraud in either execution or intent. All of the claims fail in the first instance because they do not allege the essential element of falsity. Although the Second Amended Complaint ("SAC") attempts to correct an especially bold misrepresentation that marred the First Amended Complaint ("FAC"), its allegations are nevertheless deficient in that they (1) ignore warnings that certain statements at issue were *not* to be taken as factual, (2) mischaracterize carefully-drawn risk disclosures about *future possibilities* as recklessly-false statements of *historical fact*, and (3) rest on the fallacious premise that the alleged misstatements were "contrary to" then-existing facts when the underlying facts, upon examination, neither contradict nor conflict with the statements made. The Plaintiffs can maintain a façade of viability only by ignoring the critical statutory distinction between forward-looking statements that turn out not to be accurate (which are exempt from liability-by-hindsight when accompanied by meaningful cautionary language, as was the case here), and false statements of established fact.

The SAC also fails for lack of sufficient allegations concerning the Defendants' state of mind. The allegations underlying the Section 10(b) claims under the Exchange Act do not remotely satisfy the Plaintiffs' obligation to plead facts that generate a strong inference of fraudulent intent. And the allegations supporting the other claims are inadequate because (1) under the circumstances, it was necessary for the Plaintiffs to plead and prove actual knowledge of falsity, and (2) no such inference can plausibly be drawn from the facts alleged.

The Court should therefore dismiss the Second Amended Complaint in its entirety.

1

## BACKGROUND[1]

**I.      The Longview-Butterfly Combination.**

This lawsuit concerns a business combination by which Longview Acquisition Corp. ("Longview") acquired Butterfly Network, Inc. The merged entity is also known as Butterfly Network, Inc. ("Butterfly"). ¶21.

Longview was incorporated in February 2020 as a Special Purpose Acquisition Company ("SPAC"). ¶¶49-50. Longview was founded for the purposes of (1) listing on a public exchange, and (2) acquiring or merging with a privately-held corporation. ¶50. Three months after it was incorporated, Longview conducted an Initial Public Offering ("IPO") through which it issued some 34,500,000 "units." ¶59. Each unit consisted of one share of Class A common stock and one-third of a redeemable warrant for another share. These shares were issued under a registration statement filed with the SEC on a Form S-1. *Id.*; Ex. A, Form S-1 at 1.

In November 2020, Longview entered into a merger agreement with Butterfly. ¶62. Butterfly was then a privately-held corporation, founded in 2011. ¶60. Butterfly developed, manufactured, and marketed medical devices—specifically, handheld ultrasound probes that connected to a smartphone or tablet for display. ¶71-75. Butterfly's handheld devices were significantly less expensive than traditional, cart-based ultrasound machines. ¶73.

---

[1] Additional facts are discussed in the Argument. The purpose of this section is to place those facts, and Defendants' arguments, in context. The facts in this memorandum are drawn from either (1) the FAC, ECF No. 53, (2) the SAC, ECF No. 68, or (3) other documents of which the Court can properly take notice, primarily the text of SEC filings referenced in or integral to the facts alleged in the SAC. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (documents "integral to or explicitly relied upon in the complaint" may be considered on motion to dismiss). References to the SAC are in the form "¶--." References to the FAC are in the form "FAC ¶--." The other documents are attached as exhibits to the Declaration of John F. Sylvia and are referenced as such ("Ex. –").

In anticipation of the proposed combination, which required the approval of a majority of Longview's then-current shareholders, Longview issued a combined proxy statement/prospectus. Because the business combination anticipated the issuance of additional shares of Class A common stock in the merged enterprise, the proxy statement/prospectus was filed with the SEC on a Form S-4, which functioned as a registration statement under the Securities Act of 1933. Ex. B, Form S-4 (cover page). The registration statement became effective on January 26, 2021. ¶65. Longview's shareholders approved the proposed business combination and the transaction took place on February 16, 2021. *Id.*

## II.    The Plaintiffs' Claims.

On November 15, 2021, Butterfly issued a third quarter earnings release reporting that the company was adjusting its revenue forecasts downward by approximately $16-18 million. ¶348. The company's stock price declined by about 13%. ¶351. This lawsuit followed. ECF 1 (original Complaint filed on February 16, 2022). The SAC was filed on February 24, 2023. ECF 68.

### A.    The Plaintiffs.

The proposed lead Plaintiffs are an entity (KNS Holdings LLC DBPP UA Jan. 1, 2016 ("KNS Holdings") and two individuals (Carl Metzger ("Metzger") and Dan Liu ("Liu")), all of whom allegedly purchased Butterfly Class A common stock. ¶¶18-20.

### B.    The Plaintiffs' Claims.

The SAC asserts claims for primary liability under Section 11 of the Securities Act (Count I), Section 14(a) of the Exchange Act (Count III), and Section 10(b) of the Exchange Act (Count IV). In addition, it asserts claims for secondary liability under Section 15 of the Securities Act (Count II), and for control person liability under Section 20(a) of the Exchange Act (Count V).

The Defendants vary according to claim. The "Section 14(a) Defendants" are Butterfly and six individuals who served as directors of Longview before the merger. ¶35. The "Section 11

3

Defendants" are Butterfly, and twelve individuals who were all directors of Longview before the business combination and/or directors of the merged company. *Id.* The "Section 10(b) Defendants" are Butterfly, Todd Fruchterman (Butterfly's former CEO), and Stephanie Fielding (Butterfly's former CFO). *Id.; see also* ¶¶22-23. Second, the Section 15 claim alleges that Dr. Fruchterman is secondarily liable for Butterfly's violation of Section 11. ¶¶400-03. Third, the Section 20(a) claim similarly alleges that Dr. Fruchterman and Ms. Fielding are liable as control persons for Butterfly's violations of Section 10(b). ¶418-26.

All of the claims arise from a common set of allegations. According to the SAC, Butterfly was a bad investment for Longview because the target company had locked itself into obligations to purchase more inventory from its suppliers than it was likely to be able to sell. ¶¶82-95. Butterfly's prospects, moreover, were allegedly unfavorable because (1) the company's sales strategy to date had focused on smaller "early adopters," who comprised a limited market, ¶¶96-104, (2) it had not sufficiently developed the sales infrastructure needed to expand into the "enterprise market" of large healthcare providers, where real growth opportunities were located, ¶¶105-19, 169-80, and (3) enterprise customers were slow to adopt Butterfly's products because of their novelty and developmental status. ¶¶156-68. Consequently, Butterfly's revenue forecasts at the time of the combination were supposedly unachievable. ¶¶120-55.

The Section 11 and Section 14(a) claims are limited to alleged misstatements in the Form S-4 and related SEC filings. ¶¶209-36 (Form S-4); ¶¶237-45 (investor presentation materials incorporated into the Form S-4); ¶¶252-53. The core of these claims consists of three sets of allegations: (1) that the Defendants made false statements "about the Company's software capabilities and its integration with clinical workflow," ¶209; *see also* ¶¶210-26, (2) that Butterfly's "IPO Forecasts," as presented in the Form S-4, "lacked any reasonable basis," ¶¶227-

30, and (3) that certain inventory-related problems, disclosed as "risks" in the Form S-4, had in fact "already materialized" at the time of the merger. ¶¶231-32 (risk of excess inventory); ¶¶233-34 (risk of write-downs due to purchases of excess inventory); ¶¶235-36 (risk that excess inventory would become obsolete).

The Section 10(b) claim is also based on alleged misstatements in the Form S-4, ¶253, but it adds allegations about statements made in other contexts: (1) at a healthcare conference in January 2021, ¶¶257-68, (2) in Butterfly's Form 10-K for calendar year 2020, which was filed after the merger, ¶¶269-89, and (3) in earnings calls and investor presentations in March, May and August 2021. ¶¶290-302. In substance, however, the Section 10(b) allegations track the same allegations related to the Form S-4. *See, e.g.,* ¶¶270-85 (software capabilities and integration with clinical workflow), ¶¶286-88 (inventory-related risk disclosures), ¶¶264-68, 293-98, 301-02 ("IPO Forecasts").

## ARGUMENT

### I.    Counts I, III, And IV: The SAC Does Not Allege That Any Defendant Made An Actionably False Statement.

Although the various statutes under which the Plaintiffs have based their primary-liability claims differ in some respects, all of them require proof that the Defendants made *false* statements in connection with the Longview-Butterfly transaction.[2] All three primary-liability claims fail, therefore, because the SAC's hodgepodge of "false and misleading statement" allegations, ¶¶257-302, does not plausibly assert that any Defendant made any false statements. *See Woodell v. Weiner, M.D.O.*, No. 20-3044, 2022 U.S. App. LEXIS 33532, at *2 (3d Cir. Dec. 6, 2022) (citing

---

[2] *See* 15 U.S.C. §77k (Section 11 of the Securities Act); 15 U.S.C. §78j (Section 10(b) of the Exchange Act); 17 C.F.R. §240.10b-5(b); *Kiger ex rel. Qualcomm, Inc. v. Mollenkopf*, 2021 U.S. Dist. LEXIS 220509, at *5 (D. Del. Nov. 15, 2021).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To avoid dismissal, 'a complaint must contain sufficient factual matter … to state a claim to relief that is plausible on its face.")).[3]

###### A.       Software Quality and Integration with Clinical Workflow (¶¶209-26)

The Plaintiffs have now filed three iterations of a complaint, and this part of their claim has changed significantly over time. The corresponding section of the FAC was considerably shorter, *see* FAC ¶¶157-59, and was, ironically enough, entirely dependent on a misrepresentation *by the Plaintiffs*. The FAC misstated what the Defendants said in order to gin up a specious inference of falsity. It alleged that the Form S-4 said:

> Butterfly's Ultrasound-on-Chip™ reduces the cost of manufacturing, while **Butterfly's software is […] fully integrated with the clinical workflow**, accessible on a user's smartphone, tablet, and almost any hospital computer connected to the Internet.

---

[3] As a threshold matter, Plaintiffs lack standing to maintain their Section 11 claim. The SAC utterly fails to allege any actual *facts* tracing Metzger's, Liu's, and HNS Holdings' post-merger stock purchases to the S-4. Rather, the SAC merely alleges, in the most abstract and conclusory terms possible, that each Plaintiff "purchased or otherwise acquired Butterfly Class A common stock pursuant or traceable to the Defective Proxy/Registration Statement . . . ." ¶18 (KNS Holdings), ¶19 (Metzger), ¶20 (Liu). Defendants recognize that Third Circuit precedent currently holds that such generalized allegations may be sufficient to withstand a motion to dismiss. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n.7 (3d Cir. 2006). However, in light of the weight of more recent authority construing this issue, as well as more recent United States Supreme Court president interpreting pleading standards generally, it is Defendants' position that such precedent is outdated, and likely subject to revision if raised on appeal. *See, e.g.*, *DeVito v. Liquid Holdings Grp., Inc.*, No. 15-6969 (KM)(JBC), 2018 U.S. Dist. LEXIS 217963, at *48 (D.N.J. Dec. 18, 2018) ("general allegations of traceability, akin to notice pleading" are insufficient as a matter of law); *In re ARIAD Pharms. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) ("almost by definition, a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element"); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107-08 (9th Cir. 2013) ("when a company has offered shares under more than one registration statement, aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering" and plaintiffs must "allege facts from which [the court] can reasonably infer that their situation is different" from the typical aftermarket buyer); *see also Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (Rule 12(b)(6) requires more than a mere "formulaic recitation of the elements of the cause of action"); *Iqbal*, 556 U.S. at 678.

FAC ¶157 (purporting to quote Form S-4 at 24).

That, however, is not what the proxy statement said. The relevant passage from the Form S-4 read:

> Butterfly's Ultrasound-on-Chip™ reduces the cost of manufacturing, while Butterfly's software is **intended to make the product easy to use and** fully integrated with the clinical workflow, accessible on a user's smartphone, tablet, and almost any hospital computer connected to the Internet.

Ex. B, Form S-4 at 23 (emphasis added).

The First Amended Complaint, in other words, used brackets and ellipses ("[…]") to conceal text and alter the meaning of the statement at issue. As the Plaintiffs crafted it, Paragraph 157 of the FAC gave the impression that Butterfly told investors its software "is fully integrated" with a user's clinical workflow *in the then-present tense*, reflecting the *existing* capabilities of Butterfly's software *at the time of the Longview-Butterfly combination*.

This was a false impression. Contrary to what the FAC alleged, Butterfly did not tell investors that it had *presently achieved* full integration—i.e., that its "software *is* fully integrated with the clinical workflow." The Form S-4 actually informed investors that ease of use and full integration were goals for *the future*—things that Butterfly "intended" to achieve. Ex. B, Form S-4 at 23. *See* Webster's Third New Int'l Dictionary (2002) at 1175 ("intend" means "to design for or destined for a specified purpose or future"). That particular statement, moreover, was consistent with statements elsewhere in the Form S-4, which likewise characterized software integration as an ongoing process. Ex. B, Form S-4 at 221 ("We are working to enhance our device's software capabilities with new features . . . to more deeply integrate our platform with hospital systems").

Because it was plainly aspirational, the statement that Butterfly actually made was not rendered false by the allegation that "Butterfly's probes still had a lot of software features that needed to be developed" at the time of the merger. FAC ¶159(1). And nothing else in the FAC (or, for that matter, in any of the Complaint's three versions) suggests that the statement was in any

7

way untrue. The "full integration" allegations in the FAC, therefore, did not plausibly assert falsity, and could not support any of the Plaintiffs' claims.

The Defendants pointed out this instance of "creative editing" in their letter requesting a pre-motion conference. ECF No. 60 at 2. Not surprisingly, the ellipses and brackets disappeared from the SAC, which now quotes the alleged misstatement in full. ¶209. But while the quotation has been corrected, the underlying legal error has not been, and cannot be, fixed. The unexpurgated quote shows exactly what its abridged predecessor attempted to conceal: that Butterfly made a statement of intention which did not misrepresent an existing fact.[4]

The SAC attempts to salvage this portion of the Plaintiffs' claims by including, as ostensible misstatements, several additional quotes from the Form S-4. ¶¶212, 214, 216, 218, 220, 224, 225. Although these quotations, looked at in isolation, may appear to have been cast in the present tense, adding them to the SAC did not repair the flaw in the First Amended Complaint. For example, three of the seven new quotes were drawn from a single paragraph in the Form S-4. It is reproduced below, in full; each alleged misstatement is highlighted in bold type, with a bracketed reference to the relevant paragraph of the SAC:

> As we continue to simplify enterprise workflow and develop relationships with larger health systems, we have experienced an increase in the proportion of our sales from enterprise sales compared to eCommerce. Because institutions often make decisions to purchase on a system-wide level, enterprise sales typically generate economies of scale with larger volumes and larger numbers of users, while also increasing user retention. The enterprise channel also yields a higher subscription price, which further increases our profitability on devices and subscriptions sold. We are working to continually shift volumes to the enterprise

---

[4] An echo of the Plaintiffs' initial, misleading approach can still be discerned in Paragraph 270 of the SAC, which alleges that the Section 10(b) Defendants committed securities fraud when they included an identical statement in Butterfly's Form 10-K for 2020. This allegation, however, apparently escaped the editing process, because the quotation from the Form 10-K still contains the brackets and ellipses, and still omits the words which made it clear that Butterfly was expressing an *intent to achieve* full integration with clinical workflow, and not describing the *present capacities* of its software.

channel with the aim of ultimately using this as our primary channel, which may require increases in our sales force. We continue to enhance our software to further integrate our solution with health systems to simplify workflow and governance of their imaging ecosystem. **Our unique ability to connect and govern traditional third party ultrasound systems gives enterprise customers a solution to the governance and workflow challenges that have limited the utilization and billing of point of care imaging devices.** [SAC ¶214] **Enterprise customers deploying Butterfly's solution benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems and connects directly with customers' electronic medical records ('EMRs').** [SAC ¶216] **By adopting Butterfly Enterprise software, customers can responsibly manage and drive maximum value from their fleets of point of care imaging devices.** [SAC ¶218]

Ex. B, Form S-4 at 189.

The problem is obvious. Each of the alleged misstatements can be mischaracterized as a statement of *existing* fact by reading it in isolation. When the statements are read in context, on the other hand, it becomes clear that they are elements of a progress report on two related, forward-looking initiatives: (1) an ongoing strategic effort, through which Butterfly was "*working* to *continually shift* volumes to the enterprise channel," but which may in the future "require increases in our sales force," and (2) a supporting technological effort to "*continue* to enhance our software to *further* integrate our solution with health systems . . . ." The import of the paragraph, which was consistent with the overall forward-looking tenor of the Form S-4, *see, e.g.,* Ex. B, Form S-4 at 212 ("We are working to enhance our device's software capabilities with new features . . . to more deeply integrate our platform with hospital systems"), is that while Butterfly's software and sales infrastructure may not have been where they *needed* to be to reach the goal of increased enterprise sales, it was also not where they were *going* to be if the merger took place and the company received an infusion of capital that enabled it to continue to pursue these goals.

Like the company's statement that its software was "intended" to make the product easy to use, ¶209, Ex. B, Form S-4 at 23, therefore, these statements are not rendered false by allegations

9

that Butterfly's software was—exactly as the Form S-4 *said* it was—a work in progress that would continue to be improved after the merger. Thus, for example, while the Plaintiffs claim that certain of Dr. Fruchterman's observations in 2022 were "contrary to" the Form S-4, ¶¶215(10), 217(12), 219(10), his comments in fact jibed perfectly with the Company's earlier statements. The Form S-4, looking forward in January 2021, described the work that Butterfly was doing "to continually" develop the enterprise channel, and to "continue to enhance" its software to "further integrate" it with enterprise health systems. Ex. B, Form S-4 at 180. Dr. Fruchterman, looking back in November 2022, reported on the results of that effort, explaining how "we went to work on our enterprise level software," "spent the last year investing heavily in the development of our software solutions," and had achieved "[s]ignificant progress and software development" as a result. There is no inconsistency, and thus no basis for the allegation of falsity.

All of the new allegations in this section of the SAC suffer from the same defect. They are not inconsistent with, much less belied by, the facts on which the Plaintiffs rely.[5] The underlying allegations amount—at best—to an assertion that Butterfly's software was not a finished product at the time of the merger in January 2021. The Company, however, did not make a "contrary" claim in the Form S-4: it said, truthfully, that the software was an *unfinished* product that Butterfly was *continuing* to enhance to *further* the goal of increased enterprise sales. Thus, there is a mismatch between the statements at issue and the allegations that supposedly falsify them.

---

[5] *See, e.g.,* ¶¶218(1) ("Butterfly's products were still in a proof-of-concept phase"); 218(2) (storage of ultrasound images was limited to Butterfly's cloud storage); 218(3) ("Butterfly's probes still had a lot of software features that needed to be developed"); 218(4) ("there were many issues still being worked out with the software"); 218(5) ("at the time of the IPO, Butterfly's platform was not ready to meet enterprise requirements"); 218(6) (Butterfly "began to really ... develop its software to integrate with enterprise workflows after the IPO"); 218(7) ("Butterfly was 'still building' its software"); 218(8) (Butterfly "had experienced 'implementation barriers' that were preventing easy use of the Company's products"); 218(9) (Butterfly announced new software in February 2022).

### B.    2021 "IPO Forecasts" (¶¶227-30)

The next set of "false and misleading statement" allegations concerns what the SAC calls "the 2021 IPO Forecasts." ¶¶227-30, citing Form S-4 at 115-116. Despite the label that the Plaintiffs have attached to them, these financial projections were not created for the merger (which, because new Butterfly stock was issued, amounted to an IPO), or for the purpose of influencing the proxy votes of Longview's shareholders. Although the projections were included in the Form S-4 in January 2021, they had been prepared in November 2020 for Longview's board "[i]n connection with its consideration of the potential business combination . . . ." Ex. B, Form S-4 at 111-12. The proxy statement made clear that the projections had been included therein "solely to provide Longview's stockholders access to information made available in connection with Longview's Board's consideration of the proposed business combination." *Id.* at 112.

The Form S-4 warned investors, moreover, that "[t]he Projections should not be viewed as public guidance," and that the forecasts did "not take into account any circumstances or events occurring after" November 19, 2020—the date on which they were prepared. *Id.* at 112. The Form S-4 additionally contained the following disclaimers:

- "***The Projections were not prepared with a view toward public disclosure*** or with a view toward complying with the guidelines established by the SEC or the American Institute of Certified Public Accountants with respect to prospective financial information. ***The Projections have not been audited.***"

- "The Projections were prepared in good faith by Butterfly's management based on their reasonable estimates and assumptions with respect to the expected future performance of Butterfly at the time the Projections were prepared and ***speak only as of that time***. While presented with numerical specificity, ***the Projections are forward-looking and reflect numerous estimates and assumptions*** including, but not limited to, future industry performance under various industry scenarios as well as assumptions for competition, general business, economic, market and financial conditions and matters specific to the businesses of Butterfly, ***all of which are***

11

*difficult to predict and many of which are beyond the preparing parties' control*…."

- "The Projections *were prepared solely for internal use* to assist Longview in its evaluation of Butterfly and the business combination."

- "The Projections are *not fact*. The Projections are *not a guarantee of actual future performance*. The future financial results of Butterfly may differ materially from those expressed in the Projections due to factors beyond either of their ability to control or predict."

- "The Projections are *not included in this proxy statement/prospectus in order to induce any Butterfly stockholders to vote* in favor of any of the proposals at the special meeting."

Ex. B, Form S-4 at 112 (emphasis added).

The Third Circuit has repeatedly held that financial forecasts presented for this limited purpose and in the context of such explicit disclaimers are not false. For example, in *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016), Cooper negotiated a merger with a company called Apollo, then sought shareholder approval through a proxy statement. *Id.* at 487. After the deal fell through, OFI sued Cooper and two of its officers under Section 10(b) and Section 14(a), alleging, among other things, that "Cooper's financial projections presented in the Proxy Statement were objectively false . . . ." *Id.* at 500.

Affirming dismissal, the Third Circuit held that "OFI has not pled falsity as it relates to the projections," because the projections "did not stand alone as a statement of affirmative fact." *Id.* at 501. They had been accompanied in the proxy statement "by a lengthy and specific disclaimer" stating that the financial projections had been incorporated "only because this information was presented to the Apollo Parties" in connection with the potential merger, and warning investors "not [t]o rely" on the projections as "necessarily predictive of future events." *Id.*

The proxy statement for the Cooper-Apollo merger was not false, then, because the projections were "plainly not included as statements of fact." *Id.* The proxy statement merely informed investors "that the projections were, in fact, the projections that Cooper provided to Apollo and the financing bank during the negotiation of the deal." *Id.* Absent an allegation "that Cooper provided Apollo or the financing bank with some different set of projections during negotiations," OFI had not pled falsity. *Id.*; *see also Laborers Local No. 231 Pension Fund v. Cowan*, 837 Fed. Appx. 886, 888 (3d Cir. 2020) (affirming dismissal of Section 14(a) claim based on allegedly false projections in proxy statement for sale of company, where disclaimer stated that projections were included solely to give voting shareholders access to information that had been made available to negotiating parties and were "not included … to influence a Lionbridge stockholder's decision whether to vote for the merger agreement").

This case is indistinguishable. Like the proxy statements in *OFI* and *Cowan*, the Form S-4 in this case couched the financial forecasts at issue in a "lengthy and specific disclaimer" which, among other things, warned that the projections were "not fact" and explained that they had been included only to give voting shareholders access to the same information provided to Longview's Board during negotiations, and explicitly cautioned investors *not* to rely on them as predictive of future events. Ex. B, Form S-4 at 112. If anything, the disclaimers in the Form S-4 were even lengthier, more specific, and more cautionary than those provided in *OFI* and *Cowan*. In any event, their presence makes clear that the "IPO Forecasts" were not included as statements of fact, and that absent allegations that Longview's Board had been provided "with some different set of projections during negotiations," the Plaintiffs have "not pled falsity as it relates to the projections." *OFI Asset Mgmt.*, 834 F.3d at 501.

13

The defense cited *OFI* in its request for a pre-motion conference, ECF 60 at 2-3, and in an apparent attempt to evade its holding, the Plaintiffs added a number of allegations to the SAC which (they claim) indicate that the "IPO Forecasts" were published elsewhere and at other times, and thus (they allege) show that "even if the projections had originally been prepared by Butterfly to be presented to Longview's Board, these projections were now being jointly published by Butterfly and Longview to the investing public as annual guidance in connection with the IPO." ¶130; *see also* ¶¶126-39.

This theory has three flaws. First, it has no relevance to, or impact on, the Section 11 and Section 14 claims. Those claims are, and as a matter of law can be, predicated only on the statements made *in* the Form S-4, which were expressly made "solely to provide Longview's stockholders access to information made available in connection with Longview's Board's consideration of the proposed business combination." Ex. B, Form S-4 at 112. *OFI* applies directly, and bars any Section 11 or Section 14 claim based on the "IPO Projections."

Second, even insofar as the Section 10(b) claim may involve statements made in other contexts, the putative Class Period began on January 12, 2021, ¶1(c), and the Section 10(b) claim therefore does not encompass the statements referenced in ¶¶126-31, which were made in November 2020.

Finally, even with respect to statements allegedly made outside the Form S-4 and during the Class Period, ¶¶132-38, the Section 10(b) claim has another "apples to oranges" problem—yet another incongruity between the statements made and the "facts" that allegedly render them false. According to the SAC, the "IPO Projections" were false when made because the projected revenues "did not factor" in three types of data: (1) "*historical* sales growth rates," (2) "deals that were *currently* in Butterfly's sales pipeline," and (3) the sufficiency of Butterfly's existing sales

14

force to achieve the company's goals. ¶140 (emphasis added); *see also* ¶¶141-55. But these alleged facts all relate to the condition of the company *before* the merger with Longview; they say nothing about the accuracy—much less establish the falsity—of the IPO Projections which took into account the expected positive future effect of the merger and IPO. These alleged facts might indicate that the "IPO Projections" *would have been inaccurate if the IPO had never occurred.* But the "IPO Projections," as the Plaintiffs' own moniker for them suggests, were properly and reasonably based on the assumption that the merger/IPO *would* occur; that Butterfly would receive a significant infusion of capital as a consequence; and that management would deploy the new resources to grow revenues beyond "historical" performance and "current" sales pipelines by building a bigger and more capable sales force and by continuing to develop and improve the company's products. Beyond those mismatched assumptions, the Plaintiffs have nothing but hindsight to show that the "IPO Projections" were false when made.

### C.  "Materialized" Risks (¶¶231-36)

Under the caption "Risk Factors," the Form S-4 disclosed and discussed in considerable detail a number of "risks and uncertainties that may have a material adverse effect on our business, financial conditions, results of operation or reputation." Ex. B, Form S-4 at 46; *see generally id.* at 47-98. The Plaintiffs claim that a trio of these disclosures were misleading because the "risks" identified in them were not contingent on future events, but had "already materialized" at the time of the merger. ¶¶232, 234, 236. Although the SAC suggests that the Plaintiffs have identified three distinct "materialized risks," all of the allegations spring from the same root: the assertion that Butterfly's managers locked the company into commitments to purchase more inventory than it would ultimately need. ¶¶82-95.

These purchase commitments, though, were disclosed to investors in the Form S-4. ¶¶83-85, 89-92. And the SAC itself acknowledges that Butterfly disclosed to investors (1) the risk of

"excess … inventory," ¶231, quoting Ex. B, Form S-4 at 69, (2) the risk that the Company might "be required to take write-downs or write-offs, restructuring and impairment or other charges," ¶233, quoting Ex. B, Form S-4 at 51-52, and (3) the risk that technological change "may render Butterfly's current or future products obsolete." ¶235, quoting Ex. B, Form S-4 at 63.

The Plaintiffs contend, however, that these disclosures were nevertheless misleading because "the risk of harm to Butterfly's business from excess inventory had already materialized . . . ." ¶232. As a consequence, the Plaintiffs allege, "the risk of future losses from purchases [sic] commitments" had also "already materialized," ¶234, and so had "the risk of adverse financial effects arising from obsolete hardware"—both as effects of "Butterfly's massive purchase commitments that outpaced demand for the Company's products." ¶236.

There is, of course, nothing actionable in the insinuation that Butterfly's managers "made ... unwise business decisions" in taking on purchase commitments that created the risks of excess or obsolete inventory. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir. 1999). The Plaintiffs' burden, rather, is to allege facts that, if proven, would show that what the Defendants called "risks" were actually, at the time of disclosure, matters of "historical fact," *Slayton v. American Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010)—that is, "facts that were established at the time the statement was made." *Id.*

Claims that a risk had "already materialized" at the time of disclosure cannot rest on allegations that the defendant merely understated the likelihood that the risk would be realized: "'there is an important difference between warning that something '*might*' occur and [disclosing] that something '*actually had*' occurred.'" *Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) (quoting *In re Harman Int'l Ind., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.C. Cir. 2015)).

16

The Third Circuit's reliance on *Harman* is instructive. The defendants' risk disclosures were deemed actionable in *Harman* because in that case, unlike this one, the company already "had on hand" hundreds of millions of dollars of already-obsolete product, *Harman*, 791 F.3d at 106, such that "there was no longer a mere risk and some evidence of obsolescence . . . ." *Id.* at 107. By the time the company disclosed a "risk" of obsolescence, rather, it was already experiencing "an intractable problem," a "reality that the Company failed to disclose." *Id.* In those circumstances, the company's warnings "about a generalized risk of obsolescence" could be deemed misleading. *Id.*

This case is different. The SAC does not say or suggest that any of the products in Butterfly's inventory were obsolete at the time of the business combination. The claim that the "risk of obsolete hardware had already materialized" relies on (1) allegations that, given the level of its purchase commitments, Butterfly "would never be able to use all of the inventory" it possessed, ¶232(4), not on allegations that Butterfly possessed inventory that was presently obsolete, as well as (2) allegations that Butterfly *later* wrote off some inventory as obsolete, ¶¶232(5), 234(6), 236(5)—just the sort of hindsight-based pleading "that the [PSLRA] was intended to eliminate." *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 883 (3d Cir. 2018). Nor does the SAC allege that the other risks of which Butterfly had warned— that it might be saddled with excess inventory requiring write-downs of its financial statements— "actually had occurred" before the merger. *Globus Med.*, 869 F.3d at 242. These events were still contingencies, not matters of historical fact. *Cf. In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930 (D.N.J. 1998) (warnings of possible difficulties integrating acquiree's subscriber base were actionable when acquirer was already experiencing integration difficulties).

17

**D.**     **Statements in Investor Presentation Materials (¶¶237-45)**

The SAC next devotes several paragraphs and numerous subparagraphs to allegations of misleading statements in an Investor Presentation Webcast that took place on November 20, 2020. Some of these allegations are duplicative of those already discussed. ¶¶242-43 (repeating allegations about "IPO Forecasts"). Others give a spurious appearance of falsity by using snippets of the presentation materials that have been taken out of context.

Thus, for example, the Plaintiffs allege that the materials from the Investor Presentation Webcast falsely stated that Butterfly's products had "momentum" and "strong initial adoption" by healthcare institutions, when in fact the company's customer base at the time consisted mostly of "home users" rather than "enterprise" clients such as hospitals. ¶¶238-39.

But these allegations are misleadingly incomplete. The presentation materials did not claim that Butterfly *presently* had "momentum" with large healthcare institutions, or that it had *already* experienced "strong initial adoption" by such "enterprise" customers. As can be seen in the SAC itself, the slide that contained the allegedly-false statement was captioned: "Healthcare Institutions *to* Drive Adoption as Scale: Strong initial adoption, excitement, and momentum." ¶237 (emphasis added). The word "to" in the caption makes all the difference. It means that the supposedly-offending slide presented a strategic plan, not an accomplished fact. Once again, the Plaintiffs rely on a chronological incongruity, claiming that statements about the *future* were false because they did not jibe with *present* conditions.

The allegations about the Investor Presentation Webcast are defective, moreover, because they ignore the larger context—the "total mix" of information made available to Longview and Butterfly investors. The "strong initial adoption" allegations, for example, fail to take account of the disclosures which notified investors (1) that Butterfly's sales to date had been concentrated in non-enterprise early adopters, and (2) that the shift to enterprise sales was a strategy for the future.

18

Indeed, the SAC itself quotes disclosures to that effect, such as the statements made back in June 2020 by Butterfly's then-president, Gioel Molinari, who "confirmed that the Company was 'focus[ed] on capturing the lower, the early adopter market' and admitted that the business had not yet 'cross[ed] the chasm' from early adopter to enterprise user, stating: 'We've been really, really good at capturing tens of thousands of early adopters [], however, we still have to really make this mainstream.'" ¶98, quoting Spotlight: Gioel Molinari – President – Butterfly Network – PortableUltrasound at 42:00, https://www.youtube.com/watch/ v=hvvmFTIamok.

Thus, the alleged misstatement was literally true, in that it explicitly did not purport to represent an existing state of affairs, but described a strategy "to" drive future adoption by enterprise customers. It was, moreover, not at all misleading in context, which included candid disclosures that Butterfly's sales had been concentrated so far among non-enterprise early adopters, and that the company still had a "chasm" to cross to achieve its strategic goal of marketing to enterprise clients.

### E.   Other Alleged False Statements (¶¶257-302)

The SAC also alleges that various defendants made misstatements in other contexts: a healthcare conference webcast (¶¶257-68), several earnings calls (¶¶290-302), and a Form 10-K (¶¶269-89). These allegations are by and large duplicative of allegations already discussed and are defective for the same reasons. *See* ¶¶259-61 (same statements as Investor Webcast Presentation), ¶¶270-285 (software integration and product quality), ¶¶286-92 (risks of excess and obsolete inventory), ¶¶264-68, 293-97, 301-02 ("IPO Forecasts").

## II.   <u>Counts I, III, And IV: The SAC Does Not Allege Facts Sufficient To Generate The Requisite Inferences Of Intent To Defraud Or Recklessness, And Of Actual Knowledge Of Falsity.</u>

All of the primary-liability claims in the SAC require adequate state-of-mind allegations. Count IV—the claim under Section 10(b)—requires proof of "scienter." The Third Circuit defines

19

scienter as either "conscious wrongdoing, such as intentional fraud," or a strong form of recklessness "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care" which "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535 (3d Cir. 1999) (internal citations and quotations omitted). Count IV, moreover, is subject to the heightened pleading requirements of the PSLRA, which require the assertion of scienter to "be supported by facts stated 'with particularity'" that "give rise to a 'strong inference'" of culpability. *Id.* (quoting 15 U.S.C. §78u-4(b)(2)).

Given the nature of the alleged misstatements, all three of the primary-liability claims—not just the Section 10(b) claim but the Section 11 and Section 14(a) claims as well—are subject to a second, no less exacting, state-of-mind requirement. The passage of the PSLRA added identical "safe harbor" provisions to both the Securities Act and the Exchange Act. *Howard v. Arconic Inc.*, No. 2:17-cv-1057, 2021 U.S. Dist. LEXIS 116935, at *73-74 (W.D. Pa. June 23, 2021). These provisions exempt "forward-looking statements" from liability to the extent (1) that such a statement is identified as forward-looking and is accompanied by meaningful cautionary statements, or (2) the plaintiff fails to prove that the statement was made with "actual knowledge" that it was false. *See* 15 U.S.C. §77z-2(c); 15 U.S.C. §78u-5(c); *see also Laasko v. Endo Int'l, PLC*, No. 20cv07536(EP)(MAH), 2022 U.S. Dist. LEXIS 147122, at *15 (D.N.J. Aug. 17, 2022). The safe harbor provisions apply to Section 11 and 14(a) claims that are based on forward-looking statements, effectively making them "scienter-based" as well. *Kurtzman v. Compaq Computer Corp.*, 2000 U.S. Dist. LEXIS 22476, at *172-73 (S.D. Tex. Dec. 12, 2000); *see also Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*, 114 F. Supp. 2d 316, 326 (D.N.J. 2000); *Baum v. Harman Int'l Indus.*, 408 F. Supp. 3d 70, 83-84 (D. Conn. 2019).

20

A.    **Counts I And III: The Safe Harbor Provisions Defeat The Section 11 and Section 14 Claims.**

The Section 11 and Section 14 claims both fail because they are based on forward-looking statements that were accompanied by meaningful cautionary language, and because the SAC fails to allege that any defendant made a forward-looking statement with actual knowledge of its falsity. *See Laasko*, 2022 U.S. Dist. LEXIS 147122, at *15.

1.    **The Alleged Misstatements In The Form S-4 Were Forward-Looking.**

Because they are based on statutes that specifically govern registration statements and proxy statements, respectively, Counts I and III are limited to the alleged misstatements made in, or incorporated into, the Form S-4. ¶¶209-45 (allegations supporting Section 11 claim); ¶¶252-53 (allegations supporting Section 14(a) claim). All of the alleged misstatements supporting the Section 11 and Section 14(a) claims were therefore "forward-looking." That term "is broadly defined in the statute," which "captures a wide range of statements . . . ." *OFI Asset Mgmt.*, 834 F.3d at 490 n.5 (quoting *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009)). "Forward-looking" means, among other things: a statement containing a projection of revenues or "other financial items," a statement of the "plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," and a "statement of future economic performance . . . ." 15 U.S.C. §77z-2(i)(1); 15 U.S.C. §78u-5(i)(1).

All of the alleged misstatements in the Form S-4 were forward-looking. The "IPO Forecasts," ¶¶227-30, obviously fit the definition, since they both conveyed financial projections and addressed themselves to future economic performance.

The statutory definition of forward-looking statements also encompasses the alleged misstatements about software quality and integration, ¶¶209-26; inventory-related risks, ¶¶231-36; and the expansion of sales to healthcare enterprises. ¶¶237-39. As the Court has seen, every

one of these statements—most right on their faces, and all of them when read in context—spoke to Butterfly's future plans, intentions, and goals: the manner in which its software was "intended" to make the product easy to use and fully integrated with the clinical workflow, the company's "continuing" work to achieve the goals of developing an enterprise sales infrastructure and enhancing its software to attract larger customers, the as-yet-unrealized "risks" of excess inventory and it financial consequences, and the plan to use enterprise sales "to drive" the future adoption of Butterfly's products. *Cf. OFI Asset Mgmt.*, 834 F.3d at 501 (use of word "expected" identified statement as forward-looking); *Laasko*, 2022 U.S. Dist. LEXIS 147122, at *15 ("the word 'expected' is a term that defined the statement as forward-looking."); *see also* Ex. B, Form S-4 at 6 (forward-looking statements often include, or are preceded or followed by, words such as "may," "will," "plans," "intends," or "similar expressions"). "[C]ontext is critical to determining whether statements are forward-looking," *In re ECOtality, Inc. Sec. Litig.*, No. 13-03791-SC, 2014 U.S. Dist. LEXIS 130499, at *20 (N.D. Cal. Sept. 16. 2014), and when read in context, all of these statements were forward-looking in the precise, statutory sense of expressing "plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. §77z-2(i)(1)(B); *see also* 15 U.S.C. §78u-5(i)(1)(B); *Saslaw v. Al Askari*, 95 Civ. 7641 (LAP), 1997 U.S. Dist. LEXIS 5621, at *23 (S.D.N.Y. Apr. 23, 1997) ("statements integral to the formulation and articulation of a business strategy to be pursued … fall squarely within the definition of forward-looking statements"). Consequently, they could be actionable under the securities laws only if they were *not* accompanied by meaningful cautionary statements, *and* if the SAC adequately alleged that they were made with actual knowledge of their falsity. *OFI Asset Mgmt.*, 834 F.3d at 501 (safe harbor provisions are "disjunctive").

**2.    The Forward-Looking Statements Are Exempt From Liability Under The Safe Harbor Provisions.**

The alleged misstatements in the Form S-4 are immune from liability under both elements of the statutory standard.

**a.    The Forward-Looking Statements Were Accompanied By Meaningful Cautionary Statements.**

"Where a forward-looking statement is accompanied by meaningful cautionary language, the alleged false or misleading statement is rendered immaterial as a matter of law." *Laasko*, 2022 U.S. Dist. LEXIS 147122, at *15. Cautionary language is sufficient if it is "extensive, specific, and directly related to the alleged misrepresentation." *Id*.

The Form S-4 was prefaced by a long and detailed "Cautionary Note Regarding Forward-Looking Statements." Ex. B, Form S-4 at 6-7. The Cautionary Note warned investors that the proxy statement/prospectus included forward-looking statements. *Id.* at 6. It explained that such statements "are inherently subject to risks, uncertainties and assumptions," *id.*, cautioned that neither Longview nor Butterfly "can assure you that either will achieve or realize these plans, intentions or expectations," *id.*, and instructed investors "not [to] put undue reliance on these statements, which speak only as of the date hereof." *Id.* at 7.

The Cautionary Note also offered a tutorial in how to recognize forward-looking statements, explaining that they can be distinguished by both their substance ("Generally, statements that are not historical facts … are forward-looking") and their vocabulary ("These statements may be preceded by, followed by or include" such words as "expects," "plans," "anticipates," or "intends"). *Id*. More specifically, the Cautionary Note informed investors that they should consider statements to be forward-looking if they concerned, among other things, "the success, cost and timing of Butterfly's and New Butterfly's product development activities," "the potential attributes of Butterfly's and New Butterfly's products and services," Butterfly's "ability

23

to compete with other companies," "the size and growth potential of the markets for Butterfly's and New Butterfly's products and services," Butterfly's "financial performance," and any of the "other factors detailed under the section titled '*Risk Factors*.'" *Id.* at 6-7 (emphasis in original).

Several of the alleged misstatements, of course, were located in the "Risk Factors" section of the Ex. B, Form S-4 at 46-95, doubly emphasizing their forward-looking nature and the uncertainty of the potential outcomes under discussion. Many of them, moreover, concerned subjects that had been flagged as forward-looking by virtue of their subject-matter, since they spoke to Butterfly's product development activities, the company's ability to compete, and the size and growth potential of the enterprise-customer market.

Finally, as the Court has seen, the so-called "IPO Forecasts" were not just inherently forward-looking, and therefore limited by the general terms of the Cautionary Note, but were presented in a context that made it clear they had not been presented *as projections*, and had been included only to give Longview shareholders access to the same information that had been provided to the company's Board of Directors. Ex. B, Form S-4 at 111-13. It is difficult to imagine how a cautionary statement could be more meaningful than the Form S-4's explicit warnings that the financial projections it contained "are not fact," "are not a guarantee of actual future performance," and were "not included in this proxy statement/prospectus in order to induce any Butterfly stockholders to vote in favor of any of the proposals at the special meeting." *Id.* at 112.

> **b.    The SAC Does Not Allege That Any Defendant Made A Forward-Looking Statement With Actual Knowledge Of Its Falsity.**

Even if the "meaningful cautionary statement" exemption did not apply, the defendants would be immune to liability for the forward-looking statements at issue because the SAC fails to allege, even in conclusory terms, that any of the defendants actually knew that any of the statements were false when made. The Section 11 claim is predicated on allegations of "negligence

24

and strict liability and does not sound in fraud," ¶393, and the Section 14(a) claim expressly disclaims any "alleg[ation] that the 14(a) Defendants acted with scienter or fraudulent intent . . . ." ¶405. Nor does the SAC allege facts from which an inference—much less a strong inference—of actual knowledge could be drawn.

**B.   Count IV: The Section 10(b) Claim Fails Because The SAC Does Not Allege Specific Facts Giving Rise To A Strong Inference Of Scienter.**

Though not limited as a matter of law to the statements in the Form S-4, the Section 10(b) claim rests largely on the same alleged misstatements and/or similar statements of a forward-looking nature. ¶¶258 ("strong initial adoption" and revenue forecasts), 270 (software quality and integration), 286-88 (inventory risks), 293-98 (revenue projections), 301-02 ("IPO Forecast"). To that extent, Count IV is defective for the reasons stated in Section II.A.

The Section 10(b) claim fails entirely, moreover, because it does not adequately plead scienter. As noted, the Exchange Act and the PSLRA require the Plaintiffs to allege particular facts that give rise to a strong inference of either intent to defraud or extreme recklessness, amounting to a "lesser form of intent rather than a greater degree of negligence." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 283 (D.N.J. 2007). This "is not easy to allege . . . ." *PAMCAH-UA Local 675 Pension Fund v. BT Group PLC*, No. 20-2106, 2021 U.S. App. LEXIS 23189, at *2 (3d Cir. Aug. 5, 2021). To meet the "strong inference" standard, the "allegations must support an inference of scienter that is 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

Viable Section 10(b) claims are most likely to exist "where the complaint 'contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant officers were aware that they were

25

withholding vital information or at least were warned by others that this was so.'" *In re ARIAD Pharms. Sec. Litig.*, 842 F.3d 744, 751 (1st Cir. 2016) (citation omitted). The burden is on the plaintiff "to set forth the specific reports, information or other indicia of fraud that rendered the defendants' conduct highly unreasonable, representing an extreme departure from the standards of ordinary care." *In re IMAX Sec. Litig.*, 587 F. Supp. 2d, 471, 481 (S.D.N.Y. 2008). The SAC does not carry this burden. *See Laasko*, 2022 U.S. Dist. LEXIS 147122, at *23-34 (D.N.J. Aug. 17, 2022) ("inferences of scienter do not survive if they are merely reasonable").

**Knowledge of Falsity**. The claim is limited to three defendants: Butterfly, Dr. Fruchterman (CEO), and Ms. Fielding (CFO). ¶35. Insofar as they say anything about the critical issue of "what [Dr. Fruchterman and Ms. Fielding] knew and when they knew it," *Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 86 (1st Cir. 2008), the allegations in the SAC are second-hand at best and hopelessly non-specific. The various "CWs" on whom the Plaintiffs rely for these allegations uniformly lack first-hand knowledge. None reported to Dr. Fruchterman or Ms. Fielding, ¶¶40-44, and as far as the SAC alleges, none had any relevant, direct interaction with them. None, therefore, could even pretend to say, on the basis of personal knowledge, what Dr. Fruchterman or Ms. Fielding knew or did not know.

The most that the Plaintiffs could come up with are allegations that Dr. Fruchterman and Ms. Fielding sometimes, on unspecified dates, reviewed reports in which, or attended meetings at which, such general subjects as "sales" and "demand" were discussed. ¶¶304-09. These allegations, however, do not impart the sort of specific information needed to sustain an inference of scienter. None says, for example, that before Butterfly included the "IPO Forecast" in the Form S-4, Dr. Fruchterman attended a meeting at which he was warned that the projections were inaccurate; or that before Butterfly advised investors of the "risk" of excess inventory, Ms.

26

Fielding received a specific report making it known—or so obvious that she must have known—that the risk had "already materialized."[6]  *Cf. Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300-01 (S.D.N.Y. 2018) (scienter pleaded where complaint "identified specific reports" and described "numerous meetings" at which defendants were given "information contradicting their public statements").[7] The CW-based allegations, therefore, do not support an inference—much less a strong one—that either of the individual "10(b) Defendants" was supplied with specific information indicating the falsity of their subsequent statements to investors.

**Core operations**. The vagueness of the "knowledge" allegations is fatal as well to the Plaintiffs' theory that scienter should be imputed to the 10(b) Defendants because the alleged misstatements concerned Butterfly's "core" business. ¶¶323-25. Although the Third Circuit has recognized that "core operations" allegations may *sometimes* add *some* inferential weight to the

---

[6] Plaintiffs cannot show that Dr. Fruchterman had knowledge of the alleged falsity of any statement in the Form S-4 that Butterfly filed with the SEC on November 27, 2020 because Butterfly did not hire Dr. Fruchterman as CEO until January 2021—***two months after it filed the S-4***. ¶22. Nor may Plaintiffs hold any of the Section 10(b) Defendants liable for any statements made before the Butterfly/Longview merger. *See In re Carlotz, Inc. Sec. Litig.*, No. 21-cv-5906 (RA), 2023 U.S. Dist. LEXIS 57126, at *13-14 (S.D.N.Y. Mar. 31, 2023). Furthermore, each of the alleged misstatements in the S-4 and its subsequent pre-merger amendments were made by Butterfly—not Dr. Fruchterman or Ms. Fielding. Accordingly, such alleged misstatements are not actionable against Dr. Fruchterman or Ms. Fielding. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 148 (2011).

[7] *See also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) ("Mere access to reports containing undisclosed sales data is insufficient to establish a strong inference of scienter."); *In re ShengdaTech, Inc. Sec. Litig.*, No. 11 Civ. 1918 (LGS), 2014 U.S. Dist. LEXIS 112190, at *22 (S.D.N.Y. Aug. 12, 2014) ("alleged access to information through which a defendant could have discovered red flags is insufficient to plead scienter"); *In re Boston Sci. Corp. Sec. Litig.*, No. 10-10593-DPW, 2011 U.S. Dist. LEXIS 106042, at *45 (D. Mass. Sept. 19, 2011) (strong inference of scienter could not be drawn from allegation that defendant "had access, and recognized the value of using, the online computer system"); *Plumbers & Pipefitters Local Union No. 620 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 884-86 (N.D. Ill. 2011) (access to sources of information without any allegations regarding if, when, and how defendants actually accessed this information is not enough to contribute to a strong inference of scienter).

scienter analysis, it has declined to apply the doctrine in the absence of "some additional allegation of specific information conveyed to management and related to the fraud." *Martin v. GNC Holdings, Inc.*, 757 Fed. Appx. 151, 155 (3d Cir. 2018) (quoting *Avaya*, 564 F.3d at 270). Since, as the Court has just seen, there are no such allegations in the SAC, the "core operations" argument has no place in the analysis.

**Due diligence**. Allegations that Dr. Fruchterman and Ms. Fielding provided "due diligence" materials to Longview in connection with the proposed combination, ¶326-29, are also insufficient as a matter of law. "[P]leading the mere fact of due diligence cannot meet the scienter requirement."[8]  *Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 99 Civ. 1944 (NRB), 2000 U.S. Dist. LEXIS 7444, at *12 n.5 (S.D.N.Y. May 31, 2000); *see also City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 U.S. Dist. LEXIS 11278, at *25-27 (S.D.N.Y. Jan. 21, 2021); *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Amer. Holdings, Inc.*, 12 Civ. 4025 (AT), 2013 U.S. Dist. LEXIS 178462, at *19-20 (S.D.N.Y. Dec. 17, 2013).

**Laurent Faracci's Departure**. The resignation of Butterfly's CEO before the company filed the Form S-4, ¶¶316-22, does nothing to support an inference of scienter because the SAC alleges no facts to show that Mr. Faracci's departure was "highly unusual" in any way, ¶321, much less that it was "unusual" in the particular sense that Faracci left Butterfly because he knew the Form S-4 was fraudulent. *Id.* The latter allegation, in particular, is not just ungrounded but counter-intuitive. How many events in the life of a corporation could be *less* "unusual" than a change of ownership accompanied by a changing of the executive guard? The obvious, and far more

---

[8] Again, Plaintiffs' due diligence allegations ignore that Butterfly did not even employ Dr. Fruchterman until January 2021—***two months after Butterfly filed the S-4***. ¶22.

28

plausible, explanation for Mr. Faracci's departure is that it was a consequence of the impending business combination, not that it was an indication of any misconduct in connection with the merger. *See Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*, 838 F.3d 76, 85-86 (1st Cir. 2016); *Laasko*, 2022 U.S. Dist. LEXIS 147122 at *22-23.

**"High Executive Turnover."** Nor is the putative inference of scienter supported by allegations that ten Butterfly executives left the company over a two-year period between January 2021 and December 2022. For one thing, there is again an obvious and far more "compelling ... inference of nonfraudulent intent," *Tellabs, Inc.*, 551 U.S. at 314—that the turnover was a consequence of the merger, which occurred in January 2021. In any event, bare allegations of executive turnover "cannot operate even as a meaningful piece of additional evidence, *i.e.*, a piece of the scienter puzzle," absent allegations linking the executive departures to the alleged misconduct. *See Intelligroup*, 527 F. Supp. 2d 262, 344-48 (D.N.J. 2007) and cases cited therein. No such nexus is alleged here.

**David Perri's Stock Trades**. Allegations that David Perri, Butterfly's new COO, made stock trades in 2021, ¶¶330-39, don't just fail to *support* an inference of scienter—they actively *undermine* the requisite deduction. To be sure, "insider trading" by a Section 10(b) defendant can be evidence of intent to defraud, but Mr. Perri is not a defendant here. Dr. Fruchterman and Ms. Fielding are the individual "10(b) Defendants," and the SAC does not and cannot allege that they engaged in any stock transactions during the putative Class Period. And when it comes to insider trading and inferences of scienter, absence of evidence is evidence of absence: if the *presence* of suspiciously-timed trades can provide circumstantial evidence of bad intent, their *absence* "may raise the opposite inference." *In re Aspeon Sec. Litig.*, 168 Fed. Appx. 836, 840 (9th Cir. 2006).

29

**The "Holistic" View.** The scienter analysis is, at bottom, a holistic one, requiring the Court to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya*, 564 F.3d at 272 (quoting *Tellabs*, 551 U.S. at 323) (emphasis in original). Viewed from a holistic perspective, the SAC is, if anything, less than the sum of its parts—a vain, alchemical attempt to conjure something from a set of nothings. As the Court has seen, the Section 10(b) claim rests on statements that either (1) explicitly disclaimed any capacity or intent to depict the company's finances or to influence investors' votes, or (2) just as explicitly expressed the company's forward-looking views, properly hedged with cautions about the limitations of such expressions. Nothing in the SAC indicates, with anything remotely like the degree of specificity demanded by the PSLRA, that either individual 10(b) Defendant spoke with knowledge—actual or constructive—of any statement's ostensible falsity. The facts alleged do not support an inference of fraudulent intent, and they point directly to an innocent, and far more plausible, possibility: that the proxy statement was quite properly intended to give investors an optimistic, but prudently-realistic, perspective on the ramifications of the proposed business combination.

## III.    Counts II And V Fail To State Claims For Derivative Liability.

The Section 15 claim (Count II) and the Section 20(a) claim (Count V) are derivative of the Section 11 and Section 10(b) claims, respectively. *In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432, 454 (D. Del. 2014). A plaintiff cannot maintain a derivative claim "without meeting the pleading requirements for a primary violation" of the securities laws. *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 403 (E.D.Pa. 2005). Consequently, for the reasons discussed above, Counts II and V must be dismissed for failure to plead a viable primary violation.

## CONCLUSION

The Court should **dismiss** the Second Amended Complaint with prejudice.

30

**Dated:** April 24, 2023                    Respectfully Submitted,


/s/ Seth R. Goldman
Seth R. Goldman
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
919 Third Avenue
New York, NY  10022
Tel:  212-692-6845
srgoldman@mintz.com

John F. Sylvia (*admitted pro hac vice*)
Patrick E. McDonough (*admitted pro hac vice*)
Evelyn Limon (*admitted pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 348-1820
jfsylvia@mintz.com
pemcdonough@mintz.com
elimon@mintz.com


*Attorneys for Defendants Butterfly Network, Inc.*
*f/k/a Longview Acquisition Corp., Todd. M.*
*Fruchterman, Jonathan M. Rothberg, John Rodin,*
*Larry Robbins, Mark Horowitz, Westley Moore,*
*Derek Cribbs, and Randy Simpson*


/s/ *Jim Walden*
Jim Walden
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
Tel:  212-335-2030
jwalden@wmhlaw.com


*Attorneys for Defendant Stephanie Fielding*


31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 24, 2023, the foregoing Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint was filed electronically with the United States District Court for the District of New Jersey through the Court's ECF System, which constitutes service on all parties under Local Civil Rule 5.1.

**Dated**:  April 24, 2023

/s/ Seth R. Goldman
Seth R. Goldman