**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CRAIG M. ROSE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| | ) Civ. No. 2:22-cv-00854-MEF-JBC |
| Plaintiff, | ) |
| | ) **ORAL ARGUMENT REQUESTED** |
| vs. | ) |
| | ) |
| BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORP., TODD M. FRUCHTERMAN, STEPHANIE FIELDING, JONATHAN M. ROTHBERG, JOHN RODIN, LARRY ROBBINS, MARK HOROWITZ, WESTLEY MOORE, DEREK CRIBBS, and RANDY SIMPSON, | ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants | ) |
| | ) |

MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

GLOSSARY OF TERMS................................................................................................... vi

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS.................................................................................................. 3

    I.    Butterfly Was Unable to Expand Sales into the Enterprise Market Because Its Ultrasound Probes Lacked Critical Functionality Required by Enterprise Customers .............................. 3

    II.    Butterfly's Inability to Sell to Enterprise Customers and Huge Inventory Purchase Commitments Resulted in Overstocked Inventory and Inevitable Write-Offs ......................... 4

    III.    Butterfly's Long-term Viability Was in Jeopardy Because It Lacked the Funds Needed to Develop Software that Would Enable Expansion into the Enterprise Market ......................... 5

    IV.    Butterfly Creates Grossly Inflated Financial Forecasts that Lack Any Reasonable Basis to Maximize IPO Proceeds Needed to Fund Development of Enterprise Technology ................. 5

    V.    One Year After the IPO, Defendants Admit Butterfly's Probes Lack the Critical Functionality Required by Enterprise Customers .................................................................................. 6

ARGUMENT ................................................................................................................... 7

    I.    The Complaint Adequately Alleges False Statements of Material Fact .................................. 7

        A.    Plaintiffs Adequately Allege Software Misrepresentations ...................................... 8

        B.    Plaintiffs Adequately Allege the Enterprise Adoption, Pipeline Bookings, and Class Period Demand Misrepresentations were Materially False and Misleading....................................... 10

        C.    Plaintiffs Adequately Allege The 2021 IPO Forecasts Lacked Any Reasonable Basis....... 13

        D.    Plaintiffs Adequately Allege that the Inventory and Purchase Commitment Misrepresentations were Materially False and Misleading....................................... 17

    II.    The SAC Adequately Alleges Claims Under Section 11 of the Securities Act of 1933 .......... 21

    III.    The Complaint Adequately Alleges Claims under Section 10(b) of the Exchange Act .......... 22

        A.    The Complaint Adequately Alleges Materially False and Misleading Statements ............. 22

        B.    Plaintiffs Adequately Allege that Defendants Acted with Scienter ................................... 22

    IV.    The Complaint Adequately Pleads Claims under Section 14(a) of the Exchange Act ............ 30

    V.    The Complaint Adequately Pleads Claims under Sections 15 and 20(a) .............................. 30

CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Cases**

*Carmignac Gestion, S.A. v. Perrigo Co. PLC,*
2019 WL 3451523 (D.N.J. Jul. 31, 2019) .............................................................. 15, 21

*City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.,*
908 F.3d 872 (3d Cir. 2018) ........................................................................... 7, 10

*City of Edinburgh Council v. Pfizer, Inc.,*
754 F.3d 159 (3d Cir. 2014) .................................................................................... 22

*City of Hialeah Emp. Ret. Sys. & Laborers Pension Tr. Funds for N. Ca. v. Toll Bros.,*
2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) .......................................................... 14, 21

*City of N. Miami Beach Polic Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Hldgs. Corp.,*
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ................................................................ 28

*Cornwell v. Credit Suisse Grp.,*
689 F. Supp. 2d 629 (S.D.N.Y. 2010) ...................................................................... 26

*Curran v. Freshpet, Inc.,*
2018 WL 394878 (D.N.J. Jan. 12, 2018) .................................................................. 25

*Deutsche Zentral-Genossenchaft AG v. HSBC N. Am. Hldg, Inc.,*
2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) ........................................................... 28

*Frater v. Hemispherx Biopharma, Inc.,*
996 F. Supp. 2d 335 (E.D. Pa. 2014) ...................................................................... 30

*General Electric Co. by Levit v. Cathcart,*
980 F.2d 927 (3d Cir. 1992) .................................................................................... 30

*Ho v. Duoyuan Global Water, Inc.,*
887 F. Supp. 2d 547 (S.D.N.Y. 2012) ...................................................................... 29

*In re Advanta Corp. Sec. Litig.,*
180 F.3d 525 (3d Cir. 1999) .................................................................................... 23

*In re Boston Scientific Corp. Sec. Litig.,*
2011 WL 4381889 (D. Mass. Sept. 19, 2011) .......................................................... 27

*In re Bristol-Myers Squibb Sec. Litig.,*
2005 WL 2007004 (D.N.J. Aug. 17, 2005) ................................................................ 7

*In re Burlington Coat Factory,*
114 F.3d 1410 (3d Cir. 1997) .................................................................................. 13

*In re Cendant Corp. Litig.,*
60 F. Supp. 2d 354 (D.N.J. 1999) ............................................................................ 30

*In re CommVault Sys., Sec. Litig.*,
  2016 U.S. Dist. LEXIS 135257 (D.N.J. Sept. 30, 2016) ............................................... 29

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) ....................................................................................... 21

*In re Enzymotec Secs. Litig.*,
  2015 U.S. LEXIS 167403 (D.N.J. Dec. 15, 2015) ....................................................... 18

*In re Heckman Corp. Sec. Litig.*,
  869 F. Supp. 2d 519 (D. Del. 2012) ........................................................................... 24

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
  2017 WL 1536223 (D.N.J. Apr. 27, 2017) .................................................................. 20

*In re Horsehead Holding Corp. Secs. Litig.*,
  2018 WL 4838234 (D.N.J. Oct. 4, 2018) ..................................................................... 30

*In re Ikon Office Sols., Inc. Sec. Litig.*,
  66 F. Supp. 2d 622 (E.D. Pa. 1999) ........................................................................... 25

*In re Innocoll Hldgs Pub. Co. Secs. Litig.*,
  2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ............................................................. 25

*In re Lattice Semiconductor Corp. Sec. Litig.*,
  2006 WL 538756 (D. Or. Jan. 3, 2006) ...................................................................... 26

*In re Par Pharm. Sec. Litig.*,
  2009 WL 3234273 (D.N.J. Sept. 30, 2009) ................................................................ 25

*In re PTC Therapeutics, Inc. Sec. Litig.*,
  2017 U.S. Dist. LEXIS 137930 (D.N.J. Aug. 28, 2017) .............................................. 29

*In re Shengda Tech., Inc. Sec. Litig.*,
  2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ............................................................ 27

*In re Suprema Specialties, Inc. Sec. Litig.*,
  334 F. Supp. 2d 637 (D.N.J. 2004) ............................................................................. 21

*In re Toronto-Dominion Bank Secs. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018) ................................................................... 25

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Pa. 2015) ......................................................................... 27

*In re Valeant Phams. Int'l Inc. Sec. Litig.*,
  2017 WL 1658822 (D.N.J. Apr. 28, 2017) .................................................................. 28

*In re Veritas Software Corp. Sec. Litig.*,
  2006 WL 1431209 (D. Del. May 23, 2006) ................................................................. 24

*Industriens Pensionsforsikring v. Dickinson*,
  2022 WL 3273879 (D.N.J. Aug. 11, 2022) .............................................................. 13, 14, 16, 18

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) .................................................................................... 22, 27

*Laborers Local No. 231 Pension Fund v. Cowan*,
  837 Fed. Appx. 886 (3d Cir. 2020) ......................................................................... 15, 16

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*,
  2011 WL 2444675 (D. Del. June 14, 2011) ............................................................ 25, 26, 27

*Manufacturers Life Ins. Co., v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  2000 WL 709006 (S.D.N.Y. June 1, 2000) .............................................................. 28

*McCullough v. Advest, Inc.*,
  754 F. App'x 109 (3d Cir. 2018) ............................................................................. 22

*McDermid v. Inovio Pharm., Inc.*,
  520 F. Supp. 3d 652 (E.D. Pa. 2021) ...................................................................... 8, 12

*Obasi Inv., Ltd. v. Tibet Pharm., Inc.*,
  931 F.3d 179 (3d Cir. 2019) .................................................................................... 21

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
  834 F.3d 481 (3d Cir. 2016) .................................................................................... 15, 16

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021) ......................................................................... 20

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) .................................................................................... 7

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*,
  778 F. Supp. 2d 858 (N.D. Ill. 2011) ...................................................................... 27

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ................................................................................ 27

*Princeton Opthalmic, LLC v. Corinthian Ophthalmic, Inc.*,
  2017 WL 4543688 (D.N.J. Oct. 10, 2017) .............................................................. 10

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018) .............................................................. passim

*S. Ferry LP # 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) .............................................................. 24

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000) ........................................................................ 20

*Skiadas v. Acer Therapeutics, Inc., et. al.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) .............................................. 30

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
    2022 WL 17740482 (D.N.J. Dec. 16, 2022) ................................................ 28

*Tellabs, Inc. v. Makor Issues & Rights*, Ltd.,
    551 U.S. 308 (2007) ..................................................................................... 23

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017) ..................................................................11, 19

*Wojtunik v. Kealy*,
    394 F. Supp. 2d 1149 (D. Ariz. 2005) .......................................................... 24

**Statutes**

15 U.S.C. § 77k(3) ............................................................................................ 21

15 U.S.C. § 78n(a) .............................................................................................. 7

15 U.S.C. § 78u-4(b)(2)..................................................................................... 22

15 U.S.C. § 78u-5(c) ......................................................................................... 20

15 U.S.C.S. § 77k............................................................................................... 7

15 U.S.C.S. § 78j............................................................................................... 7

17 C.F.R. § 240.10b-5 ........................................................................................ 7

## GLOSSARY OF TERMS

| TERM | DEFINITION |
|---|---|
| ¶__ | All references to "¶__" are to paragraphs of the Second Amended Complaint ("SAC"). |
| **Butterfly** | **Butterfly Network, Inc**. Butterfly is a medical device company that designs and sells handheld ultrasound probes and software. Butterfly was a privately held company until its IPO in February 2021 when it merged with a publicly traded company, Longview Acquisition Corp. |
| **CP** | **Class Period**. January 12, 2021 through November 15, 2021, inclusive. |
| **CW** | **Confidential Witness**. The SAC contains allegations from former employees of Butterfly. |
| **DB or Motion** | **Defendants' Brief**. Defendants' Motion and Memorandum in Support of the Motion to Dismiss the Second Amended Complaint. |
| **IPO** | **Butterfly's Initial Public Offering**. The merger, or de-SPAC transaction, closing on February 16, 2021, in which Butterfly combined with Longview, resulting in Butterfly being publicly traded for the first time. |
| **Longview** | **Longview Acquisition Corp.** A shell corporation with no business operations of its own incorporated for the explicit purpose of listing on a public exchange and subsequently acquiring or merging with a privately held, high growth potential company that was renamed Butterfly Network Inc. after merging with Butterfly in a February 2021 de-SPAC transaction. |
| **SAC** | **Second Amended Complaint**, filed February 24, 2023. |
| **S-4** | **Defective Proxy/Registration Statement**, effective January 26, 2021. The defective proxy/registration statement Defendants filed with the SEC on Form S-4 on November 27, 2020, thereafter amended on Forms S-4/A on January 6, 2021, January 19, 2021, and January 26, 2021 and the final prospectus on Form 424(b)(3) filed on January 26, into which the S-4 and its amendments were incorporated in their entirety. |
| **2021 IPO Forecasts** | **Butterfly's 2021 Revenue and Margin Forecasts**. Butterfly's revenue and margin forecasts for 2021, published in connection with Butterfly's IPO. |

vi

**PRELIMINARY STATEMENT**

Butterfly Network, Inc. ("Butterfly" or the "Company") is a startup company that designs and sells handheld ultrasound devices called "Probes." Throughout the Class Period, Butterfly's Probes lacked critical functionality required by hospitals and healthcare institutions ("Enterprise Customers") necessary to integrate the Probes into clinical workflows and comply with privacy laws. Thus, Butterfly had only been able to sell its Probes to individual practitioners who were willing to purchase them without the functionality Enterprise Customers required.

At the time of the IPO, however, Butterfly did not have the funding needed to develop additional functionality and, therefore, could not expand into the enterprise market without a massive cash infusion. Defendants admit as much in their Motion to Dismiss the Second Amended Complaint ("DB" or "Motion"), stating that "Butterfly's software and sales infrastructure may not have been where they needed to be to reach the goal of increased enterprise sales" because Butterfly needed an "***infusion of capital***" to "***enable[] it to continue to pursue these goals***." DB at 9.

Butterfly obtained the additional capital by going public through a de-SPAC merger with Longview (the "IPO") in which it raised $550 million. The only way Defendants could justify a valuation high enough to secure sufficient cash from the IPO was by publishing false financial forecasts and misrepresenting the state of Butterfly's Probe technology and pipeline of Enterprise Customers. In the S-4[1] issued to obtain investor support for the IPO, Defendants forecasted 2021 sales of $78.1 million (the "2021 IPO Forecasts"), a 70% growth rate over 2020 sales that Butterfly had never before come close to achieving. According to confidential witnesses ("CWs"), the 2021 IPO Forecasts were a "pie-in-the-sky" that Defendants "slapped together for investors" but that nobody at Butterfly

---

[1] "S-4" refers to the Defective Proxy/Registration Statement filed with the SEC on Form S-4, and all materials incorporated by reference, as amended and declared effective on January 26, 2021.

1

(including Defendants) took seriously because the forecasts depended on "penetration in [the] enterprise" market. CWs stated that Enterprise Customers were unwilling to purchase Butterfly's Probes because the Probes were still in a proof-of-concept phase and lacked critical functionality. Thus, CWs confirmed, Butterfly's sales pipeline had no viable enterprise deals throughout the Class Period. CWs further confirmed that, typically, it takes at least one year to close an enterprise deal due to the lengthy vetting process. Developing and testing new software functionality also takes considerable time—here, it took Butterfly an entire year to develop and release new enterprise functionality after receiving the IPO funding. Thus, Defendants knew it was impossible for Butterfly to achieve the 2021 IPO Forecasts given the Company had no viable enterprise deals and it would take at least one year to develop the software and complete the lengthy enterprise sales cycle.

Yet, Defendants issued the S-4 touting the 2021 IPO Forecasts and falsely claiming the forecasts were supported by "[s]trong initial adoption" by "Healthcare Institutions" of Butterfly's Probes, which purportedly "provide[] a complete solution" and "can integrate seamlessly with large healthcare systems." Defendants repeated these, and other similar false statements, throughout the Class Period. Even worse, after Defendants Fielding and Fruchterman instructed CW3 to internally revise the 2021 IPO Forecasts downward in May or June 2021 to reflect shortfalls in enterprise sales, they proceeded to publicly reaffirm the 2021 IPO Forecasts in the August 13, 2021 press release—*an alleged false statement Defendants do not challenge in their Motion*.

Under the crushing weight of evidence from Plaintiffs' CWs and Butterfly's own end of Class Period admissions, Defendants now admit in their Motion the very facts Plaintiffs allege were not disclosed and that rendered Defendants' statements false—the Probes were "an *unfinished product*" and "ease of use and full integration were goals for the future." DB at 10. The SAC also adequately alleges Defendants' scienter through, *inter alia*, their receipt of weekly and monthly reporting

2

packages, attendance at Company meetings, access to the sales pipeline of potential customers and extensive due diligence materials provided in the IPO—all of which disclosed a lack of enterprise sales due to a lack of Probe functionality. Moreover, it is no coincidence that Butterfly's former CEO abruptly resigned days before the S-4 became effective. In their Motion, Defendants ignore these (and other) facts, yet concede Plaintiffs have pled motive through Butterfly's dire need for cash. DB at 9.

Through a series of disclosures, Defendants revealed that the 2021 IPO Forecasts were overstated by 23% due to a lack of enterprise sales because the Probe's software lacked functionality and was "objectively lagging." Upon these disclosures, Butterfly's stock price declined $2.86 per share, and investors suffered massive losses. Today, Butterfly's stock is trading around $2.00 per share, *less than one-tenth the price* it had reached shortly after the IPO.

## STATEMENT OF FACTS

**I.    Butterfly Was Unable to Expand Sales into the Enterprise Market Because Its Ultrasound Probes Lacked Critical Functionality Required by Enterprise Customers**

Butterfly designs and sells handheld ultrasound Probes that require connection to a smartphone or tablet to capture and display ultrasound images. ¶¶3, 71-75. Throughout the Class Period, however, the Company was only able to sell its Probes to non-enterprise "early adopters" who were willing to purchase the device before the software included important features required by Enterprise Customers. ¶¶96-105. According to CW4, Enterprise Customers were unwilling to purchase Butterfly's Probes because, among other deficiencies, they were unable to integrate with Electronic Healthcare Records or create reports and could not meet various "workflow" and privacy requirements. ¶¶96-105, 109.

Despite the lack of critical functionality required by Enterprise Customers, Defendants told investors prior to the IPO and throughout the Class Period that Butterfly's Probe "**provides a complete solution**" in point-of-care imaging that "**can integrate seamlessly into large health care systems, simplifying the enterprise workflow**," that there had been "**Strong initial adoption**" of Butterfly's

3

Probes by "**<u>Healthcare Institutions</u>**," including "**<u>most of the Top 100 US Health Systems</u>**," and that near term growth was supported by *existing* "**<u>pipeline bookings across the enterprise [] market[]</u>**." ¶¶212, 220, 237, 238, 240.  These statements were false. Defendants explicitly admit as much in their Motion, stating, *inter alia*, that "***the software was an unfinished product***" and "***the company still had a 'chasm' to cross to achieve its strategic goal of marketing to enterprise clients***." DB at 10, 19.

At the time of the IPO, Butterfly also did not have an enterprise sales force capable of selling to large healthcare institutions. ¶¶169-80, 194-200, 203. Thus, throughout the Class Period, Butterfly never attained any enterprise sales. ¶¶117-18. Both CW2 and CW3 confirmed that when they joined Butterfly shortly after the IPO and throughout their tenures, Butterfly never had a single enterprise-wide implementation of its Probes. ¶117. CW5 recalled that it was not until late 2021 or early 2022 that Butterfly "bought" its first "flagship account" by offering the University of Rochester Medical Center ("URMC") Probes at a steep discount and software at no cost. ¶118.

## II.    Butterfly's Inability to Sell to Enterprise Customers and Huge Inventory Purchase Commitments Resulted in Overstocked Inventory and Inevitable Write-Offs

Butterfly relies upon third parties such as Taiwan Semiconductor Manufacturing Corporation ("TSMC") to manufacture the Probe's highly specialized microchip components and assemble the devices. ¶82. Under its contract with TSMC, Butterfly was subject to non-cancellable, inventory purchase commitments that required Butterfly to purchase minimum quantities of inventory, even if Butterfly was unable to generate sufficient demand for its products. ¶¶83-87. At the time of the IPO and throughout the Class Period, Butterfly's sales growth was slow because the Company was only able to sell its Probes to the non-enterprise, early adopter market, causing Butterfly's minimum inventory purchase commitments to far outpace demand. ¶¶77-78, 93-95. CW4, who was employed as a Director of Sales at Butterfly from 2019 through 2022, confirmed that demand among early adopters was *never sufficient* to sell the volume of inventory that Butterfly had committed to purchase.

4

¶¶43, 94, 105. As a result, in 2019 and the first nine months of 2020, Butterfly was forced to write-down its inventories by $5.3 million and $6.9 million, respectively. ¶¶91-95.

By September 30, 2020, the situation was far worse: Butterfly had inventories of $14.9 million, accrued purchase commitments of $63.4 million due within one year, and purchase commitments totaling $169.0 million that would accrue by the end of 2022. ¶¶91-95. At the time of the IPO, Butterfly had never achieved annual sales approaching that magnitude (reporting annual sales of $27.6 and $46.3 million in 2019 and 2020, respectively) and, according to CWs, did not have sufficient bookings in the pipeline to support sales growth at such levels before the inventory would become obsolete. ¶102. Indeed, according to the S-4, Defendants knew the technology would be obsolete within two years and, thus, planned "to launch new probe [sic] with technological updates every other year." ¶76.

### III. Butterfly's Long-term Viability Was in Jeopardy Because It Lacked the Funds Needed to Develop Software that Would Enable Expansion into the Enterprise Market

Unable to sell the massive quantities of inventory it had committed to purchase, Butterfly's prospects for survival were bleak unless it could obtain a cash infusion to develop the functionality required by Enterprise Customers who would buy the Probes in mass quantities. ¶¶92-105. But prior to the IPO, such a strategy was impossible because Butterfly lacked the funds necessary to develop enterprise software functionality and hire an enterprise sales force. ¶¶114, 160. CWs confirm that it was not until after the IPO, which added more than $500 million to Butterfly's balance sheet, that the Company was able to hire an enterprise sales force and begin to develop its software to include the necessary enterprise functionality. ¶¶114, 121, 140, 160. Defendants agree. DB at 9 (admitting the "***infusion of capital***" from the IPO transaction "***enabled it to continue to pursue these goals***"); DB at 15 ("***building a bigger and more capable sales force***" required an "***infusion of capital***").

### IV. Butterfly Creates Grossly Inflated Financial Forecasts that Lack Any Reasonable Basis to Maximize IPO Proceeds Needed to Fund Development of Enterprise Technology

The de-SPAC merger presented Butterfly an opportunity to obtain more than half a billion

5

dollars,[2] funds Butterfly desperately needed to develop software required by Enterprise Customers and to hire an enterprise sales force. ¶¶114, 121, 140, 160. Because Butterfly was running out of cash and had massive purchase commitments accruing, it was highly motivated to ensure that the business combination with Longview was consummated. ¶¶91-94, 114, 121, 140, 160.

To maximize IPO proceeds, Butterfly falsely reported the grossly inflated 2021 IPO Forecasts, which lacked any reasonable basis. ¶¶140-55. CWs 2, 3, 4 and 5 all confirmed the 2021 IPO Forecasts were a "pie-in-the-sky" that nobody at the Company, including Defendants, took seriously because they depended upon "penetration in enterprise" market—something that was unachievable given Butterfly's software lacked critical functionality. ¶140-44, 156-63. CWs further confirmed that these forecasts were overstated by *at least* 20% because they were based on a sales pipeline containing leads that were "not actually viable." ¶¶152, 154. For example, when CW5 contacted New York University ("NYU") about a potential $1.4 million deal in Salesforce, Butterfly's CRM software, NYU immediately said it had no interest. ¶152. Yet, CW5 was instructed to keep the deal in Salesforce even though the opportunity was "clearly not viable." *Id.* The gross margin forecasts were also unachievable because Butterfly already experienced, and would continue to experience, inventory write-offs and losses on purchase commitments for which there was insufficient demand. ¶¶91-95, 186-95.

## V.    One Year After the IPO, Defendants Admit Butterfly's Probes Lack the Critical Functionality Required by Enterprise Customers

In January 2022, nearly one year after the IPO, Butterfly announced that, contrary to Defendants' prior misstatements, Butterfly had, only then, booked its *first* enterprise sale. ¶200. Then, in November 2022, Butterfly disclosed the Company "spent the last year investing heavily in the development of our software solutions" because "we were not where we needed to be," especially

---

[2] S-4 at 35, 118 ("Sources and Uses of Funds for the Business Combination" specify $544.6 million for "Cash to Balance Sheet").

6

regarding Butterfly's "enterprise level software and workflow solutions" which Defendant Fruchterman described as "objectively lagging." ¶203. At that time, Fruchterman confirmed "software is the enterprise enabler" and the Company only recently developed critical enterprise software, noting "enterprise level software development has now become a positive differentiator for Butterfly." ¶203. Defendants' admissions also show the 2021 IPO Forecasts lacked any reasonable basis. ¶¶200, 203. *See also, e.g.*, DB at 10 ("*the software was an unfinished product*"); DB at 19 ("*the company still had a 'chasm' to cross to achieve its strategic goal of marketing to enterprise clients*").

## ARGUMENT

On a motion to dismiss, courts must accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiffs' favor. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). "[A] complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

## I.    The Complaint Adequately Alleges False Statements of Material Fact

Liability under §11 of the Securities Act and §§10(b) and 14(a) of the Exchange Act requires a common element: untrue statements of material fact. *Compare* 15 U.S.C.S. § 77k, *with* 15 U.S.C.S. § 78j, 15 U.S.C. § 78n(a), *and* 17 C.F.R. § 240.10b-5. "[E]ven an objectively true statement, if it leaves out material information may be actionable." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *22 (D.N.J. Aug. 17, 2005); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018) ("The law does not permit corporate executives to mislead investors through half-truths. By putting [an issue] 'in play,' Defendants 'acquire[] a duty to disclose information relating to that topic'").

As discussed below, Defendants made materially false and misleading statements relating to (i) Butterfly's software, (ii) enterprise adoption and demand for Butterfly's Probes, (iii) forecasted sales

7

and margins for 2021, and (iv) Butterfly's inventory and purchase commitments.[3]

### A. Plaintiffs Adequately Allege Software Misrepresentations

Defendants repeatedly published materially false and misleading statements about the capabilities of Butterfly's software prior to and throughout the Class Period. ¶¶209-10, 212, 214, 216, 218, 220, 222, 224-25, 267, 270-71, 273, 275, 277, 279, 281, 283-84. For example, the S-4 and subsequent Class Period misstatements falsely stated that Butterfly's Probes are "**fully integrated with the clinical workflow**" (¶¶209-10, 270-71), "**can integrate seamlessly into large health care systems, simplifying the enterprise workflow for scanning and increasing the effectiveness of the imaging ecosystem within the enterprise**" (¶212), and "**provides a complete solution to address an unmet need in point-of-care medical imaging**" that "**addresses the traditional ease-of-use challenges and the complex clinical workflow**." ¶¶220, 279.

The above statements were false when made because Butterfly's software throughout the entire Class Period was incapable of integrating with Enterprise Customers' clinical workflows and was not "a complete solution" because it lacked the functionality they required. *See McDermid v. Inovio Pharm., Inc.,* 520 F. Supp. 3d 652, 663 (E.D. Pa. 2021) ("By alleging Defendants claimed to have achieved something they did not achieve and thereby instilling false confidence in investors, Plaintiffs have satisfied their burden of alleging why [Defendants'] statements were misleading.").

Indeed, according to CW2 and CW3, Butterfly's software was still in a proof-of-concept phase and missing important functionality required to integrate the Probes into the clinical workflows of Enterprise Customers. ¶¶80, 107-08, 156, 211. CW4 similarly reported that Butterfly's platform lacked integration with Electronic Health Records, lacked the ability to create reports, could not perform "QR"

---

[3] Exhibit 1, attached hereto is a table detailing each of the alleged misrepresentations and the facts demonstrating that such misrepresentations were false when made, with scienter where applicable.

scoring, and could not meet various workflow requirements of Enterprise Customers. ¶109. CW2 similarly stated that the Probes were limited to Butterfly's cloud storage and did not integrate with enterprises' on-premises storage solutions. ¶158. Nearly two years after the IPO, during the November 2022 Earnings Call, Defendant Fruchterman disclosed that, contrary to Defendants' prior statements, Butterfly's "***enterprise level software and workflow solutions***" had been "***objectively lagging***" and the Company had only recently begun "*investing heavily in the development of our software solutions*" during the past year. ¶203. Moreover, CW5 stated that when CW5 left the Company in November 2022, Butterfly was "*still building*" its software and likened the situation to "*building a plane as we flew it.*" ¶110. Defendants' Motion acknowledges that, far from being the "complete solution" touted in the S-4, the software was in truth "***an unfinished product***" at the time of the IPO. DB at 10.

**Defendants' Arguments Have No Basis in Law or Fact.** Defendants concede many of the crucial facts that Plaintiffs allege demonstrate falsity. *E.g.*, DB at 7 (stating that "ease of use and full integration were goals for *the future*—things that Butterfly 'intended' to achieve"). Defendants argue, however, that these conceded facts do not demonstrate falsity because (1) the S-4 disclosed the true state of Butterfly's software, (2) Plaintiffs have mischaracterized the alleged misstatements as statements of existing fact by reading them in isolation, and (3) the overall forward-looking "tenor" of the S-4 rendered the statements of present fact "plainly aspirational" and thus not misleading. Each argument lacks merit.

*First*, Defendants' Motion seeks to rewrite the S-4 to include facts they wish they had disclosed but did not. *See, e.g.*, DB at 9-10 (Butterfly "*said, truthfully, that the software was an unfinished product*" and "*Butterfly's software was—exactly as the Form S-4 said it was—a work in progress*"). The statement "unfinished product," however, ***appears nowhere*** in the S-4 and Butterfly ***never*** describes its software as "a work in progress" in the S-4 or elsewhere.

9

*Second*, none of the software misstatements contain the language Defendants point to as indicia of forward-looking. DB at 23 (*e.g.*, "expects", "plans", "intends"). Rather, the alleged false statements are all present facts. *See, e.g.*, ¶212 ("[O]ur solution *can integrate* seamlessly into large health care systems"); ¶¶220, 279 ("Butterfly *provides* a complete solution"). *See Roofer's Pension Fund*, 2018 WL 3601229, at *15 (statements such as "we…**are**…in line with our going online integration process," were present facts) (emphasis in original). At best, Defendants raise a factual dispute not appropriately decided on a motion to dismiss where the court must draw all reasonable inferences in Plaintiffs' favor. *City of Cambridge Ret. Sys.*, 908 F.3d at 878.

*Third*, Defendants' assertion that the purported "overall forward-looking tenor" of the S-4 rendered the misstatements of presently existing facts "plainly aspirational" and thus not in contention with the admitted facts (DB at 7, 9-10) has no support in fact or law. The alleged misstatements are about the current state of Butterfly's technology. *See Princeton Ophthalmic, LLC v. Corinthian Ophthalmic, Inc.*, 2017 WL 4543688, at *6, 9 (D.N.J. Oct. 10, 2017) (on summary judgment, rejecting Defendants' invitation to interpret present tense statement "[medical] device *can* dose in microliter volumes" as a future prediction, finding the interpretation is an issue of fact).

### B. Plaintiffs Adequately Allege the Enterprise Adoption, Pipeline Bookings, and Class Period Demand Misrepresentations were Materially False and Misleading

At the IPO and throughout the Class Period, Defendants misrepresented the demand for Butterfly's Probes in the enterprise market. ¶¶126, 237-38. For example, Defendants stated in the Investor Presentation on November 20, 2020 (incorporated into the S-4 by reference) and again in the January 2021 Webcast Presentation that there had been "**Strong initial adoption, excitement, and momentum**" from "**Healthcare Institutions**" and that "**Butterfly has an existing footprint in most of the Top 100 US Health Systems**." ¶¶237-38, 259-260. Defendants repeated these false statements during the Class Period. *See, e.g.*, ¶291 (3/29/21 earnings call, stating "**[t]here's strong demand in**

10

**enterprise right now for Butterfly, not only as a unique ultrasound device, but for our total solution too**" and "**we see a lot of opportunities in the enterprise channel**"); ¶299 ("**we believe we have a strong pipeline and demand for our solution across the breadth of use cases afforded by our team, and still see our annual performance shaping up to be in the guidance range we've provided in Q1**"); ¶293 (same).

These statements were materially false and misleading because Butterfly had not experienced *any* initial adoption of its Probes by healthcare institutions, let alone "strong adoption" or "strong demand" and, thus, Butterfly did not have a "footprint" in "most of the Top 100 US Health Systems." ¶200. According to CW1 and CW4, Butterfly's customers throughout 2019 and 2020 consisted of "home users," individual practitioners, e-Commerce customers, and non-enterprise early adopters. ¶¶97, 239, 261. Defendants admit as much in their Motion. DB at 19 ("Butterfly's sales had been concentrated so far among non-enterprise early adopters"). CW2 and CW3 reported that Butterfly did not have a single successful enterprise-wide implementation of its Probes prior to or during the Class Period. ¶117. In fact, Butterfly's first agreement with a large healthcare institution was not announced until January 2022, more than one year after the IPO. ¶200. CW5 stated that the first agreement with URMC was only achieved after Butterfly agreed to heavily discount the sale price of the Probes and give the software away for free. ¶118. *See also*, Section I.A., *supra*.

Further, when Defendants chose to speak about demand for Butterfly's Probes, they had a "duty" to disclose facts necessary to make the statements made not misleading. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017). Defendants did not do so. Rather, they omitted that the Probe's software lacked enterprise functionality, the Company had not yet achieved any enterprise-wide implementations of Butterfly Probes, and the Company did not have the funds to develop critical functionality required by Enterprise Customers until after obtaining additional funds through the IPO.

11

**Defendants' Arguments Ignore the SAC's Allegations**. Contrary to Defendants' contentions, the demand misstatements concern then-presently existing facts, *e.g.*, "strong initial adoption, [] and momentum" and "an existing footprint in most of the Top 100 US Health Systems," and do not concern forward-looking plans. *See McDermid,* 520 F. Supp. 3d at 663 (rejecting defendants' alternative interpretations of the allegations on a motion to dismiss). Indeed, none of the buzzwords Defendants cite as indicia of forward-looking (*e.g.*, "expected," "plans," "anticipates") appear anywhere in the alleged misstatements. *See, e.g.*, ¶237 (Figure Q.). Moreover, the word "to" in the title of the slide in Figure Q below, "Healthcare Institutions *to* Drive Adoption at Scale" (¶238), does not transform the statement directly below it, "Strong initial adoption," into a forward-looking statement. Rather, "strong initial adoption" is a statement of present fact intended to provide support for the above misstatement.



Defendants next argue that, because they told investors in a June 2020 YouTube video that Butterfly had not "cross[ed] the chasm from early adopter to enterprise user," their contradictory statements in the S-4 (*e.g.*, "strong initial adoption" from "Healthcare Institutions") were "not at all misleading in context." DB at 19. This argument fails for several reasons. First, the June 2020 video was stale because it was published six months before the IPO. Second, *very few people saw or heard* the video, *which has received only 610 views and 0 comments* to date. Third, Defendants' subsequent, contradictory misstatements would supersede any earlier statements. Regardless, Defendants' assertion

is a fact-intensive argument that is not properly raised on a motion to dismiss. *Roofer's Pension Fund*, 2018 WL 3601229, at *9.

Additionally, Defendants do not meaningfully dispute the falsity of the demand and pipeline misrepresentations issued after the IPO. Rather, Defendants' only argument is that the alleged misstatements published after the IPO are duplicative of the alleged misstatements published in the S-4 and, thus, are not actionable for the same reasons Defendants asserted against the S-4 misstatements. DB at 19. But Defendants' Class Period misrepresentations include words such as "now" and "today," leaving no room for Defendants' arguments that the statements are forward-looking. *See e.g.*, ¶291 (3/29/21 earnings call, stating "[t]here's strong demand in enterprise *right now* for Butterfly" and "we see a lot of opportunities in the enterprise channel."); ¶293 ("we are excited about the demand in the marketplace *today*, and are pleased to *reaffirm* revenue guidance").

### C. Plaintiffs Adequately Allege The 2021 IPO Forecasts Lacked Any Reasonable Basis

Federal securities laws "do not obligate companies to disclose their internal forecasts [but] if a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis." *Industriens Pensionsforsikring v. Dickinson*, 2022 WL 3273879, at *191 (D.N.J. Aug. 11, 2022) (citing *In re Burlington Coat Factory*, 114 F.3d 1410, 1427 (3d Cir. 1997)). "A projection lacks a reasonable basis if it was made after inadequate consideration of available information." *Id*. In the S-4, Defendants published the 2021 IPO Forecasts projecting, *inter alia*, **2021 revenue of $78.1 million and gross margins of 43%**. ¶227. Defendants repeated these forecasts throughout the Class Period in investor presentations, and during quarterly earnings calls and press releases. ¶¶120-39, 227, 228, 229, 242, 244, 258, 264, 294-96, 301.[4]

---

[4] Contrary to Defendants' erroneous contention (DB at 14), the November 2020 Presentation is part of Plaintiffs' 10(b) Exchange Act claim as it is incorporated by reference into the S-4.

Plaintiffs adequately allege the 2021 IPO Forecasts were false and lacked any reasonable basis, and Defendants knew it. The SAC alleges, with the corroboration of five CWs, that the 2021 IPO Forecasts were based on a growth strategy that *depended* on Butterfly selling Probes in mass quantities to Enterprise Customers—something Defendants knew Butterfly could not achieve because its Probes lacked the critical functionality required by Enterprise Customers. ¶¶120-22; *see also*, Section I.B. *supra*. Thus, CW4 estimated, the forecasts were ***inflated by at least 20%***. ¶154.

CWs 3, 4 and 5 reported that forecasts typically consider a company's historical results, its current sales pipeline, and whether its salesforce is sufficient. ¶¶140, 142, 144. However, CWs 2, 3, 4 and 5 all stated that the 2021 IPO Forecasts were unsupported by the then-current pipeline of potential sales, the current sales force, or historical results. ¶¶140-43. For example, CW2 stated that Salesforce included a deal with the City of Miami listed as buying 66 Probes when, in fact, the City of Miami only wanted three. ¶147. The sale of 66 Probes would have generated more than $160,000 in revenue, whereas three Probes generated just over $7,400. ¶¶75, 79. Following CW2's independent investigation, CW2 removed about one-half of the deals from Salesforce because they were "smoke and mirrors." ¶149. CW4 similarly recalled a prospective deal with Atrium listed as buying 700 Probes when it only purchased 70 (¶150), or approximately $170,000 in revenue compared to $1.7 million. ¶¶75, 79. Likewise, CW5 recalled a software opportunity with NYU valued at $1.4 million in Salesforce, but NYU told CW5 it had "no interest." ¶152. CW3 reported that the 2021 IPO Forecasts were "slapped together for investors" based upon arbitrary growth rates that nobody, including Butterfly's management, took seriously. ¶140. Thus, Plaintiffs adequately allege falsity. *City of Hialeah Emp. Ret. Sys. & Laborers Pension Tr. Funds for N. Ca. v. Toll Bros.*, 2008 WL 4058690, at *2 (E.D. Pa. Aug. 29, 2008) (finding projections were unreasonable at the time made); *Dickinson*, 2022 WL 3273879, at *192 (where revenue projections "relied on durable Alaris sales in FY20" and the company

14

faced a substantial risk that product's software problems would prevent sales of Alaris in FY20, the projections were, as here, "unmoored from the Company's immediate reality" and lacked a reasonable basis). Moreover, according to the CWs, since the enterprise sales cycle typically takes at least one year (or more) due to lengthy vetting processes, it was impossible for Butterfly to achieve the 2021 IPO Forecasts. ¶¶162-63.

The 2021 IPO Forecasts are also actionable because Defendants had a duty to disclose material information to make them not misleading. *Roofer's*, 2018 WL 3601229, at *13. As Defendants now admit in their Motion, they failed to disclose that Butterfly's sales pipeline lacked any viable enterprise deals because the Probes' "software was an *unfinished* product." DB at 7, 10, 19, 22. Therefore, the 2021 IPO Forecasts that Defendants claimed were supported by "strong initial adoption" by Enterprise Customers lacked any reasonable basis.

**Defendants' Arguments Lack Merit**. Defendants' first argument, that the 2021 IPO Forecasts are not actionable because they were accompanied by disclaimers that the forecasts were prepared solely for Longview's use in the merger (DB at 11-15), is unavailing. The November 20, 2020 Investor Presentation, incorporated by reference into the S-4, contained ***no such disclaimer***. ¶242. Absent such a disclaimer appearing in the presentation, Defendants cannot now argue that the presentation was only meant for Longview. *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at * 12 (D.N.J. Jul. 31, 2019) ("there must be some attempt to incorporate the cautionary language 'by reference' as part of the challenged statement.").

Moreover, Defendants ignore the crucial distinction that, unlike in *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 500-01 (3d Cir. 2016) and *Laborers Local No. 231 Pension Fund v. Cowan*, 837 Fed. Appx. 886, 888 (3d Cir. 2020), neither of which involved public listings, the forecasts here were also accompanied by extensive management assurances that "[t]he Projections were

15

prepared in good faith by Butterfly's management based on their reasonable estimates and assumptions with respect to the expected future financial performance of Butterfly" and "in the view of Butterfly's management, [the 2021 IPO Forecast] was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future performance of Butterfly." ¶¶123, 228-29. *Laborers Local No. 231 Pension Fund*, 837 Fed. Appx. at 891 ("projections themselves are false and misleading when those projections are included as an estimate of the company's future performance.").

Defendants also repeatedly reaffirmed the 2021 IPO Forecasts before and after the IPO. *See* ¶¶120-39 (2021 IPO Forecasts published on November 20, 2020, December 2020, at a J.P. Morgan Healthcare Conference in January 2021, during a corporate presentation in March 2021, in a May 2021 press release and during Butterfly's August 2021 earnings call). Defendants' assurances and repeated reaffirmations clearly demonstrate that the 2021 IPO Forecasts were included in the S-4 to induce investor reliance on the forecasts and secure desperately needed cash from the IPO. Further, while the 2021 IPO Forecasts are forward-looking, they are actionable because the purported risk that Butterfly may not meet them had materialized and Plaintiffs have alleged Defendants' actual knowledge the forecasts lacked any reasonable basis. *Dickinson*, 2022 WL 3273879, at *190 (the risk was manifest "whether or not the risk yet impacted the Company's bottom line.") *See also* Section I.D., *infra*.

The cases Defendants rely on support Plaintiffs' position. For example, in *OFI Asset Mgmt.*, 834 F.3d 481 and *Laborers Local No. 231 Pension Fund*, 837 Fed. Appx. at 891, projections in the proxy statements were purportedly issued, "solely to provide shareholders with the same information that had been provided to [management]" and their accuracy disclaimed, referring to them as "aspirational," "outdated" and not "predictive of actual future events." *OFI* at 488, 501, *Laborers Local*, 837 Fed. Appx. at 891. In contrast, Butterfly's projections were issued as management's best

16

estimate of Butterfly's future performance (¶¶126-29, 228-29) and the November 20, 2020 Investor Presentation was provided, in part, "to assist interested parties in making their own evaluation with respect to the proposed business combination []." Investor Presentation at 2. Further, Defendant Fruchterman told analysts in the November 15, 2021 Earnings Call that the 2021 IPO Forecasts were intended to be something of value *to investors*, referring to them as the "***annual guidance provided by prior management 1 year ago***" that Defendants were now revising downward. ¶132.

Defendants' fraud by hindsight argument (DB at 14-15) misstates the SAC. Plaintiffs allege that, at the time of the IPO (and throughout the Class Period), Defendants failed to disclose that Butterfly's Probes lacked essential enterprise functionality and, thus, its current pipeline had no viable enterprise sales. CWs 1, 3, 4 and 5 further confirmed that the Enterprise Customer sales cycle typically takes at least one year (or more) due to lengthy vetting processes. Further, it takes at least one year to develop new enterprise software functionality, as evidenced by the fact that it was not until February 28, 2022—one year after the IPO—that Butterfly finally introduced its enterprise software. ¶357. Therefore, *at the time of the IPO*, it was impossible for Butterfly to achieve the 2021 IPO Forecasts— regardless of whether the Company received cash from the IPO. Defendants' argument erroneously presumes that they were free to disseminate forecasts untethered from reality, while ignoring the Probe's lack of critical functionality, Butterfly's lack of sales force, its failure to penetrate the enterprise market, and the time it takes to develop enterprise software and complete the enterprise sales cycle.

### D. Plaintiffs Adequately Allege that the Inventory and Purchase Commitment Misrepresentations were Materially False and Misleading

Defendants misleadingly described Butterfly's future write-offs as merely possible, rather than a certainty. For example, Defendants asserted in the S-4 (¶¶231, 286):

> **If Butterfly does not adequately predict market demand or otherwise optimize and operate its sales and distribution channels successfully, it could result in excess or insufficient inventory or fulfillment capacity, increased costs, or**

17

**immediate shortages in product or component supply, or harm Butterfly's business in other ways.**

The above statement was false and misleading because, at the time Defendants published the S-4, due to Butterfly's significant, *non-cancelable purchase commitments*, Butterfly effectively had excess inventories it would never be able to sell before it became obsolete and would need to be written off. Thus, Butterfly did not adequately predict demand and the purported risk had already materialized. *Dickinson*, 2022 WL 3273879, at *190 (risk manifest "whether or not the risk yet impacted the Company's bottom line."); *In re Enzymotec Secs. Litig.*, 2015 U.S. LEXIS 167403, at *11 (D.N.J. Dec. 15, 2015) (cautionary language insufficient where "risks had already come to pass and that it was therefore unreasonable to make generalized warnings when Defendants knew, or should have known, of the specific regulations and their likely effect").

Indeed, at the time of the IPO, Butterfly had a $169 million inventory purchase commitment that had to be purchased by December 31, 2022. CW4 reported that throughout CW4's tenure, Butterfly *had never experienced sufficient demand* to sell the amount of inventory the Company had committed to purchase before it became obsolete. ¶¶94, 105. As discussed in Section II, *supra*, Butterfly never had annual sales exceeding $46 million. Moreover, there were insufficient deals in the pipeline and Butterfly's hardware would become obsolete within just two years—well before Butterfly could generate sales sufficient to cover its purchase commitments. Importantly, at the time of the IPO, Butterfly's software did not include enterprise functionality and CW4 confirmed that demand among non-enterprise customers was insufficient to sell the $169 million of inventory Butterfly had committed to purchase before it would become obsolete. ¶106. Thus, Butterfly's future write-offs for obsolete inventory were not a contingent risk but guaranteed. *Dickinson*, 2022 WL 3273879, at *190. In *Dickinson*, the court found that even though the FDA had not yet placed a hold on sales of the medical device, Alaris, and sales were not yet impacted, the risks had materialized because the company was

18

on notice that the FDA intended to put a hold on the product and it would take months to rectify the issue, explaining "the risk that Alaris faced imminent delays was manifest, whether or not the risk yet impacted the Company's bottom-line." *Id.* Like in *Dickinson*, future inventory write-offs were "manifest" because Butterfly's purchase commitments were far greater than existing demand, "whether or not that risk yet impacted the Company's bottom-line." *Id*. The inventory misrepresentations were also false by omission because they failed to disclose that the $169 million purchase commitment had to be purchased by December 31, 2022—*within just two years*. ¶92. *See also* Section II., *supra*.

The cases Defendants rely on are easily distinguishable and actually support Plaintiffs' position. For example, in *Williams*, the defendant warned that if an independent distributor ceased doing business with the company "our sales could be adversely affected." *Williams*, 869 F.3d at 238. Because the plaintiffs only alleged the termination of a distributor, but not that it had an adverse effect on sales, the alleged misstatement was not actionable as the risk warned of had not materialized. *Id.* at 242-43. Unlike *Williams*, Plaintiffs allege that the risk warned of—the potential for excess inventory, inventory write-downs or write-offs, and obsolescence (¶¶231, 233, 235, 286, 288)—had already materialized because Butterfly's sales pipeline was insufficient to allow Butterfly to sell all of its $169 million purchase commitment before the inventory became obsolete. ¶¶92-94. In fact, Butterfly had already written off millions of dollars of inventory, at an accelerating rate, prior to the IPO. ¶94.  In *Harman*, the defendants contended their disclosure that "inventories . . . had grown substantially," coupled with warnings about the competitive European market, implicitly warned about the risk of inventory obsolescence. *In re Harman Int'l Ind., Inc. Sec. Litig.*, 791 F.3d 90 (D.C. Cir. 2015). Rejecting this argument, the D.C. Circuit found that, as here, "[r]eferences to amassed inventory did not convey that inventory was obsolete," and the risk warnings were insufficient because they

19

purported to "warn of actual obsolescence that had already manifested itself." *Id.* Like in *Harman*, Butterfly's risk warnings were insufficient because the risks warned of had already "manifested."

**Defendants' Purported Cautionary Language is Insufficient**. The PSLRA safe harbor only protects forward-looking statements that are accompanied by meaningful cautionary language, or for which plaintiff fails to establish that the defendants had actual knowledge that the statement was false. 15 U.S.C. § 78u-5(c).  Defendants' purported cautionary language is insufficient because it is vague and not tailored to the specific risks being warned about, the risks had already materialized and Defendants knew their statements were false when made.

"To suffice, the cautionary statements must be substantive and *tailored to the specific* future projections, estimates or opinions […] which the plaintiffs challenge." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) (citation omitted). None of the purported cautionary language that Defendants identify contains language tailored to their misstatements or even mentions that due to non-cancelable purchase commitments, deficient software, or a lack of enterprise sales, Butterfly was at risk of being overstocked and unable to sell its inventory before it became obsolete. Defendants do not demonstrate otherwise. *See, e.g.,* DB at 23-24 (describing vague risks pertaining generally to "product development activities" and "size and growth potential of the markets."). Instead, Defendants' purported "cautionary language"—*e.g.*, DB at 23 (S-4 cautioned that forward-looking statements "are inherently subject to risks, uncertainties and assumptions")—is more akin to the general language in *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 644-45 (D.N.J. 2021) (warning of "known and unknown risks, uncertainties, assumptions and other factors") that the court found was "too blanket or vague to constitute meaningful cautionary language." *See also In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, *14-15 (D.N.J. Apr. 27, 2017) (warnings relating to changes in accounting principles not tailored to alleged manipulations).

20

Defendants' proffered cautionary language is also insufficient because the risks being warned of had already materialized—Butterfly's deficient software resulting in a lack of enterprise sales made it a foregone conclusion Defendants would be unable to sell Butterfly's excessive inventory balance (inventory on hand plus non-cancelable purchase commitments) before it became obsolete and had to be written off. *Toll Bros.*, 2008 WL 4058690, at \*3. Finally, as set forth *infra* (Section III.B.), Defendants made the statements with knowledge of their falsity. 15 USCS § 78u-5(c)(1)(B); *Carmignac Gestion, S.A.*, 2019 WL 3451523, at \*12-13.

## II.     The SAC Adequately Alleges Claims Under Section 11 of the Securities Act of 1933

"Section 11 imposes near-strict liability for untruths and omissions made in a registration statement." *Obasi Inv., Ltd. v. Tibet Pharm., Inc.*, 931 F.3d 179, 182 (3d Cir. 2019). "A *prima facie* case under §11 is straightforward, requiring only a showing of a material misrepresentation or omission from a defendant's registration statement." *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 782 (3d Cir. 2009). Unlike fraud cases brought under §10(b) of the Exchange Act, a §11 plaintiff need not allege scienter, reliance, or loss causation. *See id.* at 782-783. As stated in Sections I.A.–I.D., *supra*, Plaintiffs have alleged that the S-4, and documents incorporated by reference, contained materially false statements.[5] *See also* Exhibit 1. While Defendants assert that Plaintiffs lack standing (DB at 6 n.3), they acknowledge their argument lacks merit under Third Circuit law[6] and the Court already decided

---

[5] Contrary to Defendants' argument that because Fruchterman was not employed at Butterfly when the original S-4 was filed he cannot be liable for the alleged false statements (DB at 27, n.6), the Securities Act states that liability may attach to "every person who, with his consent, is named in the registration statement as being ***or about to become a director, [or] person performing similar functions.***" 15 U.S.C. § 77k(3), "Civil liabilities on account of false registration statement"[.] As Fruchterman consented to becoming a director (¶22) and had been a director of old Butterfly since January 2021, he was thereby "consenting to" and "performing similar functions," and is liable.

[6] "Because Plaintiffs have alleged that they have purchased 'in' or 'traceable to' the [] offerings, Plaintiffs have plead standing sufficiently at this motion to dismiss stage." *In re Suprema Specialties, Inc. Sec. Litig.*, 334 F. Supp. 2d 637, 649 (D.N.J. 2004); *See also* ¶¶18-20.

at the pre-motion conference that Plaintiffs adequately pled standing at this stage in the litigation.

## III.   The Complaint Adequately Alleges Claims under Section 10(b) of the Exchange Act

To state a claim for securities fraud under §10(b) and Rule 10b-5, plaintiffs "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (citation omitted). Defendants challenge only the elements of material misrepresentation or omission and scienter.[7]

### A.   The Complaint Adequately Alleges Materially False and Misleading Statements

As stated in Sections I.A.–I.D., *supra*, Plaintiffs have alleged that the Defendants published materially false and misleading statements and omitted material facts in connection with the purchase or sale of Butterfly stock. A detailed table of the false and misleading statements and omissions is attached hereto as Exhibit 1. Accordingly, the SAC adequately pleads the material falsity element of a securities fraud claim arising under §10(b) of the Exchange Act.

### B.   Plaintiffs Adequately Allege that Defendants Acted with Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 267 (3d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)). Scienter is adequately alleged when a plaintiff demonstrates defendants "knew facts or had access to information suggesting that their public statements were not accurate." *McCullough v. Advest, Inc.*, 754 F. App'x 109, 113 (3d Cir. 2018). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun genre,' or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights*,

---

[7] Accordingly, while Plaintiffs address only the elements of falsity and scienter here, they maintain the SAC sufficiently pleads all elements of the claims asserted.

22

*Ltd.*, 551 U.S. 308, 324 (2007) (citations omitted). Rather, it need only be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314 (2007). Reckless conduct is also sufficient to establish scienter. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) (A reckless statement is one "which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.").

Applying a holistic scienter analysis, as the Court must do, Plaintiffs' scienter inference—that Defendants were motivated to issue false statements to support inflated forecasts and obtain desperately needed funds to develop functionality to expand into the enterprise market—is as compelling as Defendants' opposing inference—that the S-4 was "intended to give investors an optimistic, but prudently-realistic, perspective" of the business combination. DB at 30.

**Defendants' Admissions Create a Strong Inference of Scienter.**    Defendants admitted on February 28, 2022, a full year after the IPO, that, despite telling investors Butterfly's software "provides a complete solution" that "can integrate seamlessly into large health care systems" (¶¶212, 220) resulting in a purported strong pipeline of Enterprise Customers, Butterfly, in fact, had no Enterprise Customers during the Class Period because the Probe lacked important functionality:

> Today, as mentioned in our press release, ***we officially bring that solution to market***. Butterfly Blueprint represents our comprehensive offering that includes hardware, Compass software and services, specifically designed to support health care institutions to achieve enterprise-wide imaging from the bedside and encounter-based workflow across multiple care disciplines and settings…. (2/28/22, Defendant Fruchterman)

¶357. As UBS noted in its February 28, 2022 report, "BFLY announced its ***first enterprise wide deployment***." ¶362. Then, on November 3, 2022, Defendant Fruchterman admitted that up until November 2022, Butterfly's software had been "lagging" and Butterfly had "spent the last year investing heavily in the development of our software solutions[.]" ¶366. Defendants admit in their own Motion that Butterfly's ultrasound Probe was an "unfinished product" that was still "a work in progress" throughout the Class Period. DB at 10. Defendants' admissions create a strong inference of

23

scienter. *S. Ferry LP # 2 v. Killinger,* 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (finding scienter where defendant admitted "we did not complete integration"); *In re Heckman Corp. Sec. Litig.,* 869 F. Supp. 2d 519, 539 (D. Del. 2012) ("admissions alone show that defendants were aware, and chose not to disclose, information that a reasonable shareholder would like to know").

**Receipt of Contradictory Internal Company Reports and Information Received from Attendance at Company Meetings Supports Scienter.** According to CWs 2, 3 and 5, Defendants were responsible for, and did approve Butterfly's forecasts, including the 2021 IPO Forecasts. ¶¶142, 305. *Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1167 (D. Ariz. 2005) ("strong" scienter inference where defendants "personally directed" fraudulent activity); *In re Veritas Software Corp. Sec. Litig.*, 2006 WL 1431209, at *9 (D. Del. May 23, 2006) ("Allegations that defendants participated in the drafting, preparation, and/or approval of public representations complained of adequately alleges scienter.").

Further, Butterfly stated in the S-4 that the 2021 IPO Forecasts would be achieved from Butterfly's purported enterprise sales pipeline. ¶240. According to CWs 2, 3 and 4, Butterfly had not been able to sell to Enterprise Customers because the software was still in a proof-of-concept phase and lacked critical functionality that Enterprise Customers required. ¶¶107-10, 140, 150, 156-61; *see also* Section I.A., *supra*. Defendants were aware (or recklessly disregarded) through their receipt of internal weekly and monthly reports, that the 2021 IPO Forecasts were overstated by at least 20% because Butterfly had no enterprise sales due to its Probes' lack of functionality, as evidenced by:

- CW3 stated that throughout CW3's employment, Defendants Fielding and Fruchterman and Jan Grimm, Chief Revenue Officer, received by email a monthly reporting package with detailed Excel spreadsheets reporting on sales by Probe, channel and region, distributed by either Defendant Fielding or a Director reporting to Fielding and that these reports showed Butterfly's sales pipeline was insufficient to achieve the 2021 IPO Forecasts. ¶305.

- CW4 stated that Jan Grimm (CRO) created a report that Grimm provided to Defendants Fielding and Fruchterman on a weekly basis containing sales pipeline data, by state, region and sales representative. ¶¶307-08. CW4 stated that these reports derived from Salesforce showed the 2021 IPO Forecasts were unachievable and overstated by at least 20%, recalling a deal with Atrium reporting more than 700 Probes but where it only sold 70. ¶¶144, 150, 154.

24

Defendants' receipt of detailed reports contradicting their public statements demonstrates scienter. *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Swanson*, 2011 WL 2444675, at *12 (D. Del. June 14, 2011) (defendants' "access to sales data and internal reports" contradicting their public statements supports scienter); *In re Par Pharm. Sec. Litig*., 2009 WL 3234273, at *4 (D.N.J. Sept. 30, 2009) ("daily reports" containing pertinent information "distributed to Par's senior executives" evidence of scienter); *Curran v. Freshpet, Inc*., 2018 WL 394878, at *4–5 (D.N.J. Jan. 12, 2018) (same).

Moreover, in the Third Circuit, a finding of recklessness can be "based on [defendants'] ***mere 'access* to information'** in contradiction to their public statements." *In re Innocoll Hldgs Pub. Co. Secs. Litig.*, 2020 WL 1479128, at *12 (E.D. Pa. Mar. 25, 2020) (scienter pled based on defendants' access to FDA database contradicting their public statements); *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("access to information contradicting their public statements[,]" supports scienter); *In re Ikon Office Sols., Inc. Sec. Litig*., 66 F. Supp. 2d 622, 631-33 (E.D. Pa. 1999) (same). It "is unnecessary to read in an additional requirement that Plaintiffs must explicitly plead that Defendants examined or considered the information available to them." *Innocoll*, 2020 WL 1479128, at *12. Here, Defendants' access to Salesforce, as confirmed by CWs 2, 3, 4 and 5, would have alerted them that Butterfly lacked Enterprise Customers and sales leads needed to achieve the 2021 IPO Forecasts, further supporting their scienter. *See, e.g.*, ¶¶146-49; Section I.C., *supra*.   Defendants' scienter is also supported by CW3 and CW5's accounts that it was widely known throughout Butterfly that the 2021 IPO Forecasts were "unattainable" because they were based on arbitrary growth rates unconnected to the pipeline that "***nobody*,**" including Butterfly's management, took seriously. ¶¶140, 142. *In re Toronto-Dominion Bank Secs. Litig.*, 2018 WL 6381882, at *13 (D.N.J. Dec. 6, 2018) (finding scienter where improprieties were "widely known within" company) (citing *Cornwell v.*

25

*Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) ("widespread knowledge…of problems with valuation, risk management and internal controls" supported scienter)).

CW3 stated that in May or June 2021, Defendants Fielding and Fruchterman instructed CW3 to revise the 2021 IPO Forecasts downward to reflect shortfalls in enterprise sales and losses on excess inventory. ¶¶13, 183. Yet, Butterfly reaffirmed the 2021 IPO Forecasts in the August 13, 2021 press release—***an alleged false statement Defendants do not challenge in their Motion***. *See* I.C., *supra*. *See also Swanson*, 2011 WL 2444675, at *7-8 (contradictory internal reports supports scienter).

Defendants were also aware of demand and sales shortfalls as a result of the Probes' lack of enterprise functionality because these issues were discussed at internal Company meetings that the Defendants Fielding and/or Fruchterman attended, including: (i) sales team meetings every three weeks with CW2 throughout CW2's tenure (¶¶311-12); (ii) forecast meetings that CW3 attended with Defendants Fielding and CEO Fruchterman, discussing the need to lower Butterfly's 2021 IPO Forecasts due to shortfalls in Enterprise Customer sales (¶313); and (iii) monthly "all hands" meetings during which Defendant Fruchterman discussed Butterfly's sales goals and its difficulty achieving them (¶314). CW4 further reported that throughout 2021, CW4 attended weekly sales meetings every Friday wherein they discussed that Butterfly was consistently falling short of the 2021 IPO Forecasts and that, for each deal in Salesforce, Grimm reviewed "every detail to the nth degree" because Grimm had to then report the results at weekly meetings with Defendants. ¶313. Where, as here, Defendants "personally attended meetings" where pertinent issues were discussed, scienter is satisfied. *Swanson*, 2011 WL 2444675 at *2, 7-8 (defendants' attendance at company meetings regarding alleged fraud supports scienter); *In re Lattice Semiconductor Corp. Sec. Litig.,* 2006 WL 538756, at *14-15 (D. Or. Jan. 3, 2006) (same).

Defendants' entire argument rests on a misstatement of Third Circuit law and disregards the

26

alleged facts. As discussed above, Plaintiffs have alleged the "who, what, when, where and how." Nothing more is required. *Swanson*, 2011 WL 2444675, at *6-7. Still, Defendants demand more, relying almost exclusively on out-of-circuit cases. DB at 26.[8] Moreover, Defendants' contention that the CWs lack first-hand knowledge because none interacted with Defendants is false, as CWs 2, 3 and 4 each attended meetings with Defendants where Butterfly's sales shortfall was always discussed.

**Statements in Response to Analyst Questions Support Scienter**. During a March 29, 2021 Earnings Call in which one analyst asked whether Butterfly was "rapidly scaling up" its Enterprise Customer base, defendant Fruchterman responded "[t]here's ***strong demand*** in enterprise right now for Butterfly, not only as a unique ultrasound device, ***but for our total solution*** too" (¶ 291) indicating his "personal knowledge" of enterprise demand and the Probe's lack of enterprise functionality. Numerous courts have held that a defendant's response to pointed analyst questions, as here, supports scienter. *See, e.g.*, *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (finding scienter where defendant replied to analyst questions that the trends were strong or similar to previous successful quarters) (citing *Avaya, Inc.*, 564 F.3d at 269).

**Defendants' IPO Diligence.** Defendants provided Longview with extensive and detailed due diligence through documents and "extensive meetings …and calls with Butterfly's ***management team***

---

[8] Defendants' cases are distinguishable because, unlike here, the plaintiffs in those cases failed to allege the defendants were aware of the reports, the contents of the reports or how the reports contradicted defendants' public statements. *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014) (no scienter where plaintiff alleged defendants "mere access to reports" without identifying the "actual contents of the reports" or "link[ing] specific reports and their contents to the executives"); *In re Shengda Tech., Inc. Sec. Litig.*, 2014 WL 3928606, at *8 (S.D.N.Y. Aug. 12, 2014) (no scienter where plaintiffs did not allege defendant received the reports or was aware of them); *In re Boston Scientific Corp. Sec. Litig.*, 2011 WL 4381889, at *14-15 (D. Mass. Sept. 19, 2011) (no scienter where plaintiff alleged defendant had access to online computer system but failed to allege how the data was false); *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858 (N.D. Ill. 2011) (defendants' access to systems insufficient where plaintiff did not allege what contradicting facts defendants should have learned from the system and when).

regarding operations, *financial prospects*, customers, sales and marketing strategy, [and] its *product pipeline*…." ¶¶326-28. Such diligence materials included, *inter alia*: (i) "the ability of Butterfly to sell into large enterprises and associated integration challenges" (¶327); (ii) "the ability of Butterfly to meet its financial projections" (*id.*); and (iii) "Butterfly's ability to demonstrate the value of its technology to existing and potential users and its ability to integrate into and add value to large healthcare enterprise systems" (¶328). CWs confirmed that Butterfly's pipeline in Salesforce showed at the time of the IPO that the 2021 IPO Forecasts were overstated by 20% (or more) and had no viable enterprise deals. Thus, Plaintiffs plead far more than the "mere fact" due diligence was conducted, as Defendants wrongly contend. DB at 28. Rather, Plaintiffs allege the specific diligence materials Defendants provided, the detailed topics of the diligence and that Defendants, as part of management, participated.

That Defendants provided detailed diligence materials relating to the alleged fraud further supports their scienter. *Strougo v. Mallinckrodt Pub. Ltd. Co.*, 2022 WL 17740482, at *8 (D.N.J. Dec. 16, 2022) (allegations that defendants provided due diligence in acquisition "suggest that at the very least, these individual Defendants had access to information…, which can support a finding of recklessness") (*citing In re Valeant Pharms. Int'l Inc. Sec. Litig.*, 2017 WL 1658822, at *8 (D.N.J. Apr. 28, 2017) (finding scienter where allegations included defendants' due diligence)). Defendants' out of circuit cases are distinguishable because the plaintiffs in those cases, unlike here, failed to identify the specific diligence materials provided or what information they conveyed.[9]

**<u>Core Operations.</u>** Butterfly's main source of revenue is the sale of Probes, accounting for

---

[9] *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Hldgs. Corp.*, 2021 WL 212337, at *9 (S.D.N.Y. Jan. 21, 2021) (scienter insufficient where plaintiff failed to "specifically identif[y] the reports" or allege defendant attended meetings or had access to documents); *Manufacturers Life Ins. Co., v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2000 WL 709006, at *4, n.5 (S.D.N.Y. June 1, 2000) (no scienter where plaintiff did not identify information received in due diligence); *Deutsche Zentral-Genossenchaft AG v. HSBC N. Am. Hldg, Inc.*, 2013 WL 6667601, at *19 (S.D.N.Y. Dec. 17, 2013) (same).

more than 80% and 75% of sales in 2020 and 2021, respectively. ¶324. As the Probes were Butterfly's core business, it would be absurd to suggest Defendants were unaware the software lacked critical functionality resulting in a lack of enterprise sales or that inventory growth was far outpacing demand. *See In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801, at *17 (D.N.J. Aug. 28, 2017) ("It seems implausible that [the CEO and CFO] were not paying close attention to the results of the company's most critical clinical trial for their most important drug."); *In re CommVault Sys., Sec. Litig.*, 2016 WL 5745100 (D.N.J. Sept. 30, 2016) (imputing knowledge of fraud concerning core business).

**Departures of Faracci and Numerous Executives Support Scienter.** Despite Butterfly proclaiming in its November 20, 2020 press release that "Butterfly's management team, led by Chief Executive Officer, Laurent Faracci, will continue to lead the combined company following the transaction" (¶316), on January 23, 2021, just three days before filing the Defective Proxy/Registration Statement, Faracci unexpectedly resigned, according to CW1, after being unable to renegotiate the TSMC contract to reduce unattainable inventory purchase commitments. ¶320. The timing of CEO Faracci's departure is suspicious and demonstrates Faracci knew the 2021 IPO Forecasts were overstated and would have made this known to Defendants. *Roofer's Pension Fund*, 2018 WL 3601229, at *20 (executive resignation probative of scienter "given the timing […]"); *Ho v. Duoyuan Global Water, Inc.,* 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012).

**Defendants Needed the IPO Proceeds to Fund Development of Critical Functionality.** According to CW4, Butterfly could not fund development of its Probes without the IPO proceeds. ¶160. Thus, Butterfly's long-term viability was in jeopardy unless it could maximize proceeds from the IPO to fund development of the functionality Enterprise Customers required. Defendants admit as much in their Motion. DB at 9, 15. Defendants were, therefore, motivated to make the alleged misstatements to support an inflated IPO valuation and raise the capital needed to develop software

29

that would meet Enterprise Customers' requirements. *See, e.g., Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) (scienter alleged where defendant was "sufficiently short on cash at the time of the alleged misrepresentations that it could not afford to finance an additional clinical trial"); *Skiadas v. Acer Therapeutics, Inc., et. al.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) (motive pled where the company needed to fundraise to survive).

## IV.    The Complaint Adequately Pleads Claims under Section 14(a) of the Exchange Act

To state a claim under §14(a), a plaintiff must show that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 377 (D.N.J. 1999) (citing *General Electric Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992)). As set forth in Sections I.A.–I.D., *supra*, Plaintiffs have adequately alleged that Defendants published a proxy statement containing material misrepresentations and omissions, which caused the Plaintiffs' losses. Defendants do not challenge causation and never assert that they were not acting at least negligently. Moreover, as set forth above, Defendants' argument that the alleged misrepresentations *should be interpreted as forward-looking* lacks merit and is improper on a Rule 12(b)(6) motion to dismiss.

## V.    The Complaint Adequately Pleads Claims under Sections 15 and 20(a)

Because the SAC adequately pleads primary violations of §11, §10(b) and §14(a), it adequately alleges control person liability under §15 of the Securities Act and §20(a) of the Exchange Act. *See In re Horsehead Holding Corp. Secs. Litig.*, 2018 WL 4838234, at *21 (D.N.J. Oct. 4, 2018).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety.

DATED: June 23, 2023                    Respectfully submitted,
                                        **LEVI & KORSINSKY, LLP**

30

*/s/ Eduard Korsinsky*
Eduard Korsinsky
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 992-4523
Fax: (212) 363-7171
ek@zlk.com

Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
David C. Jaynes (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
djaynes@zlk.com

*Counsel for Plaintiffs and the Class*

31