**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CRAIG M. ROSE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORP., TODD M. FRUCHTERMAN, STEPHANIE FIELDING, JONATHAN M. ROTHBERG, JOHN RODIN, LARRY ROBBINS, MARK HOROWITZ, WESTLEY MOORE, DEREK CRIBBS, and RANDY SIMPSON,<br><br>Defendants. | Case No. 2:22-CV-00854-EP-JBC<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Motion Date: August 7, 2023<br><br>*Document Filed Electronically* |

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION**
**COMPLAINT**

Seth R. Goldman
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
919 Third Avenue
New York, NY  10022
Tel:  212-692-6845

i

srgoldman@mintz.com

John F. Sylvia (*admitted pro hac vice*)
Patrick E. McDonough (*admitted pro hac vice*)
Evelyn Limon (*admitted pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 348-1820
jfsylvia@mintz.com
pemcdonough@mintz.com
elimon@mintz.com

*Attorneys for Defendants Butterfly Network, Inc. f/k/a Longview Acquisition Corp., Todd M. Fruchterman, Jonathan M. Rothberg, John Rodin, Larry Robbins, Mark Horowitz, Westley Moore, Derek Cribbs, and Randy Simpson*

Jim Walden
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
Tel: 212-335-2030
jwalden@wmhlaw.com

*Attorneys for Defendant Stephanie Fielding*

Dated: July 24, 2023

ii

# TABLE OF CONTENTS

I.    The Second Amended Complaint ("SAC") Does Not Allege That Any Defendant Made An Actionably False Statement (Opp. at 7-21)........................1

    A.    The Alleged "Software Misrepresentations" Were Not Actionably False (Opp. at 8-13)...........................................................1

    B.    Opp. at 13-17: The "2021 IPO Forecasts" Were Not Actionably False.................................................................................3

    C.    Opp. at 17-21: The Inventory-Risk Disclosures Were Not Actionably False.....................................................................6

II.   Opp. at 22-30: The SAC Does Not Allege Sufficient Facts To Generate The Requisite Inferences Of Culpability. ............................................10

III.  Opp. at 21-22: The SAC Does Not Sufficiently Allege That Plaintiff's Purchases Of Butterfly Stock Are Traceable To The Form S-4. ......................14

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................6, 15

*Bldg. Trades United Pension Trust Fund v. Kenexa Corp.*, 2010 U.S. Dist. LEXIS 102729 (E.D. Pa. Sept. 27, 2010) ......................................................................3

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523 (D.N.J. July 31, 2019) .......................................................................................................................4

*De Vito v. Liquid Holdings Grp., Inc.*, 2018 U.S. Dist. LEXIS 217963 (D.N.J. Dec. 31, 2018) ............................................................................................... 14, 15

*Galati v. Commerce Bancorp, Inc.*, 220 Fed. Appx. 97 (3d Cir. 2007) ...................3

*Gooley v. Mobil Oil Co.*, 851 F.2d 513 (1st Cir. 1988) ............................................7

*In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519 (D. Del. 2012) .......... 12, 13

*In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir. 2006) ................15

*Inst. Investors Grp. v. Avaya*, 564 F.3d 242 (3d Cir. 2009) ..................................8, 9

*OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016) ...............3

*Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621 (D.N.J. 2021) .....................8, 9

*Slayton v. American Express Co.*, 604 F.3d 758 (2d Cir. 2010)............................6, 7

*South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248 (W.D. Wash. 2009 ............14

*Vitalone v. Logitech Int'l*, 2012 U.S. Dist. LEXIS 204503 (N.D. Cal. July 13, 2012) .......................................................................................................................3

The Defendants submit this memorandum in reply to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Opp.").

## I.   The Second Amended Complaint ("SAC")[1] Does Not Allege That Any Defendant Made An Actionably False Statement (Opp. at 7-21).

### A.   The Alleged "Software Misrepresentations" Were Not Actionably False (Opp. at 8-13).

The alleged "software misrepresentations" are not actionable because the statements at issue reflected Butterfly's plans and intentions. They did not purport to represent existing conditions at the time of the proposed business combination, and thus were not rendered false by allegations that the *current* state of the company or its products was not as advanced as its *future* expectations. Memorandum in Support of Defendants' Motion to Dismiss ("MTD" [ECF 75-2]) at 6-10.

In search of statements in the Form S-4 that arguably described Butterfly as of early 2020, Plaintiffs focus on a graphic captioned "Healthcare Institutions to Drive Adoption at Scale: Strong initial adoption, excitement, and momentum." Opp. at 10, 12. This graphic, however, *did not appear in the Form S-4*. It comes from what Plaintiffs call "the November 20, 2020 Investor Presentation," which Butterfly filed with the SEC on that date. SAC, ¶237. The claim that the Presentation was "incorporated into the S-4 by reference," Opp. at 10, is belied by Form S-4 itself.

---

[1] References to the SAC are in the form "¶--." Documents attached to the Declaration of John F. Sylvia are referenced as "Ex. –."

In any event, even a glance at the context shows that the "Healthcare Institutions" graphic supports the Defendants' position. *See* Declaration of John F. Sylvia, Ex. A at 30 (Butterfly Investor Presentation, November 20, 2020). It did not purport to illustrate Butterfly's then-current capabilities. It was the fifth in a series of slides, *id.* at 27-31, that expressly described Butterfly's "[f]ocus on *expansion into new settings* beyond legacy market with large addressable populations[.]" *Id.* at 27 (emphasis added). The slides that followed, including the one at issue, discussed both *how* Butterfly would try to achieve this expansion (e.g., through "[r]apid innovation," *id.* at 28) and *where* the expansion would occur (in "E-Commerce for Individual Practitioners and Early Adopters," in "the Home Market," and in "Healthcare Institutions," *id.* at 29-31). Thus, when the Healthcare Institutions graphic spoke of "[s]trong initial adoption, excitement, and momentum" in the institutional market, *id.* at 30, it described the conditions that Butterfly hoped and expected to *achieve* as part of its future "expansion" into this "new setting."

Plaintiffs also contend that there is "no room for Defendants' arguments that the statements are forward-looking" in allegations about the "demand" for Butterfly's products, and about the "opportunities" for the company in the marketplace. Opp. at 10-11, 13. Here Plaintiffs are wrong for a different reason. The statements they cite are "classic examples" of "puffery": statements of general corporate optimism that are too vague to sustain a securities-fraud claim. *Bldg.*

2

*Trades United Pension Trust Fund v. Kenexa Corp.*, 2010 U.S. Dist. LEXIS 102729, at \*47 (E.D. Pa. Sept. 27, 2010) ("strong" demand and "solid" growth); *see also Galati v. Commerce Bancorp, Inc.*, 220 Fed. Appx. 97, 102 (3d Cir. 2007) ("dramatic ... growth" and "strong performance"); *Vitalone v. Logitech Int'l*, 2012 U.S. Dist. LEXIS 204503, at \*18 (N.D. Cal. July 13, 2012) (cases have "routinely" attached the "puffery" label to positive statements about consumer demand).

**B.    Opp. at 13-17: The "2021 IPO Forecasts" Were Not Actionably False.**

The Third Circuit's decision in *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016), vitiates the Section 11 and 14(a) claims, which are predicated on alleged inaccuracies in the "2021 IPO Forecasts" in the Form S-4. Butterfly had given those forecasts to Longview's directors when they considered the potential business combination in 2020, and Butterfly explained to investors that they had been included in the Form S-4 only to show what the Board had previously seen. But, the Form S-4 warned, the forecasts had not been audited, they were "not fact" or "a guarantee of future performance," and they had not been included in the Form S-4 to influence shareholders' votes. MTD at 11-13. Thus, the forecasts were exactly like the financial projections in *OFI Asset Mgmt.*, which the Third Circuit held were not actionable because they had not been "included as statements of fact." *Id.* at 13 (quoting *OFI Asset Mgmt.*, 834 F.3d at 501).

3

Unable to overcome this obstacle, Plaintiffs try an end-around. They argue (1) that the November 2020 Investor Presentation contained similar forecasts, but no such disclaimers, and (2) that the Investor Presentation was "incorporated by reference into the S-4." Opp. at 15.

As the Court has seen, however, the premise for this argument—the suggestion that the Investor Presentation was incorporated into the Form S-4—is wrong. The Form S-4 speaks for itself: the Investor Presentation slides themselves appeared nowhere in it, *see* ECF 72-5, and insofar as the Form S-4 contained financial forecasts similar to the projections that had previously been included in the Investor Presentation, the information in the Form S-4 was embedded in the disclaimers discussed above, and was explicitly linked to those disclaimers in the text. *See id.* at 112. The SAC could not and does not allege otherwise. To the contrary, it says that the Presentation was published separately, as an attachment to a Form 8-K that Butterfly filed with the SEC back in November 2020. SAC, ¶126.

Moreover, even if their premise *was* correct, Plaintiffs' argument is illogical. If the Investor Presentation had been incorporated into the Form S-4, then the financial information in the Investor Presentation would have been subject to the disclaimers contained in the Form S-4. Plaintiffs' own case law bears this out. *See* Opp. at 15 (citing *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *12 (D.N.J. July 31, 2019) (cautionary language need not directly accompany a

4

challenged statement as long as there is some effort to incorporate the cautionary language by reference into the challenged statement)).

Insofar as information similar to the 2021 IPO Forecasts may have been presented to investors in other communications "before and after the IPO," Opp. at 16, the Defendants have already explained (1) that such allegations have nothing to do with the Section 11 and 14 claims, which rise or fall solely on the contents of the Form S-4, (2) that statements made before the Class Period began in January 2021 also have nothing to do with the Section 10(b) claim, and (3) that Plaintiffs' theory is fatally flawed even with respect to statements made after the beginning of the Class Period, because the facts that Plaintiffs say are inconsistent with the projections all related to the condition of the company before the business combination with Longview, and thus suggested at most that the projections would have been inaccurate if the transaction had never occurred. MTD at 14-15.

Plaintiffs apparently have no response to these arguments; they do not even attempt to refute them. Instead, Plaintiffs try to change the subject, arguing that when the Defendants used the projections later in other settings, they "demonstrate[d] that the 2021 IPO Forecasts were included in the S-4 to induce investor reliance on the forecasts[.]" Opp. at 16. Plaintiffs' theory, in other words, is that statements made elsewhere—and as late as August 2021—*retroactively nullified* the disclaimers included in the Form S-4 back in January 2020. *See id.* The operation of this

5

mechanism is not explained, and the theory that depends on it should be disregarded under established pleading principles, which discount allegations that make a plaintiff's entitlement to relief merely "possible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007), and which therefore require the Court to disregard claims that rely on unexplained phenomena that somehow cause intention to travel backwards in time.

### C.    Opp. at 17-21: The Inventory-Risk Disclosures Were Not Actionably False.

The SAC alleged that several of the risk disclosures in the Form S-4 were misleading because the risks described therein had already "materialized." SAC, ¶¶231-36. All of the allegedly-materialized risks concerned Butterfly's inventory levels and, as Plaintiffs now put it, it all comes down to the notion that "Butterfly effectively had excess inventories it *would* never be able to sell *before* it became obsolete and *would* need to be written off." Opp. at 18 (emphasis added).

In Plaintiffs' own words, then, the problem was not that the risks of obsolescence had become matters of "historical fact." *Slayton v. American Express Co.*, 604 F.3d 758, 769 (2d Cir. 2010) ("materialized risk" claims depend on allegations showing that what defendants described as "risks" actually "were established at the time the statement was made"). It was that the risks *would* become facts over a period of time—apparently two years. *See* Opp. at 18 ("Butterfly's hardware would become obsolete within just two years").

6

There are two flaws with this argument. First, even Plaintiffs cannot articulate their theory of the claim in the present tense: they can say only that Butterfly had excess inventory it "would" not be able to sell "before" it became obsolete. Opp. at 18. As Plaintiffs themselves formulate it, the "risks" described in the Form S-4 were contingencies that "would" develop in the future, not facts that had already been "established at the time the statement was made." *Slayton*, 604 F.3d at 769, 770 (distinguishing between statements that characterize as risks "historical fact[s]" that "had already transpired," and statements that characterize as risks events that "would very likely" occur).

Second, the factual linchpin of Plaintiffs' position lacks support in the SAC. Plaintiffs have violated the cardinal principle that "representations in a brief are an impuissant surrogate for a record showing." *Gooley v. Mobil Oil Co.*, 851 F.2d 513, 515 n.2 (1st Cir. 1988). Their brief says that Butterfly's products "would become obsolete in just two years," and that the company "would never be able to sell" its inventory before that happened, Opp. at 18, but the first statement is not supported by any allegations in the SAC, and the second ignores the context in which the risk disclosures were made. The rate at which Butterfly "would" be able to sell off existing inventory depended, in large part, on whether the proposed business combination occurred, giving Butterfly a capital infusion that would fund its plans to build an enterprise sales force and achieve the expansion into new markets

7

described in the Investor Presentation. Predictions that the company "would never be able to sell" existing inventory at *historical* sales levels, therefore, are neither here nor there, and cannot render false risk disclosures that were based on the assumption that, if the transaction with Longview took place, Butterfly "would" be a very different company.

Plaintiffs commit much the same error, but come at it from a slightly different angle, when they argue that the risk disclosures did not qualify as "meaningful cautionary language" under the safe-harbor provisions of the PSLRA. Opp. at 20-21. Plaintiffs rely here on *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621 (D.N.J. 2021). They say that the Court in *Ortiz* found that a "warning of known and unknown risks, uncertainties, assumptions and other factors" was "too blanket or vague to constitute meaningful cautionary language." Opp. at 20. This misstates the holding in *Ortiz*, where the Court merely noted that the defendants' "general" cautionary statements "might be" too non-specific to satisfy the statutory requirement, 537 F. Supp. 3d at 644, but determined that it "need not reach" that issue because the general warnings had been "accompanied by more specific cautionary statements tailored to the very risks at issue. . . ." *Id.* at 645.

The District Court's holding in *Ortiz*, in other words, followed the Third Circuit's holding in *Inst. Investors Grp. v. Avaya*, 564 F.3d 242 (3d Cir. 2009), in which the Court ruled that the defendants' cautionary language was "meaningful"

8

because it provided both (1) a general warning that the company's financial projections might turn out to be wrong, and (2) a list of specific uncertainties which included the very risks—of price and product competition—that allegedly caused the company to miss its projections. *Id.* at 257.

The risk disclosures in the Form S-4 here were exactly like the cautionary statements deemed meaningful in both *Ortiz* and *Avaya* because they were both "extensive and specific," and because their specifics were "tailored" to, among other things, the very risks "which the plaintiffs challenge." *Id.* at 256. The risk disclosures in the Form S-4 were indisputably extensive: in total, they ran for almost fifty single-spaced pages. ECF 72-5 at 46-94. They were just as indisputably specific, enumerating and describing more than 90 categories of risk factors relating to (1) Longview and the merger, *id.* at 46-58, (2) Butterfly's financial condition, *id.* at 58-60, (3) Butterfly's business and operations, *id.* at 60-72, (4) healthcare industry shifts and changing regulations, *id.* at 72-85, (5) Butterfly's intellectual property, *id.* at 85-94, and (6) litigation. *Id.* at 94-95.

There can be no legitimate dispute, moreover, that several of these specific disclosures were tailored to the very risks at issue here. Butterfly included the risk of obsolete inventory in a separate bullet point in its introductory list of risk factors, *id.* at 35, then devoted five paragraphs to the issue under the bold-type heading: "**Medical device development is costly and involves continual technological**

9

**change, which may render Butterfly's current or future products obsolete.**" *Id.* at 60-61; *see also id.* at 68 ("The introduction of products and services embodying new technologies can quickly make existing products and services … obsolete"), 69 (same). The Form S-4 included additional disclosures that gave the contingent risks of future obsolescence a concrete historical basis: (1) it explained that "[t]he valuation of inventory also requires us to estimate excess and obsolete inventory," including "[l]osses expected to arise from firm, non-cancelable and unhedged commitments for the future purchase of inventory items," *id.* at 226; (2) it explained that an "inventory write down" of $2,570,000 in the company's calculation of adjusted EBITDA for the first three quarters of 2020 was "for excess and obsolete inventory resulting from a shift in product lines," *id.* at 214; and (3) it disclosed the charges actually taken in 2018, 2019, and the first three quarters of 2020 for inventory adjustments and excess and obsolete inventory charges. *Id.* at F-51, F-72. The notion that this cautionary language was too "general" to have meaningfully warned investors about the risk of obsolete inventory, Opp. at 20, defies both common sense and the standards articulated in *Avaya*.

**II.    Opp. at 22-30: The SAC Does Not Allege Sufficient Facts To Generate The Requisite Inferences Of Culpability.**

In large part, the sections of the Opposition dealing with culpability (i.e., scienter and actual knowledge), merely rehash the supposedly scienter-relevant allegations made in the SAC, ¶¶303-343, and discussed in the Motion to Dismiss.

*See* MTD at 25-30; *compare* SAC, ¶¶304-315, MTD at 26-27, and Opp. at 24-27 (internal reports and company meetings); SAC, ¶¶323-324, MTD at 27-28, and Opp. at 28-29 ("core operations"); SAC, ¶¶326-329, MTD at 28, and Opp. at 27-28 ("due diligence"); SAC, ¶¶316-322, 340-342, MTD at 28-29, and Opp. at 29 (executive turnover). Because the Opposition merely reiterates what Plaintiffs say in their complaint, and the Defendants have already refuted those allegations in the Motion to Dismiss, no reply is needed on these issues.

Apparently conscious of the inadequacy of the allegations the SAC advertised as indicative of scienter, Plaintiffs now bring into play a handful of assertions that they had previously identified as relevant only to a different element of their claims. The SAC alleged that "loss causation"—a distinct element of their Section 10(b) claim—was demonstrated by allegations (1) that Butterfly's stock price declined in February 2022 after Butterfly announced a new product called Butterfly Blueprint, SAC, ¶¶356-64, and (2) by another decline in the stock price after statements made by Dr. Fruchterman in November 2022. SAC, ¶¶366-369.

Casting about for *some* indicia of culpability to rescue their foundering claims, plaintiffs have now repurposed certain of the loss-causation allegations as "admissions" that Butterfly's products were not up to snuff at the time of the Longview transaction. For example, Plaintiffs now contend that when Dr. Fruchterman touted Butterfly Blueprint in February 2022 as a "comprehensive

11

offering ... designed to support health care institutions to achieve enterprise-wide imaging," SAC, ¶357, he was admitting that Butterfly's products had previously lacked such "important functionality." Opp. at 23. Likewise, Plaintiffs now maintain that when Dr. Fruchterman said in November 2022 that Butterfly had learned "that we were not where we needed to be in order to realize the full value of our technology," but had "spent the last year investing heavily in the development" of the company's new software products, SAC, ¶366, he was admitting that Butterfly had knowingly lied about the quality of its products back in January 2021. Opp. at 23-24. These "admissions," Plaintiffs maintain, support an inference that Dr. Fruchterman, if no other Defendant, acted with scienter during the Class Period.

The cases cited by Plaintiff do not support such a strained rationale. For example, the "admissions" at issue in *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519 (D. Del. 2012), provided direct evidence of the defendants' state of mind at the time of the alleged misstatements. *Heckmann* was a Section 14 case involving a merger between Heckmann Corp. and China Water and Drinks, Inc. After the merger, it came out that China Water's financial condition had been misstated as a result of undisclosed fraud and diversion of corporate assets. *Id.* at 529-30. The District Court held that the Section 14 complaint adequately alleged Heckmann's negligence when it recounted judicial admissions made by the defendants in parallel

shareholder litigation in state court, to the effect that they had become aware of China Water's financial fraud before the shareholder vote on the merger. *Id*. at 538.

Nothing of the sort happened here. The alleged "admissions" were not of the "I knew X on Y date" variety. Plaintiffs' reasoning, rather, is that subsequent *improvements* in a product demonstrate the prior *inadequacy* of that product, and that announcing improvements is tantamount to admitting prior intent to mislead investors. This is not just illogical, but bad policy. If "new and improved" means "old was inadequate, and we knew it," then any number of advertising campaigns— past and present—would be evidence of fraud. In any event, the "admissions" in this case are a far cry from the judicial admissions in *Heckmann*.

This case is distinguishable in another important way. The supposed "admissions" were not contemporaneous with the alleged misstatements, and thus could not directly reveal any defendant's state of mind at the relevant time. The alleged admissions were made by Dr. Fruchterman, who did not join Butterfly until late January 2021, shortly before the Form S-4 was issued and the Longview transaction took place. SAC, ¶22. The putative admissions, however, reflect only his knowledge about the quality of the company's products in February and November 2022—thirteen and twenty-two months later. They do not support a strong inference that he had anything like the same level of knowledge during his very first weeks on the job. *Cf. South Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248 (W.D. Wash.

13

2009), cited in Opp. at 24 (admissions about technological integration failures, made by CEO in September-October 2003 and July 2004, supported inference that he knew the status of integration efforts when company made positive statements about it during Class Period between April 2003 and June 2004). And, in any event, Dr. Fruchterman's statements say nothing whatsoever about Ms. Fielding's intent.

**III.   Opp. at 21-22: The SAC Does Not Sufficiently Allege That Plaintiff's Purchases Of Butterfly Stock Are Traceable To The Form S-4.**

Plaintiffs point out that "the Court already decided at the pre-motion conference that Plaintiffs adequately pled standing [to assert a Section 11 claim] at this stage in the litigation." Opp. at 21-22. Insofar as the Court's comments at a pre-motion conference constitute its "decision" on the matter, the Defendants respectfully ask the Court to reconsider in light of intervening Supreme Court precedent, which supersedes the Circuit precedent on which Plaintiffs relied.

"Statutory standing under Section 11 is ... confined to purchasers who acquired securities issued 'pursuant to' or 'traceable to' the specific offering documents that are alleged to be false or misleading." *De Vito v. Liquid Holdings Grp., Inc.*, 2018 U.S. Dist. LEXIS 217963, at *44 (D.N.J. Dec. 31, 2018). A given share in Butterfly, however, may be traceable to either of *two* registration statements: (1) the Form S-4 filed in connection with the Longview-Butterfly combination in February 2021, which allegedly contained false statements, and (2) the Form S-1 issued when Longview conducted its IPO in May 2020. SAC, ¶56.

14

Plaintiffs do *not* allege that the Form S-1 contained any false statements. In order to maintain the Section 11 claim, therefore, they need to plead and prove specifically that their shares were issued under the Form S-4. The SAC, however, alleges no facts from which traceability can be inferred. It merely asserts the naked conclusion that each Plaintiff "purchased or otherwise acquired Butterfly Class A common stock pursuant or traceable to the" Form S-4. SAC, ¶¶18-20.

At the pre-motion conference, the Court accepted Plaintiffs' contention that this rote allegation was sufficient under *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 274 n. 7 (3d Cir. 2006). That case, however, was decided before the Supreme Court held that a complaint may not merely recite "a formulaic recitation of the elements of a cause of action," *Twombly*, 550 U.S. at 555, and must plead "factual content" that renders the claim "plausible on its face," and raises liability above the level of a "sheer possibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Defendants urge the Court to follow the example of *De Vito*, in which the District Court (1) followed the post-*Iqbal/Twombly* reasoning of the First and Ninth Circuits, 2018 U.S. Dist. LEXIS 217963, at *48 (2) agreed with the defense that "*Suprema* is no longer good law," *id.* at *45, and (3) dismissed, for lack of standing, a Section 11 claim predicated on essentially identical, and equally conclusory, allegations of traceability. *Id.* at *49.

15

**Dated:** July 24, 2023                    Respectfully Submitted,


/s/ Seth R. Goldman

Seth R. Goldman
MINTZ,    LEVIN,    COHN,    FERRIS,
GLOVSKY AND POPEO, P.C.
919 Third Avenue
New York, NY  10022
Tel:  212-692-6845
srgoldman@mintz.com

John F. Sylvia (*admitted pro hac vice)*
Patrick E. McDonough (*admitted pro hac vice)*
Evelyn Limon (*admitted pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY
AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 348-1820
jfsylvia@mintz.com
pemcdonough@mintz.com
elimon@mintz.com


*Attorneys for Defendants Butterfly Network, Inc. f/k/a Longview Acquisition Corp., Todd M. Fruchterman, Jonathan M. Rothberg, John Rodin, Larry Robbins, Mark Horowitz, Westley Moore, Derek Cribbs, and Randy Simpson*


/s/ Jim Walden

Jim Walden
WALDEN MACHT & HARAN LLP
250 Vesey Street, 27th Floor
New York, New York 10281
Tel:  212-335-2030
jwalden@wmhlaw.com

16

*Attorneys for Defendant Stephanie Fielding*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 24, 2023, the foregoing Reply Brief in Further Support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint was filed electronically with the United States District Court for the District of New Jersey through the Court's ECF System, which constitutes service on all parties under Local Civil Rule 5.1.

**Dated**:  July 24, 2023

/s/ Seth R. Goldman
Seth R. Goldman

507708882v.3